# EXHIBIT 3



**Accelerated**
**Escrow Company**
*Specialists in business sale transactions*

*3030 S. Jones Blvd., Suite 105*
*Las Vegas, NV 89146*
*voice (702) 477-0021*
*fax (702) 868-8321*
*www.acceleratedescrow.com*

**SELLER'S CLOSING STATEMENT**
**Final**

**File No.:** 26-00077-JN
**Officer/Escrow Officer:** Joseph T Nold, Esq.

**Printed Date/Time:** 06/08/2026 - 7:42:08AM
Page    1  of 1
**Closing Date:** 05/08/2026

**Buyer:** Illusion Attractions LLC

**Seller:** Velocity Esports Las Vegas Town Square, LLC and Velocity Esports Inc

**Business Name:** Velocity Esports

**Property:** 6587 S Las Vegas Blvd, #171, Las Vegas, NV  89119

| DESCRIPTION | DEBITS | CREDITS |
|---|---|---|
| **TOTAL CONSIDERATION** | | 1,075,000.00 |
| **COMMISSION(S):** | | |
| Listing Broker: First Choice Business Brokers | 134,375.00 | |
| **ESCROW CHARGES TO: Accelerated Law Group Inc** | | |
| Escrow Fee Escrow Fee | 2,500.00 | |
| UCC Search | 630.00 | |
| Wire Fee | | |
| **TAXES:** | | |
| Miscellaneous Tax to: Nevada Department of Taxation TBD | 12,169.26 | |
| Property Tax to: Clark County Assessor TBD | | |
| **CREDITOR CLAIMS** | | |
| Creditor Claim: Pawnee Leasing Corporation | 101,000.00 | |
| Creditor Claim: Newtek Lending | 633,431.00 | |
| **ADDITIONAL DISBURSEMENTS:** | | |
| File Maintenance Fee: Accelerated Escrow Company | 250.00 | |
| Hold Back Broker Comm. Subject To BK Court Approval: First Choice Business Brokers | | |
| Hold Back Cred. Claim Subject To BK Court Approval: NFS Capital | 153,250.00 | |
| **SUBTOTALS** | 1,037,605.26 | 1,075,000.00 |
| | | |
| **DUE TO SELLER** | 37,394.74 | |
| **TOTALS** | 1,075,000.00 | 1,075,000.00 |

THIS IS YOUR FINAL CLOSING STATEMENT INDICATING ALL DISBURSEMENTS and is governed by the terms and conditions regarding "Accounting & Statements" as contained in the General Provisions of your Escrow Instructions.

Date:    June  8, 2026                                                                    Page:          1
Time:     7:37AM

## Disbursement Worksheet

Escrow No.   : 26-00077-JN                     Buyer              : Illusion Attractions LLC
Closer           : Joseph T Nold, Esq.          Seller             : Velocity Esports Las Vegas Town Square, LLC and Veloc
Closing Date : 05/08/2026                       Property Address : 6587 S Las Vegas Blvd
Lender          :                                                      Las Vegas, NV 89119
Loan No.       :                                Trust Account      : Escrow Trust Account

**RECEIPTS:**

| St | Number | Date | By | Type | Payer | Amount |
|----|--------|------|-----|------|-------|--------|
| I | 109327 | 03/27/2026 | TJ | Earnest Money Wire Transfer | Illusion Attractions LLC | 50,000.00 |
| I | 109358 | 04/21/2026 | AMJ | Additional Wire Transfer | Illusion Attractions LLC | 875,130.00 |
| | | | | Total Issued Receipts | : | 925,130.00 |
| | | | + | Remaining Due | : | 0.00 |
| | | | | Total Receipts | : | 925,130.00 |

**CHECKS:**

| St | Number | Date | By | Type | Payee | Amount |
|----|--------|------|-----|------|-------|--------|
| | | | | Seller Proceeds | Velocity Esports Las Vegas Town Squa | 37,394.74 |
| | | | | Listing Broker | First Choice Business Brokers | 134,375.00 |
| | | | | Miscellaneous Taxes | Nevada Department of Taxation | 12,169.26 |
| W | 6948 | 05/05/2026 | AMJ | Miscellaneous Fee | Accelerated Escrow Company | 500.00 |
| F | 6949 | 05/05/2026 | AMJ | Escrow Company Charges | Accelerated Law Group Inc | 6,260.00 |
| W | 6955 | 05/08/2026 | AMJ | Creditor Claim Charges | Pawnee Leasing Corporation | 101,000.00 |
| W | 6956 | 05/08/2026 | AMJ | Creditor Claim Charges | Newtek Lending | 633,431.00 |
| | | | | Total Issued Checks | : | 741,191.00 |
| | | | + | Remaining to Disburse | : | 183,939.00 |
| | | | | Total Disbursements | : | 925,130.00 |

**SUMMARY:**

|   | | | |
|---|---|---|---|
| | Total Issued Receipts | : | 925,130.00 |
| + | Remaining Amount Due | : | 0.00 |
| - | Total Disbursements | : | 925,130.00 |
| | Difference | : | 0.00 |
| | Balance in Escrow | : | 183,939.00 |
| | Balance in Savings | : | 0.00 |

**COMMENTS:**

# EXECUTED ASSET PURCHASE AGREEMENT

<u>**ASSET PURCHASE AGREEMENT**</u>

This Asset Purchase Agreement (this "Agreement"), is made and entered into this 9th of March, 2026, (the "Effective Date"), by and among (i) VELOCITY ESPORTS INC., a Nevada corporation with a principal business address of 701 S. Carson Street, Suite 200 Carson City, NV ("VES Inc."); (ii)Sellers, VELOCITY ESPORTS LAS VEGAS TOWN SQUARE, LLC, A Nevada limited liability company with a principal business address of 6587 S Las Vegas Blvd #171, Las Vegas, NV 89119 ("VES LV LLC" and, together with VES Inc., "Sellers" and each a "Sellers"; and ILLUSION ATTRACTIONS LLC, a Nevada limited liability company located at 4670 W. Post Road, Suite 120, Las Vegas, NV ("Buyer") and Leonard Wanger and Philip Kaplan, the shareholders of the Sellers (collectively, the "Selling Shareholders," and together with the Sellers, the Selling Parties). Sellers, Selling Shareholders and Buyer may each be referred to herein individually as a "Party" and collectively as the "Parties."

**RECITALS:**

**WHEREAS**, Sellers owns and operates the business known as Velocity Esports located at 6587 S. Las Vegas Blvd #171, Las Vegas, Nevada, 89119 which includes an entertainment venue featuring an arcade, bowling alley, lounge, and bar (the "Business").

**WHEREAS**, Sellers desires to sell, assign, transfer, and convey to Buyer, and Buyer desires to purchase and acquire from Sellers, substantially all of the assets, properties, rights, and goodwill used or held for use in connection with the Business, on the terms and conditions set forth in this Agreement.

**WHEREAS,** this Agreement is subject to approval by the United States Bankruptcy Court (the "Court") for the District of Nevada pursuant to 11 U.S.C. §363 proceeding under *In re Velocity Esports, INC.,* Case # 25-12627-mkn and the jointly administered Cases ## 25-12628-mkn, 25-12629-mkn, 25-12630-mkn, and 25-12631-mkn (collectively, the "Bankruptcy"), and shall not become effective or binding upon any party until such approval is obtained.

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto agree as follows:

1.      <u>**Sale of Assets**</u>.

   1.1      At the Closing, subject to entry of a Court order, Buyer shall purchase from Sellers, and Sellers shall sell, assign, convey, transfer  and deliver to Buyer Sellers's right, title and interest in and to the assets used in the operation of the Business of Sellers's bankruptcy estate within the meaning of 11 U.S.C. §541 and are transferable by Sellers. The Assets will be specifically identified on Schedule 1.1 (Included Assets) to this Agreement. Without limiting the foregoing, the Assets may include intellectual property and digital assets (including trademarks, trade names, domain names, websites, social-media accounts and online branding) only to the extent, and solely to the extent, such rights are owned by Sellers and are transferable under applicable law and any governing agreement; no greater right shall be conveyed than that held by Sellers. A detailed list of Included Assets and Excluded Assets will be set forth in each respective schedule attached hereto.

1

1.2     The parties hereto agree that the Assets include, but are not limited to, the following:

(a)  All machinery, equipment, furniture, fixtures, arcade and bowling equipment, kitchen equipment, POS systems, vehicles, inventory, and other tangible personal property used in the Business; Buyer shall receive a credit at Closing on a dollar-for-dollar basis equal to the remaining outstanding loan balance or lease payment obligations under any Equipment Leases. For purposes of this Section: (a) "Equipment Leases" shall mean the equipment leases identified on Schedule 1.2(a) that Buyer designates for assumption and assignment pursuant to 11 U.S.C. § 365 and that the Bankruptcy Court approves for assumption and assignment to Buyer effective as of Closing.

(b)  All Intellectual Property owned by Sellers and used in the Business, including trade names, trademarks, service marks, logos, domain names, social media accounts, and, to the extent transferable and permissible under 11 U.S.C. § 363(b)(1), applicable privacy policies, and nonbankruptcy law, and as authorized by the Sale Order, customer data, as specifically listed on Schedule 1.2(b), and all associated goodwill; provided, however, that Sellers makes no representation or warranty regarding the ownership, validity, enforceability, or freedom from third-party rights of any Intellectual Property, and Buyer accepts all Intellectual Property "AS-IS"; provided further, however, that because the Intellectual Property is also used at the Velocity venue located at Newport On the Levee, 1 Levee Way, Newport, KY (the "Newport Venue"), Buyer shall grant the  Newport Venue, effective as of and following the Closing, a  perpetual, royalty-free, non-exclusive right to use the brand and associated trade names subject to reasonable license restrictions maintained by Buyer in the service area around the Newport Venue, including the right to maintain a website subdomain, continue use of its local social media handles, and utilize existing branded materials;; and all associated goodwill;

(c)  To the extent transferable, all permits, licenses, approvals, and governmental authorizations related to the Business, including any rights under the Business's liquor licenses;

(d)  All rights under the contracts, leases, and agreements that Buyer, in its sole discretion, designates for assumption, as listed on Schedule 1.2(d), as may be updated by Buyer upon written notice to Sellers at least five (5) business days prior to Closing (the "Assigned Contracts"). For the avoidance of doubt, no contract lease, or agreement shall be deemed assumed by Buyer unless expressly included on the final version of Schedule 1.2(d) delivered at Closing;

(e)  All customer lists, personnel records (excluding any items not transferable under law), business records, files, documents, accounting records, and other books and records relating to the Business;

(f)  All warranties, indemnities, and similar rights with respect to any of the Assets;

(g)  All prepaid expenses and deposits attributable to periods after the Closing Date;

(h)  All goodwill associated with the Business and the Assets.

2

1.3 **Excluded Assets**. Notwithstanding anything contained herein to the contrary, the Assets do not include, and Sellers shall retain all of its right, title, and interest in and to, the assets described in this Section 1.3 (collectively, the "Excluded Assets"), including: (a) any asset owned by or titled in the name of any non-debtor affiliate or third party (including any asset that is leased, licensed, consigned or held under a bailment or similar arrangement), unless validly assumed and assigned to Buyer pursuant to 11 U.S.C. §365 (with all required consents obtained and cure amounts paid by Buyer at or before Closing), provided that any such asset that is used in or necessary to the operation of the Business and that would reasonably be understood to constitute a Business asset being transferred (but for its ownership/title status) shall be disclosed to Buyer on a schedule delivered prior to the signing of this Agreement, as applicable (b) any asset that is not assignable by Sellers without a third-party or governmental consent that is not obtained; (c) all cash, cash equivalents, bank accounts, investment accounts, and marketable securities; (d) any Tax refunds, Tax assets of Sellers relating to periods prior to the Closing Date, and net operating losses (except to the extent expressly purchased for separate consideration and permitted by applicable law); (e) Sellers's corporate seal, minute books, stock books, and other corporate records related solely to the organization and governance of Sellers (other than those set forth in Section 1.2(e)); (f) any employee benefit plans or arrangements and assets attributable thereto;(g) any insurance policies and rights thereunder; (h) claims and causes of action of the estate (including any rights under 11 U.S.C. §§ 544–549) and recoveries therefrom, unless expressly included in this Agreement and approved by the Court with any required findings; and (i) any other assets set forth on Schedule 1.3. If any asset described in clauses (a) or (b) above is used in or necessary to the operation of the Business and would reasonably be understood to be transferred as part of the Acquired Assets, but is not transferred to Buyer for the reasons set forth herein, the cash portion of the Purchase Price shall be reduced on a dollar-for-dollar basis.

1.4 **Assumption of Contracts.** Buyer agrees to assume only the Assigned Contracts and only to the extent that the Assigned Contracts are assignable pursuant to their terms and applicable law. Except as expressly set forth herein, Buyer shall not assume or be liable for any other contracts, leases, licenses, agreements, or arrangements of Sellers.

1.5 **No Implied Transfer**. Except as expressly set forth herein, neither the execution nor performance of this Agreement shall be deemed to transfer, assign, or convey any assets, properties, rights, or privileges of Sellers to Buyer by implication, estoppel, or otherwise. Buyer shall have no rights to any assets or properties of Sellers other than the Assets specifically identified in Section 1.1.

**2.    Purchase Price**

2.1 Subject to the terms of this Agreement, the "Purchase Price" (herein so called) to be paid by Buyer shall be the sum of ONE MILLION ONE HUNDRED THOUSAND DOLLARS AND 00/100 ($1,100,000.00) for the Assets listed in Section 1. The Purchase Price shall be payable to Sellers as follows:

$1,050,000          To be paid by Buyer on the Closing Date to Sellers via escrow with ACCELERATED ESCROW COMPANY (Anitia Jackson) (the "Closing Payment").

3

$50,000      Buyer shall deposit FIFTY THOUSAND DOLLARS AND 00/100 ($50,000.00) (the "Deposit") into escrow only after written approval of this Agreement from the Bankruptcy Court and execution of this Agreement. The Deposit shall be non-refundable to Buyer upon both (a) expiration of the Due Diligence Period pursuant to Section 9 below, and (b) upon satisfaction of the Closing Conditions set forth under Section 10 below. The Deposit shall be applied to the Purchase Price at Closing. To be clear, the Deposit shall be returned to the Buyer if any of the Closing Conditions are not met, or if Buyer decides not to proceed with the transaction prior to the end of the Due Diligence Period.

2.2      The Purchase Price shall be subject to adjustment at Closing for prorated items including, but not limited to: (a) utilities, (b) prepaid expenses, (c) deposits, (d) equipment lease payments assumed by Buyer, and (e) other operating expenses attributable to the period after the Closing Date. Prorations shall be made as of 11:59 p.m. on the day immediately prior to the Closing Date. Any known amounts shall be adjusted at Closing; unknown amounts shall be settled between the Parties within thirty (30) days after the final determination of such amounts.

2.3      Sellers shall be responsible for payment of any and all expenses or other amounts owed under the Assigned Contracts through the Closing Date. To the extent that Sellers has prepaid any amounts owed under the Assigned Contracts for the period occurring after the Closing Date, then the Purchase Price shall be increased by such amount; *provided*, that Sellers has disclosed and provided documentation of any such prepaid amounts to Buyer prior to the Closing Date, to allow for Buyer's review and approval.

2.4      Subject to the terms herein and entry of the Sale Order, the cash portion of the Purchase Price payable at Closing shall be reduced by an amount equal to the Closing Credit, if and only if, as of the Closing, Buyer has assumed and taken assignment of one or more Equipment Leases pursuant to 11 U.S.C. § 365 that are identified on Schedule 1.2(a) and designated by Buyer for assumption and assignment in accordance with this Agreement (the "Closing Credit").

2.5      The Closing Credit shall be calculated as a dollar-for-dollar credit equal to the lesser of:

(a) the estimated aggregate payoff amounts or the remaining aggregate payment obligations, measured as of the Closing, under the true lease obligations of the Equipment Leases actually assumed and assigned to Buyer at Closing; or

(b) the Cap set forth in Section 3 below. The aggregate Closing Credit applied to reduce the cash consideration at Closing shall not exceed $240,000.00 (the "Cap").

2.6      The Closing Credit may be applied only if all of the following conditions are satisfied as of the Closing:

(a) the Bankruptcy Court has entered the Sale Order approving the sale under section 363(b) of the Bankruptcy Code and approving the assumption and assignment to Buyer

4

of the applicable Equipment Leases under section 365, including the Court's determination of cure amounts and adequate assurance of future performance;

(b) the Sale Order expressly approves the Closing Credit and authorizes the cash purchase price to be reduced at Closing by the Closing Credit;

(c) the Equipment Leases to be assumed and assigned are identified on the final schedules delivered at Closing, and the Bankruptcy Court approves their assumption and assignment to be effective as of the Closing;

(d) no stay of the Sale Order is in effect on the Closing Date with respect to the assumption and assignment of the Equipment Leases or the application of the Closing Credit; and

(e) the Closing Credit shall not be deemed, and shall not be applied, to fund or satisfy any cure amounts or pre-Closing arrearages owed under any Equipment Lease, which shall be addressed as provided in the Court's orders.

2.7 The Parties shall cooperate in good faith prior to Closing to obtain payoff statements or amortization schedules, lessor ledgers, or other reasonably satisfactory evidence substantiating the estimated payoff or remaining obligations for each Equipment Lease designated for assumption and assignment, solely for purposes of calculating the Closing Credit and confirming that such obligations constitute "true lease" obligations.

2.8 The Parties acknowledge and agree that the Closing Credit and any reduction in cash consideration at Closing are subject to, and conditioned upon, the Bankruptcy Court's approval pursuant to the Bankruptcy Code, including sections 363 and 365, and applicable Federal Rules of Bankruptcy Procedure and the Bankruptcy Court's Local Rules of Bankruptcy Practice.

2.9 Nothing in this Section shall be construed to confer any rights upon any lessor or third party, to alter the allocation or treatment of cure amounts or arrearages as otherwise provided by the Bankruptcy Court, or to limit Buyer's sole discretion to designate or not designate any Equipment Lease for assumption and assignment.

**3. Real Property Leases**

3.1 Sellers currently leases the Premises pursuant to that certain Commercial Lease Agreement by and between SRMF Town Square Owner LLC, a Delaware limited liability company ("Landlord") and Sellers dated June 30, 2022 ("Lease").

3.2 The parties hereto are entering into this Agreement prior to obtaining the Landlord's consent to a new lease for the Premises in the Buyer's name.

3.3 Buyer's obligation to close the transaction is expressly conditioned upon Buyer and Landlord entering into a new lease on terms that the Buyer, in Buyer's sole discretion, deems commercially reasonable.

3.4 For the avoidance of doubt, if the conditions in Section 3.3 are not fully satisfied, Buyer may terminate this Agreement upon written notice to Sellers, whereupon the Parties shall have no further obligations to one another (except those that expressly survive termination),

5

and the Deposit shall be refunded to Buyer in full; provided, however, that Buyer must negotiate in good faith with Landlord to obtain a new lease on commercially reasonable terms, and Buyer may not terminate this Agreement under this Section 3.4 if Buyer's failure to negotiate in good faith was the cause of the inability to obtain a new lease. For purposes of the foregoing, "commercially reasonable terms" shall include, at a minimum, (i) a base lease term of not less than five (5) years together with at least one (1) renewal option of not less than five (5) additional years, and (ii) reasonable rent abatement or other rent concessions to be negotiated in good faith; and if Landlord refuses to reasonably negotiate, Buyer shall be permitted to terminate this Agreement pursuant to this Section 3.4.

4.  **Assumed Liabilities and Non-Assumed Liabilities**

4.1     Buyer assumes only those specific obligations that Buyer expressly agrees in writing to assume on the final version of Schedule 1.2(d) and Schedule 4.2, which schedules shall be finalized and delivered to Sellers at least five (5) business days prior to Closing.  Buyer shall not assume any debts, obligations, or liabilities of any kind or nature whatsoever of the Sellers ("Liability") including, but not limited to, the payment of any unpaid local, state or federal taxes. Any and all Liabilities not expressly assumed by Buyer shall remain the sole responsibility of Sellers, subject to applicable bankruptcy law.

4.2     Sellers shall cooperate fully in the assignment to Buyer of Assigned Contracts, insurance policies, and other business accounts associated with the Business that Buyer, in Buyer's sole discretion, wishes to assume as set forth more specifically on Schedule 4.2 ("Assumed Liabilities"). For the avoidance of doubt, no contract or liability shall be deemed assumed by Buyer unless it is expressly listed on the final Schedule 1.2(d) and Schedule 4.2 delivered at Closing.

4.3     For the avoidance of any doubt, Buyer shall not assume any liability for the following, which is not exhaustive:

(a) Employment Liabilities. Any employment-related Liability of Sellers including, without limitation, any Liability under relating to payroll, vacation, sick leave, worker's compensation, unemployment benefits, or other compensation or benefits of any kind for Sellers's current or former employees, and any Liability arising from the termination of any employee by Sellers prior to the Closing Date or any decision by Buyer not to offer employment to any employee of Sellers. For the avoidance of doubt, Sellers shall be solely responsible for any and all costs, liabilities, or expenses arising from unemployment claims filed by or on behalf of employees who were terminated by Sellers prior to the Closing Date. Buyer shall not assume or be liable for any such unemployment claims, regardless of whether they are filed before or after the Closing Date, and Sellers agrees to indemnify and hold Buyer harmless from any such claims or related costs;

(b) Environmental Liabilities. Any Liability of Sellers in connection with or arising out of any claims based on harm to the environment as a result of the handling of hazardous substances or a violation of any environmental and safety requirements occurring prior to the Closing Date;

6

(c) <u>Taxes</u>. Any Liability for Sellers taxes, whether arising out of the operation of the Business, the ownership or use of the Assets, including payroll taxes, personal property taxes, worker's compensation obligations, unemployment compensation obligations, city income taxes, state or local sales taxes, state franchise taxes, state fees to qualify to do business as a foreign entity, transfer taxes and all similar state and local taxes (including any associated interest, fines and penalties);

(d) <u>Transaction-Related Liabilities</u>. All Liabilities incurred in connection with negotiating, executing and performing under this Agreement and the transactions contemplated herein, including legal, accounting, brokers and all other professional fees and expenses;

(e) <u>Pre-Closing Proceedings</u>. Any Liability with respect to any proceeding for claims arising from or related to the operation of the Business prior to the Closing Date, whether such claims are asserted before or after the Closing Date;

(f) <u>Order Compliance</u>. Any Liability arising out of or resulting from Sellers compliance or non-compliance with any order or other legal requirement of any governmental authority;

(g) <u>Retained Liabilities</u>. All Liabilities incurred by Sellers after the Closing that are not Assumed Liabilities; and

(h) <u>Product Liabilities</u>. Any Liability related to products sold prior to the Closing Date.

**5.** **Equipment Condition**

Sellers warrants that, to Sellers's Knowledge, all furniture, fixtures, equipment, and inventory listed under Schedule 1.2(d) are in good working order, ordinary wear and tear excepted,. and require no major repairs. Sellers further warrants that all such items shall remain in good and operable condition for use in the Business up until the Closing Date.

**6.** **Representations and Warranties of the Parties**

6.1    <u>Sellers Representations and Warranties</u>. Sellers represents and warrants to Buyer, to Sellers's Knowledge (as defined below) as of the Effective Date, with the understanding that Buyer is relying upon these representations, and which the parties hereto acknowledge to be material to this Agreement. For purposes of this Agreement, "Sellers's Knowledge" or "Knowledge of Sellers" means the actual knowledge of Selling Shareholders with a duty of inquiry or investigation.

(a) <u>Consents and Approvals</u>. Except as set forth on Schedule 6.1(a), and subject to obtaining approval of the United States Bankruptcy Court for the District of Nevada pursuant to 11 U.S.C. § 363, Sellers has the full legal right, power, and authority to enter into this Agreement and to assign, transfer, and deliver the Assets to Buyer. Schedule 6.1(a) lists all third party consents required for the transfer of the Assets, other than Bankruptcy Court approval.

(b) <u>Organization.</u> Sellers is a corporation duly organized and validly existing under the Laws (defined in <u>Section 8.1(d)</u>) of Nevada with all requisite power and authority to

7

own, operate, and lease its assets and properties and to carry on its business as now being conducted, subject to applicable Court orders and approval requirements.

(c) <u>Authority</u>. Sellers has full right, power and authority to enter into this Agreement and to carry out the transactions contemplated hereby, and to assign, transfer and deliver the Assets to Buyer, except for obtaining approval of the Court pursuant to 11 U.S.C. §363. Sellers's obligations under this Agreement are contingent upon receipt of such Court approval.

(d) <u>Compliance with Laws</u>. To Sellers's Knowledge, the Business has been conducted in material compliance with all applicable federal, state, and local laws, rules, regulations, ordinances, orders, and statutes (collectively, "Laws"). Sellers holds all necessary licenses, permits, and approvals required by any governmental authority for the lawful operation of the Business as currently conducted.

(e) <u>Litigation and Claims</u>. Except for the bankruptcy under the United States Bankruptcy Court (the "Court") for the District of Nevada, Sellers represents and warrants that there are no actions, suits, claims, investigations, or legal proceedings pending, or to Sellers's Knowledge, threatened against the Sellers, the Business, or any of its assets or properties, that would reasonably be expected to materially adversely affect the operation of the Business, the ownership of the Assets, or Sellers's ability to execute, deliver, and perform this Agreement. Sellers further warrants that it is not in default of any order, judgment, or decree of any court or governmental authority.

(f) <u>No Unfiled Insurance Claims.</u> To Sellers's Knowledge, there are no pending or necessary insurance claims on the Assets for any damages, losses, claims including, but not limited to, claims for damages, losses, or liabilities incurred prior to the Closing Date, except as disclosed in Schedule 6.1(f).

(g) <u>No Omission of Material Facts</u>. The Sellers represents and warrants that there are no facts or circumstances known to the Sellers that have not been disclosed to the Buyer that would reasonably be expected to materially and adversely affect the value, condition, or prospects of the Assets or the ability of the Buyer to conduct the business as presently conducted following the Closing.

(h) <u>No Undisclosed Liabilities</u>. Sellers represents and warrants that, to Sellers's Knowledge, the Business has no liabilities, debts, or obligations of any kind, whether accrued, absolute, contingent, or otherwise, except (i) as disclosed in this Agreement, in the Schedules attached hereto, or in the schedules and statements filed in Sellers's Chapter 11 bankruptcy case, or (ii) liabilities incurred in the ordinary course of business consistent with past practices since the date of the most recent financial statements provided to Buyer. Sellers shall indemnify Buyer against any liabilities that arise from undisclosed debts or obligations prior to the Closing Date

(i) <u>Accuracy of Financial Statements</u>. Sellers represents and warrants that, to Sellers's Knowledge, the financial statements provided to Buyer, including balance sheets, profit and loss statements, and all other financial documents, are true, correct, and complete in all material respects and have been prepared in accordance with historical accounting practices and policies, consistently applied. Sellers further warrants that

8

since the date of the last financial statement, there has been no material adverse change in the financial condition, assets, liabilities, business, or operations of the Business.

(j) <u>Tax Matters.</u> Sellers represents and warrants that all Tax Returns, reports, and declarations required to be filed by the Sellers with respect to the Business or its assets have been duly and timely filed, and all taxes, levies, duties, and assessments, including payroll taxes, sales taxes, property taxes, and income taxes, have been paid in full, whether due or claimed to be due by any taxing authority. Sellers further warrants that, to Sellers's Knowledge, there are no tax audits or disputes pending with respect to the Business, and no taxing authority has given notice of any intent to audit, assess, or collect additional taxes related to the operation of the Business.

(k) <u>Broker</u>. Other than the Broker, Sellers represents and warrants that neither Sellers nor any of its representatives has engaged any broker, finder, or other intermediary in connection with the transactions contemplated by this Agreement, and no broker's or finder's fees are payable in connection with this transaction. Sellers agrees to indemnify and hold harmless Buyer from and against any and all claims, losses, liabilities, damages, costs, and expenses (including reasonable attorneys' fees and court costs) resulting from any claims for broker's or finder's fees or commissions that may be asserted by any party claiming to have been engaged by Sellers or any of its representatives in connection with the transactions contemplated by this Agreement.

6.2 <u>Selling Shareholders Representations and Warranties</u>. Each Selling Shareholder, severally and not jointly, represents and warrants to Buyer that:

(a) Except as set forth on Schedule 6.1(a), and subject to obtaining approval of the United States Bankruptcy Court for the District of Nevada, such Selling Shareholder has the requisite power and authority to execute and deliver this Agreement and to perform his or her obligations hereunder;

(b) This Agreement constitutes a valid and binding obligation of such Selling Shareholder, enforceable in accordance with its terms;

(c) Except as set forth on Schedule 6.1(a), and subject to obtaining approval of the United States Bankruptcy Court for the District of Nevada, such Selling Shareholder has full power to cause Sellers to enter into and perform this Agreement;

(d) To Sellers's Knowledge, the execution, delivery, and performance of this Agreement by such Selling Shareholder do not and will not (i) violate any law applicable to such Selling Shareholder or (ii) conflict with or result in a breach of any agreement to which such Selling Shareholder is a party or by which he or she is bound; and

(e) Such Selling Shareholder has no actual knowledge of any fact, event, or circumstance that has had or could reasonably be expected to have a material adverse effect on the Business that has not been disclosed to Buyer in writing.

6.3 <u>Buyer Representations and Warranties</u>. Buyer represents and warrants to Sellers, with the understanding that Sellers is relying upon these representations, and which the parties acknowledge to be material to this Agreement, the following statements are true and correct:

9

(a) <u>Authority.</u> Buyer has full right, power and authority to enter into this Agreement and to carry out the transactions contemplated hereby.

(b) <u>Organization.</u> Buyer is a limited liability company duly organized, validly existing and in good standing under the Laws of Nevada with all requisite power and authority to enter into this transaction.

(c) <u>No Conflict</u>. The execution, delivery, and performance of this Agreement by Buyer will not (i) conflict with or violate any provision of Buyer's articles of incorporation, bylaws, or other organizational documents, (ii) result in any breach or default under any agreement to which Buyer is a party or by which it is bound.

(d) <u>Consents and Approvals</u>. No consents, approvals, authorizations, or filings with any governmental authority or third parties are required for Buyer's execution and delivery of this Agreement and the consummation of the transactions contemplated hereby, except for such consents and approvals that have been obtained prior to the Closing Date or will be obtained in the ordinary course of business following the Closing.

(e) <u>Legal Proceedings</u>. There are no Actions (defined below) pending or threatened against or by Buyer that challenge or seek to prevent, enjoin or otherwise delay the transactions contemplated by this Agreement. For purposes of this Agreement, "<u>Action</u>" means any claim, action, cause of action, demand, lawsuit, arbitration, inquiry, audit, notice of violation, proceeding, litigation, citation, summons, subpoena, or investigation of any nature, civil, criminal, administrative, regulatory, or otherwise, whether at law or in equity.

(f) <u>Broker</u>. Other than the Broker, Buyer represents and warrants that neither Buyer nor any of its representatives has engaged any broker, finder, or other intermediary in connection with the transactions contemplated by this Agreement, and no broker's or finder's fees are payable in connection with this transaction. Buyer agrees to indemnify and hold harmless Sellers from and against any and all claims, losses, liabilities, damages, costs, and expenses (including reasonable attorneys' fees and court costs) resulting from any claims for broker's or finder's fees or commissions that may be asserted by any party claiming to have been engaged by Buyer or any of its representatives in connection with the transactions contemplated by this Agreement.

6.3 <u>Survival.</u>

(a) The representations and warranties contained herein shall survive the Closing and remain in full force and effect for a period of twenty-four months from the Closing Date.

(b) Any representations and warranties considered fundamental, including but not limited to those relating to the Sellers's authority to enter into this Agreement, title to the Assets, tax matters, and compliance with applicable laws, shall survive the Closing and remain in full force and effect for a period sixty (60) days the expiration of the applicable statute of limitations.

(c) Any claims arising out of or related to fraud shall survive the Closing and remain in full force and effect indefinitely.

**7.**　　　__Indemnification__

7.1　　The parties hereto agree to indemnify each other on the following terms:

(a)　__Sellers Indemnification__. From and after the Closing Date, and subject to the limitations set forth in Section 7.1(c), Sellers agrees to indemnify, defend, and hold harmless Buyer, its officers, directors, stockholders, lenders, affiliates, successors, and assigns from and against any and all losses, liabilities, damages, claims, actions, suits, proceedings, judgments, costs, and expenses (including reasonable attorneys' fees and other legal costs) (collectively, "Losses") arising out of or related to (i) such claims or any breach by Sellers of its representations, warranties, covenants, or agreements in this Agreement, or any related document; (ii) Sellers's non-compliance with any Laws prior to the Closing Date, except to the extent such non-compliance was disclosed to Buyer in the Schedules; or (iii) any third-party claims originating from the operation of the Business or possession of the Assets prior to the Closing Date

(b)　__Buyer Indemnification__. from and after the Closing, Buyer shall indemnify Sellers against, and shall hold Sellers harmless from and against, any and all Losses incurred or sustained by, or imposed upon, Sellers based upon, arising out of or with respect to: (i) breach of any of the representations or warranties of Buyer contained in this Agreement; (ii) any breach or non-fulfillment of any covenant, agreement or obligation to be performed by Buyer pursuant to this Agreement; (iii) any third-party claims originating from the operation of the Business or possession of the Assets after the Closing Date; and (iv) any Assumed Liability, except to the extent that any such losses are directly attributable to Sellers's fraud, gross negligence, or willful misconduct occurring prior to the Closing Date that was not disclosed to Buyer.

(c)　__Limitations__. The party making a claim under this Section 7.1 is referred to as the "Indemnified Party", and the party against whom such claims are asserted under this Section 7.1 is referred to as the "Indemnifying Party". The indemnification provided for in Section 7.1(a) and Section 7.1(b) shall be subject to the following limitations: (i) the Indemnifying Party shall not be liable to the Indemnified Party for indemnification under Section 7.1(a) and Section 7.1(b), as the case may be, until the aggregate amount of all Losses in respect of indemnification under Section 7.1(a) and Section 7.1(b) exceeds Ten Thousand Hundred Dollars and 00/100 ($10,000.00) (the "Basket"), in which event the Indemnifying Party shall be required to pay or be liable for Losses up to and in excess of the Basket; (ii) the aggregate amount of all Losses for which an Indemnifying Party shall be liable pursuant to Section 7.1(a) and Section 7.1(b), as the case may be, shall not exceed the Purchase Price; (iii) in no event shall any Indemnifying Party be liable to any Indemnified Party for any punitive, incidental, consequential, special or indirect damages, including loss of future revenue or income, loss of business reputation or opportunity relating to the breach or alleged breach of this Agreement, or diminution of value or any damages based on any type of multiple; and (iv) Sellers shall not be liable under this Section 7.1 for any Losses based upon or arising out of any inaccuracy in or breach of any of the representations or warranties of Sellers contained in this Agreement if Buyer had knowledge of such inaccuracy or breach prior to the Closing.

11

(d) <u>Indemnification Procedures</u>. Whenever any claim shall arise for indemnification hereunder, the Indemnified Party shall promptly provide written notice of such claim to the Indemnifying Party. Such notice by the Indemnified Party shall: (a) describe the claim in reasonable detail; (b) include copies of all material written evidence thereof; and (c) indicate the estimated amount, if reasonably practicable, of the Loss that has been or may be sustained by the Indemnified Party. In connection with any claim giving rise to indemnity hereunder resulting from or arising out of any Action by a Person (defined below) who is not a party to this Agreement, the Indemnifying Party, at its sole cost and expense and upon written notice to the Indemnified Party, may assume the defense of any such Action with counsel reasonably satisfactory to the Indemnified Party. The Indemnified Party shall be entitled to participate in the defense of any such Action, with its counsel and at its own cost and expense, subject to the Indemnifying Party's right to control the defense thereof. If the Indemnifying Party does not assume the defense of any such Action, the Indemnified Party may, but shall not be obligated to, defend against such Action in such manner as it may deem appropriate, including settling such Action, after giving notice of it to the Indemnifying Party, on such terms as the Indemnified Party may deem appropriate and no action taken by the Indemnified Party in accordance with such defense and settlement shall relieve the Indemnifying Party of its indemnification obligations herein provided with respect to any damages resulting therefrom. Notwithstanding the foregoing, if Sellers is the Indemnifying Party, any settlement of an Action or agreement to assume defense thereof that could otherwise materially impact the bankruptcy estate shall require prior approval of the Bankruptcy Court. Sellers and Buyer shall cooperate with each other in all reasonable respects in connection with the defense of any claim, including: (i) making available records relating to such claim; and (ii) furnishing, without expense (other than reimbursement of actual out-of-pocket expenses) to the defending party, management employees of the non-defending party as may be reasonably necessary for the preparation of the defense of such claim. The Indemnifying Party shall not settle any Action without the Indemnified Party's prior written consent (which consent shall not be unreasonably withheld, conditioned or delayed), and if Sellers is the Indemnifying Party, such settlement shall also require approval of the Bankruptcy Court to the extent required by applicable law. For purposes of this Agreement, "Person" means an individual, a corporation, a partnership, a limited liability company, an association, a trust, a joint venture, an unincorporated organization, any other business entity, or a governmental authority.

(e) <u>Tax Treatment of Indemnification Payments</u>. All indemnification payments made under this Agreement shall be treated by the parties hereto as an adjustment to the Purchase Price for tax purposes, unless otherwise required by Law.

(f) <u>Survival of Indemnification</u>. The indemnification obligations set forth in this Section shall survive the Closing as follows: a) any breach of a representation or warranty until sixty (60) days after the expiration of the survival period applicable to such representation or warranty, (b) any breach of a covenant until such covenant is fully performed, and (c) any claim arising out of fraud indefinitely. Notwithstanding the foregoing, the indemnification obligations with respect to the Fundamental Representations and the Tax Representations shall survive until sixty (60) days after the expiration of the applicable statute of limitations.

12

8. **Covenants**

8.1    At all times prior to the Closing Date, the Sellers will continue to operate the Business in the ordinary course of business, which shall mean the regular and usual management and operation of the Business by Sellers prior to the Closing Date, consistent with past practices.

8.2    Without limiting Section 8.1, Sellers shall use commercially reasonable efforts to preserve the Business and maintain the Business's recent operating performance, including maintaining customer relationships, staffing levels, inventory and supplies, pricing practices, event bookings and marketing efforts, and shall not take (or fail to take) any action that is reasonably likely to materially depress or divert revenue, sales, or customer demand (including by reducing hours, limiting services, deferring ordinary-course maintenance, failing to timely pursue or fulfill bookings, or permitting abnormal cancellations), other than in the ordinary course consistent with past practices.

Sellers shall promptly (and in any event within five (5) Business Days following the last day of each month) provide Buyer with monthly profit and loss statements and reasonable revenue detail for each completed month prior to, and through Closing.

Buyer's obligation to consummate the transactions contemplated hereby is conditioned upon Buyer's completion of due diligence to its reasonable satisfaction. Sellers acknowledges that Buyer's decision to enter into this Agreement is based on the financial, operational, and business information provided to Buyer prior to execution.

If Buyer's Due Diligence reveals (i) any material inaccuracy or material omission in such provided information, or (ii) that the causes of any decline in revenue or EBITDA are materially different from those disclosed or described to Buyer (including due to asset dispositions, reductions in services or offerings, abnormal customer refunds or chargebacks, deterioration in the guest experience, or other undisclosed operational factors), such that the Business is materially different from what was represented, then Buyer may, upon written notice, terminate this Agreement without liability. Following receipt of such termination notice, Sellers may elect, in its sole discretion, to propose an amendment to this Agreement (including to the Purchase Price or other economic terms) to address the matters identified by Buyer. Buyer shall have no obligation to accept any such proposed amendment, and Sellers shall have no obligation to propose one.

8.3    Sellers shall use commercially reasonable efforts, at Sellers's expense obtain and deliver to Buyer evidence satisfactory to Buyer of any licenses and titles necessary to transfer and assign the Assets to Buyer.

8.4    For a period of thirty (30) days following the Closing Date (the "Transition Period"), Selling Shareholders agrees to provide reasonable transition assistance to Buyer, only if Buyer so requests, including knowledge transfer, training on business operations, and facilitating access to key systems and stakeholders. During the Transition Period Selling Shareholders will be available for phone and email consultations during normal business hours for up to twenty (20) hours per week at no additional cost.

8.5    Unless otherwise required by applicable Law or the Court rules and procedures, no party to this Agreement shall make any public announcements in respect of this Agreement or

13

the transactions contemplated hereby without the prior written consent of the other party (which consent shall not be unreasonably withheld, conditioned or delayed), and the parties shall cooperate as to the timing and contents of any such announcement. Notwithstanding the foregoing, Sellers may make such disclosures as are required by the Bankruptcy Code, Federal Rules of Bankruptcy Procedure, local bankruptcy rules, or orders of the Court, including without limitation notices to creditors and filings with the Court, without obtaining Buyer's prior consent.

8.6     The parties hereto hereby waive compliance with the provisions of any bulk sales, bulk transfer or similar Laws of any jurisdiction that may otherwise be applicable with respect to the sale of any or all of the Assets to Buyer.

8.7     Subject to entry of a Court order, following the Closing, each of the parties hereto shall, and shall cause their respective Affiliates (defined below) to, execute and deliver such additional documents, instruments, conveyances and assurances and take such further actions as may be reasonably required to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement and the other Transaction Documents. For purposes of this Agreement, "Affiliate" means with respect to any specified Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such specified Person. For the purposes of this definition, "control" (including, with correlative meanings, the terms "controlled by" and "under common control with"), as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract, or otherwise.  Buyer agrees to provide Sellers with reasonable access to copies of all financial, tax, employee/payroll, contract, and operational records reasonably necessary to administer the Bankruptcy. To the extent any such records are transferred to Buyer, Buyer shall provide Sellers and its professionals reasonable access to copies upon request for a period of not less than twelve months following the Closing, subject to customary confidentiality protections and applicable privacy law.

8.8     Sellers represents and warrants that any deposits received for future event bookings, prepaid balances on customer game cards, or accrued redemption points have been fully disclosed to Buyer in writing prior to Closing. To the extent such prepayments or credits relate to services or game play to be provided after the Closing Date, the parties shall equitably adjust the Purchase Price or provide Buyer with a credit at Closing in an amount equal to the outstanding value of such obligations, provided that any such adjustment shall not exceed the actual cash value received by Sellers for such prepayments and shall exclude any theoretical or estimated redemption values that exceed amounts actually paid by customers. Buyer shall honor valid customer deposits, unused game-card balances, and redemption points only to the extent that Sellers has provided a corresponding credit or offset at Closing, and Buyer assumes all liability for honoring such obligations from and after the Closing Date. Sellers shall indemnify and hold Buyer harmless from any customer claims relating to pre-Closing deposits, credits, or unredeemed points that were not disclosed or credited to Buyer at Closing as Schedule 8.8 (Undisclosed Credits or Deposits). The final version of Schedule 8.8 shall be delivered by Sellers to Buyer prior to or at Closing.

/ / /

14

## 9.  **Due Diligence**

Buyer will have commenced its Due Diligence (defined below) of the Business on or prior to the Effective Date and consummated its Due Diligence by the date which is sixty (60) days thereafter (the "Due Diligence Period"), unless mutually extended by the parties hereto. Upon expiration of the Due Diligence Period, the Deposit shall be non-refundable to Buyer except as set forth in Section 10 for Closing Contingencies For purposes of this Agreement, "Due Diligence" means the investigation, review, and analysis by Buyer of the Business, its operations, financial condition, assets, liabilities, and legal compliance. This includes, but is not limited to, the examination of financial records, contracts, employment agreements, permits, licenses, intellectual property rights, environmental assessments, and any other material documents or aspects of the Business.

## 10. **Closing Contingencies**

10.1    Conditions to Obligations of Buyer. The obligations of Buyer to consummate the transactions contemplated by this Agreement shall be subject to the satisfaction or Buyer's waiver, at or prior to the Closing, of each of the following conditions:

(a)  Buyer's completion of Due Diligence, the results of which shall be satisfactory to Buyer, prior to the end of the Due Diligence Period;

(b)  The parties hereto shall have executed all Transaction Documents.

(c)  Sellers shall have obtained entry of the Sale Order authorizing the sale of the Assets to Buyer free and clear of all liens, claims, interests, and encumbrances pursuant to 11 U.S.C. § 363(f), with all such liens, claims, interests, and encumbrances to attach to the sale proceeds in the same validity, extent, and priority (subject to any defenses) as they attached the Assets on or before the Closing Date, except for those expressly assumed by Buyer.

(d)  Sellers shall have used commercially reasonable efforts to bring all business accounts that are to be assumed by Buyer current and to pay any and all late fees or late charges on such accounts, to the extent funds are available from the bankruptcy estate and such payments are authorized by the Court. Any accounts not brought current in the manner described above shall be disclosed to Buyer, in writing, prior to Closing.

(e)  There shall have been no event, occurrence, fact, condition, change or effect that, individually or in the aggregate, has had or could reasonably be expected to have a material adverse effect on (i) the business, operations, properties, financial condition or results of operations of the Sellers or the Assets, or (ii) the ability of Sellers to consummate the transaction; and

(f)  Buyer and Landlord entering into a new lease that replaces the existing Lease, and fully releases Sellers and any Sellers Shareholders from all obligations, liabilities, and guarantees under the existing Lease, with such new lease to be on terms acceptable to Buyer in Buyer's sole discretion.

(g)  Buyer shall have received approval or transfer authorization for any liquor license or other regulated permit required to operate the Business, or, Buyer and Sellers shall have entered into a "management agreement" enabling Buyer to legally, fully operate

15

the Business (including the sale of alcohol) pending issuance of such approvals.

(h) All leases, subleases, or other agreements relating to any equipment, machinery, or other tangible property used in the Business (collectively, the "Equipment Leases") that Buyer has designated for assumption and assignment shall have been duly assigned to Buyer, and any required landlord, lessor, or third-party consents or estoppels shall have been obtained, in each case in form and substance satisfactory to Buyer in its sole discretion. The assumption and assignment of equipment leases shall be conditioned upon court-determined cure amounts and adequate assurance of future performance. The Closing Credit shall not offset any cure obligations.

(i) Sellers shall have obtained entry of an order of the United States Bankruptcy Court for the District of Nevada ("Sale Order") approving this Agreement and the transactions contemplated hereby, which order shall be in form and substance satisfactory to Sellers and Buyer in each's sole discretion. The Sale Order shall authorize the sale of the Assets to Buyer free and clear of all liens, claims, and encumbrances pursuant to Section 363 of the Bankruptcy Code (11 U.S.C. § 363), with findings under § 363(m) that Buyer is a good-faith purchaser; the Sale Order shall provide that all liens, claims, encumbrances and interests attach to the sale proceeds with the same validity, priority, and extent as existed prior to Closing and no stay of the Sale Order shall be in effect on the Closing Date.  Nothing in the Sale Order or this Agreement shall impair or enjoin valid rights of setoff or recoupment preserved under applicable nonbankruptcy law and 11 U.S.C. § 553, as determined by the Court.

10.2    <u>Conditions to Obligations of Sellers</u>. The obligations of Sellers to consummate the transactions contemplated by this Agreement shall be subject to the satisfaction or Sellers's waiver, at or prior to the Closing, of each of the following conditions:

(a) The representations and warranties of Buyer contained in <u>Section 6.3</u> shall be true and correct in all material respects on and as of the date hereof and on and as of the Closing Date with the same effect as though made at and as of such date;

(b) Buyer shall have delivered to Sellers the Closing Payment to the Escrow Agent for release to Sellers as set forth in <u>Section 2.1</u>; and

(c) Buyer shall have duly executed and delivered to Sellers the Transaction Documents, and all third-party consents, approvals, and authorizations required for Buyer to execute and perform its obligations under the Transaction Documents shall have been obtained and remain in full force and effect.

If the conditions to Closing are not satisfied as described herein by the Closing Date, the transaction will be terminated and the Buyer shall be refunded the earnest money, unless the parties mutually agree in writing to extend the Closing Date.

## 11.    <u>Closing Date and Closing Deliveries</u>

11.1    It is the mutual intent of the parties hereto that the transactions contemplated hereunder shall be consummated on or before **March 24, 2026,** (the "Closing Date" or "Closing") virtually or in person at the office of the Escrow Agent located at [INSERT ADDRESS].  The parties hereto may also elect to close on an earlier or later date on the

mutual written agreement of Buyer and Sellers, provided that Sellers or Buyer shall have the right to terminate this Agreement if Closing has not occurred by April 29, 2026, without penalty or liability. On the Closing Date the following actions and events shall occur:

(a)     Sellers shall deliver to Buyer a bill of sale and assignment and assumption agreement, attached as Exhibit A, for the Assets transferring and assigning all right, title and interest in the Assets to Buyer (the "Bill of Sale and Assignment Agreement").

(b)     Sellers shall deliver to Buyer a Non-Solicitation and Non-Competition Agreement, duly executed by the Selling Parties, attached hereto as Exhibit B (the "Non-Solicitation and Non-Competition Agreement").

(c)     Buyer shall pay to Sellers, via the Escrow Agent, the Closing Payment.

(d)     Buyer and Sellers shall prorate all rent, taxes, utilities relating to the acquisition of the Assets, and other matters as may be agreed upon between the Sellers and Buyer.

(e)     If necessary, Buyer and Sellers shall deliver and duly execute all documents reasonably required to enable Buyer to enter into a new lease for the Premises directly with the Landlord.

(f)     Buyer and Sellers shall each deliver to the other party a certificate of the officer/manager certifying as to (i) the resolutions of the Buyer and Sellers, which authorize the execution, delivery, and performance of this Agreement, the Bill of Sale and Assignment Agreement and the other agreements, instruments, and documents required to be delivered in connection with this Agreement or at the Closing duly signed by the Sellers (collectively, the "Transaction Documents") and the consummation of the transactions contemplated hereby and thereby, and (ii) the names and signatures of the officer/manager authorized to sign this Agreement and the other Transaction Documents.

(g)     Such other customary instruments of transfer or assumption, filings, or documents, in form and substance reasonably satisfactory to the parties hereto and their respective counsel, as may be required to give effect to the transactions contemplated by this Agreement, provided that Sellers shall not be required to deliver any document or instrument that (i) expands Sellers's representations, warranties, covenants, or indemnification obligations beyond those expressly set forth in this Agreement, (ii) subjects Sellers to any post-closing obligations not expressly contemplated by this Agreement.

## 12.     Risk of Loss

Risk of loss of or damage to the Assets prior to Closing, excluding normal wear and tear or obsolescence in the ordinary course of business, shall remain on Sellers, and in the event of destruction of or damage to the Assets, in whole or in part, before Closing Date, the Sellers shall have the option to either restore the Assets to their prior condition prior to the Closing Date, elect not to restore such Assets and Buyer may terminate this Agreement with return of the Deposit to Buyer, or proceed with a credit to the Purchase Price as mutually agreed by the parties in writing.

**13.    Confidentiality**

13.1    In the course of the negotiations, each party may disclose to the other certain proprietary, confidential or other nonpublic information relating to its respective business ("Confidential Information").  Confidential Information shall not include information that: (i) is or becomes publicly available through no breach of this Agreement by the receiving party; (ii) was rightfully in the receiving party's possession prior to disclosure by the disclosing party; (iii) is rightfully received by the receiving party from a third party without breach of any confidentiality obligation; or (iv) is independently developed by the receiving party without use of or reference to the Confidential Information. Each party hereto agrees to maintain the proprietary, confidential and nonpublic nature of such information and shall not use such Confidential Information for any purpose other than as expressly permitted under this Agreement using at least the same degree of care it uses to protect its own confidential information, but in no event less than reasonable care. Each party hereto shall keep the terms and contents of this Agreement and all ancillary schedules and exhibits confidential except as necessary to obtain financing, comply with applicable law, enforce rights under this Agreement, or to further the execution of the Transaction Documents. Notwithstanding the foregoing, Sellers may disclose the terms of this Agreement to its accountants, attorneys, financial advisors, and other professional advisors who have a need to know such information and the Court.

13.2    Buyer will use the Confidential Information acquired during the Due Diligence Period solely for the purpose of evaluating and consummating the transactions contemplated by this Agreement, and unless and until the parties consummate the acquisition of the Business, the Buyer, its affiliates, directors, officers, employees, advisors, and agents (the "Buyer's Representatives") will keep any Confidential Information strictly confidential and will disclose such Confidential Information only to Buyer's Representatives who need to know such information for the purpose of evaluating and consummating this Agreement and who are bound by confidentiality obligations at least as restrictive as those contained herein. Buyer shall be responsible for any breach of this confidentiality obligation by any of Buyer's Representatives.  In the event the acquisition is not consummated for any reason, the Buyer will, at Sellers's election, either return to the Sellers or destroy all materials containing Confidential Information, including all copies, extracts, summaries, analyses, or derivatives thereof in any form (including electronic form), and will certify in writing to Sellers within ten (10) business days that all such materials have been returned or destroyed and that no copies remain in Buyer's or any Buyer's Representative's possession or control.  This Section 13.2 shall survive the Closing or termination of this Agreement for five (5) years, except that the confidentiality obligations with respect to trade secrets (as defined under Nevada law) shall continue for so long as such information remains a trade secret. The obligations under this Section 13.2 are in addition to, and not in limitation of, any obligations the parties may have under any separate non-disclosure or confidentiality agreement.

**14.    Exclusive Dealing**

Upon (i) approval of this Agreement by the Bankruptcy Court, and (ii) full execution of this Agreement by all parties, and thereafter until the Closing Date: (a) Sellers shall not negotiate, directly or indirectly, with any other party or in any way solicit offers from any other party to purchase, lease or manage the Business or purchase, lease or manage the assets of the Business, (b) Sellers shall not grant any other party any rights that would require additional consent with respect to Sellers's consummation of the

18

transactions contemplated herein, (c) Sellers shall continue to operate the Business in a manner consistent with current operations, maintaining good relations with all of its customers and vendors, and (d) Sellers shall not sell, transfer, encumber or amend the ownership of the Business or any portion thereof. Sellers shall promptly notify Buyer of any event that could have an adverse effect on the value, condition or operations of the Sellers's Business. Notwithstanding the foregoing, exclusivity shall terminate upon entry of bidding procedures, and Sellers retains a fiduciary exception to solicit and accept higher or better offers, in each case subject to Court approved bidding procedures. Buyer shall be designated as the "Stalking Horse Bidder" for the purposes of any competitive bidding or sale process relating to the transactions contemplated by this Agreement, as described in Exhibit [ ].

**15.    Expenses**

15.1    Each party shall be solely responsible for its own expenses, including legal, accounting, and due diligence costs, incurred in connection with the negotiation, execution, and performance of this Agreement and the transactions contemplated hereby, whether or not the Closing occurs. Neither Party shall have any right to seek reimbursement from the other Party for any such costs or expenses, including, without limitation, costs associated with due diligence, negotiation and preparation of the Transaction Documents, or obtaining financing. Notwithstanding the foregoing, the Parties' rights and obligations under Exhibit A, if approved by the Bankruptcy Court, shall control.

15.2    The parties hereto agree to split the costs of escrow each paying one-half (1/2) of the total fee.

**16.    Non-Competition**

Sellers shall execute a Non-Competition Agreement and Non-Solicitation Agreement, wherein the Sellers shall agree not to own or operate a business that is directly competitive with the Business within Clark County, Nevada for a period of five (5) years from the Closing Date and to refrain from solicitation of current customers and employees of the Business, attached as Exhibit B.

**17.    Broker's or Finder's Fee**

The Sellers shall bear sole responsibility for paying the Sellers's broker fee to First Choice Business Brokers of Las Vegas, Attn: Freddie McFinn (the "Broker").

**18.    Successors and Assigns**

This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors, assigns, heirs and personal representatives.

**19.    Modification & Waivers**

This Agreement may not be modified, amended, or terminated except by an instrument in writing, signed by each of the parties affected thereby and Court approval. No failure to exercise and no delay in exercising any right, remedy, or power under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise thereof, or the exercise of any other right, remedy, or power provided herein or by law or in equity. This Agreement, which incorporates all referenced exhibits and Schedules, supersedes all prior communications or understandings between the parties hereto and constitutes the entire agreement between the parties with respect to the matters covered herein.

19

**20.**      **Time is of the Essence**

Time is of the essence of this Agreement and of each and every term, covenant and condition hereof, provided that Sellers shall have a grace period of thirty (30) days for any delays caused by Sellers's bankruptcy proceedings or required Court approvals shall automatically extend all deadlines applicable to Sellers.

**21.**      **Notices**

All notices or other communications to be given by either party hereto to the other shall be in writing, shall be served by personal delivery or by depositing such notices in the United States mail, certified or registered, return receipt requested, with certification or registration and postage charges prepaid, properly addressed and directed to Sellers and Buyer at the addresses set forth below.  Either party hereto may designate a different person or entity or place to or at which notice shall be given by delivering a written notice to that effect to the other party, which notice shall be effective after the same is actually received by the other party. Except as expressly provided in the preceding sentence, all notices shall be deemed to have been delivered only upon actual receipt as evidenced by a return receipt or other delivery receipt.

|  |  |
|---|---|
| If to Sellers: | Velocity Esports, Inc.<br>3838 Kenneth Avenue<br>Chicago, IL 60641<br><br>Velocity Esports Las Vegas Town Square, LLC<br>6587 S. Las Vegas Boulevard, #171<br>Las Vegas, Nevada 89119 |
| If to Selling Shareholders: | [insert names and addresses] |
| Copy to: | Nevada Bankruptcy Attorneys LLC<br>5502 S. Fort Apache Rd. Suite #200<br>Las Vegas, NV 89148<br>Attn:  Matthew I. Knepper, Esq. |
| If to Buyer: | Tim Clothier<br>Illusion Attractions, LLC<br>4670 W. Post Road, Suite 120,<br>Las Vegas, NV  89118 |

**22.**      **Construction**

The language and all provisions of this Agreement shall be construed as a whole according to their fair meaning, and no part of this Agreement shall be construed against either Party on the basis that such Party or its counsel drafted the provision. Each Party acknowledges that it has reviewed this Agreement and has had the opportunity to have it reviewed by legal counsel of its choice. Accordingly, any rule of construction to the effect that ambiguities are to be resolved against the drafting Party shall not apply in the interpretation of this Agreement or any amendment, schedule, or exhibit hereto. The headings in this Agreement are for convenience only and shall not be deemed to limit, modify, or otherwise affect the construction or interpretation of any provision herein.

**23.**     **Governing Law, Venue & Jurisdiction; Equitable Relief**

23.1    The terms and provisions of this Agreement shall be governed by, construed in accordance with, and interpreted under the Laws of the state of Nevada with venue and jurisdiction in Clark County Nevada and the United States Bankruptcy Court for the District of Nevada.

23.2    In addition to any and all other remedies that may be available under applicable law in the event of any breach of this Agreement, the parties hereto shall be entitled to such injunctive or other equitable relief as may be granted by a court of competent jurisdiction, without the necessity of posting a bond or proving actual damages.

**24.**     **Attorneys' Fees**

If either party institutes a suit against the other in any way connected with this Agreement or its enforcement, the Successful Party (defined below) to any such action shall be entitled to recover from the other party reasonable attorneys' fees (not to exceed the actual attorneys' fees incurred), witness fees and expenses, any and all other litigation expenses and court costs incurred in connection with said suit, both at the trial and appellate levels. The parties hereto agree that this Agreement is being entered into in Clark County, Nevada, and that the proper venue and jurisdiction of any proceeding at law or equity shall be Clark County, Nevada.  For purposes of this Agreement, "Successful Party" means the party in whose favor a judgment, decree, or final order is rendered, regardless of whether that party prevails on all counts or claims involved in the action. Notwithstanding the foregoing, in the event that a Successful Party cannot be reasonably determined, neither party shall be considered the "Successful Party" for the purposes of collecting attorneys' fees and costs from the other party hereto pursuant to this Section 24.

**25.**     **Counterparts**

This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original as against any party whose signature appears hereon, and all of which shall together constitute one and the same instrument.  This Agreement shall become binding when one or more counterparts hereof, individually or taken together, shall bear the signatures of all of the parties reflected hereon as signatories.

**26.**     **Invalidity**

The invalidity or unenforceability of any covenant, term or condition of this Agreement, or any portion of any covenant, term or condition of this Agreement, shall not affect any other covenant, term or condition or portion hereof, and this Agreement shall remain in effect as if such invalid or unenforceable covenant, term or condition (or portion thereof) was not contained herein or was reduced to enforceable limits by a court.

**27.**     **Representation by Counsel**

Each of the parties hereto has been represented by or has had the opportunity to be represented by legal counsel of his or her own choice.

**28.**     **Incorporation of Exhibits**

21

The Schedules and/or Exhibits identified in this Agreement are incorporated herein by reference and made a part hereon.

[*Remainder of page intentionally left blank; signature page follows*]

IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the Effective Date.

**BUYER:**

By:_____
Tim Clothier, Illusion Attractions, LLC

**SELLERS:**

By: _____
Authorized Signer, Velocity Esports, Inc.

By:_____
Authorized Signer, Velocity Esports Las Vegas Town Square, LLC

**SELLING  SHAREHOLDERS:**

_____
Leonard Wanger

_____
Philip Kaplan

23

**EXHIBIT A**

Stalking Horse Protections for Buyer

**Court Approval Required.**

The Parties acknowledge and agree that the Stalking Horse Protections set forth herein, including any break-up fee, expense reimbursement, and overbid protections, are not binding or payable unless and until approved by the Bankruptcy Court in an order entered in the Bankruptcy pursuant to 11 U.S.C. §§ 363 and 503(b) and Fed. R. Bankr. P. 2002 and 6004).

**Break-Up Fee.**

If (i) Sellers terminates this Agreement in order to accept a Competing Transaction, or (ii) a Competing Transaction is consummated with any third party within twelve (12) months following termination of this Agreement, then, as liquidated damages and not as a penalty, Sellers shall pay to Buyer a break-up fee equal to three percent (3%) of the Transaction Value (the "Break-Up Fee").

A "Competing Transaction" means any agreement, proposal, or transaction with a third party to purchase, acquire, or otherwise assume all or any material portion of the Business, Purchased Assets, or Sellers's equity interests, or to otherwise operate the Business instead of Buyer.

For purposes of this Section, "Transaction Value" means the gross consideration that would be paid or delivered in such Competing Transaction, including, without limitation, (A) all cash consideration, (B) the value of any non-cash consideration, (C) the assumption of indebtedness, liabilities, or obligations, including assumed equipment leases, and (D) any contingent or earn-out consideration (valued at the face value of such contingent payments).

The Break-Up Fee shall be payable in full at the closing of any Competing Transaction.

**Expense Reimbursement.**

In addition to the Break-Up Fee, Sellers shall reimburse Buyer for the following actual, reasonable, documented costs incurred in connection with the negotiation, diligence, and pursuit of this transaction (collectively, the "Expense Reimbursement"):

(i) Buyer's legal fees in the amount of $13,900,

(ii) Liquor license consultant fees in the amount of $4,000,

(iii) Administrative and internal support costs in the amount of $6,000, and

(iv) Buyer's additional third-party due diligence expenses, including attorneys, accountants, consultants, financial advisors, and other professionals, not to exceed Twenty-Five Thousand Dollars ($25,000) in the aggregate ("DD Cap"), reimbursable based on documented invoices actually incurred (and only to the extent such aggregate expenses do not exceed the DD Cap).

The Expense Reimbursement shall be payable at the earlier of (x) closing of any Competing Transaction or (y) ten (10) business days following Sellers's termination of this Agreement in favor of a Competing Transaction.

A-1

**Bid Protections / Overbid Procedures**

In the event Sellers conducts or permits a competitive bidding process:

(i) The initial minimum overbid above Buyer's Purchase Price shall be Seventy-Five Thousand Dollars ($75,000);

(ii) Thereafter, additional bid increments shall be no less than Fifty Thousand Dollars ($50,000) per bid;

(iii) Buyer shall have the continuing right, but not the obligation, to submit subsequent bids in increments of at least Fifty Thousand Dollars ($50,000) regardless of the initial overbid amount submitted by a competing bidder; and

(iv) Buyer shall be afforded a reasonable opportunity to continue bidding following each qualified competing bid so long as Buyer remains a qualified bidder.

**Return of Deposit.**

Notwithstanding anything to the contrary contained in this Agreement, in the event (i) Sellers terminates this Agreement in order to pursue or consummate a Competing Transaction, or (ii) a Competing Transaction is consummated with a third party at any time following termination of this Agreement, all deposits, earnest money, or other funds paid by Buyer pursuant to this Agreement (collectively, the "Deposit") shall be returned to Buyer in full, without setoff, deduction, or withholding of any kind, within five (5) business days of such termination (or, if later, within five (5) business days following consummation of the Competing Transaction if the Deposit remains held pending that event).

The return of the Deposit pursuant to this Section shall be in addition to, and independent of, Buyer's rights to the Break-Up Fee and Expense Reimbursement, and shall not be credited against or reduce any obligation of Sellers under Buyer's Stalking Horse Protections. The Deposit shall not be deemed forfeited, applied, or retained by Sellers under any circumstance in which Sellers elects to proceed with a Competing Transaction.

If the Deposit is being held by an escrow agent, the Parties shall execute any instructions required to authorize the immediate release of the Deposit to Buyer, and Sellers irrevocably consents to such release upon the occurrence of the foregoing events.

**Survival / Priority**

The obligations set forth in this Section shall survive termination of this Agreement solely to the extent allowed by the Bankruptcy Court pursuant to any applicable entered order allowing for such amounts shall constitute Buyer's priority administrative claim in connection with any Competing Transaction.

**Remedies**

Buyer shall be entitled to enforce this Section by specific performance and/or monetary damages, and Sellers acknowledges that monetary damages alone would be inadequate absent enforcement of these protections.

A-2

**BUYER:**

By: *Tim Clothier*

Tim Clothier, Illusion Attractions, LLC

**SELLERS:**

By: *Philip N Kaplan*

Authorized Signer, Velocity Esports, Inc.

By: *Philip N Kaplan*

Authorized Signer, Velocity Esports Las Vegas Town Square, LLC

**SELLING  SHAREHOLDERS:**

*Leonard Wanger*

Leonard Wanger

*Philip N Kaplan*

Philip Kaplan

A-3

**EXHIBIT B**

**(Bill of Sale)**

**BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT**

THIS BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT (this "Bill of Sale") is executed and delivered as of April 14, 2026, (the "**Effective Date**") by Velocity Esports Inc., a Nevada corporation and Velocity Esports Las Vegas Town Square, LLC, a Nevada limited liability company (together, the "Grantor"), to Illusion Attractions LLC, a Nevada limited liability company ("Grantee"), as follows:

1.      Introduction, Contemporaneously with the execution and delivery of this Bill of Sale, Grantor has sold to Grantee substantially all of the Assets, as defined in that certain Asset Purchase Agreement dated       March 9, 2026       (the "Purchase Agreement"). Unless otherwise specified, all initially capitalized terms used herein shall have the meanings ascribed to them in the Purchase Agreement.

2.      Transfer of Assets.              Grantor hereby sells, conveys, transfers, assigns, and delivers to Grantee, and Grantee hereby purchases, acquires, accepts assignment, and assumes from Grantor, all of Grantor's right, title, and interest in and to the Assets free and clear of all liens, claims, encumbrances, and interests pursuant to Section 363 of the United States Bankruptcy Code, with any such liens, claims, encumbrances, and interests to attach to the proceeds of the sale in the order of their priority, subject to the rights and defenses, if any, of Grantor and any statutory or administrative claimants. Grantee acknowledges that Grantor makes no representation or warranty with respect to the Assets being conveyed hereby except as specifically set forth in the Purchase Agreement.

3.      Assumed Liabilities. Buyer hereby accepts assignment, assumes, and agrees to discharge and perform when due, all the Assumed Liabilities.

4.      Warranty of Title.  Grantor does for itself, its successors and assigns, covenant and agree to and with Grantee to warrant and defend title to the Assets described herein and hereby sold unto Grantee, its executors, administrators, successors and assigns, against all and every person or persons whomsoever.

5.      Subject to Purchase Agreement. This Agreement is being delivered and executed pursuant to the Purchase Agreement and is subject to all the terms and conditions of the Purchase Agreement. No provision of this Agreement will enlarge, alter, or amend the terms or provisions of the Purchase Agreement. If there is any conflict between the terms and conditions of this Agreement and the terms and conditions of the Purchase Agreement, the terms and conditions of the Purchase Agreement control.

6.      Further Actions. Each party shall do and perform, or cause to be done and performed, all such further acts and things, and shall execute and deliver all such other agreements, certificates, instruments and documents, as the other party may reasonably request in order to carry out the intent and accomplish the purposes of this Agreement and the consummation of the transactions contemplated hereby.

7.      Counterparts; Electronic Signature. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by email or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

8.      Governing Law. This Agreement will be governed exclusively by the internal Laws of the

A-4

A-5

state of Nevada without regard to the conflicts of law principles of such state that would require the substantive Laws of another state to apply.

9.        Amendment or Modification; Waiver. This Agreement may be amended or modified only by a written instrument executed by the parties hereto. Any of the terms of this Agreement may be waived only in writing at any time by the party or parties hereto entitled to the benefits thereof.

[*Remainder of page intentionally left blank; signature page follows*]

**IN WITNESS WHEREOF**, the parties hereto have caused this Bill of Sale to be executed as of the Effective Date.

**GRANTEE:**

By_____
    Tim Clothier, Illusion Attractions, LLC

**GRANTOR:**

By_____
    Authorized Signer, Velocity Esports, Inc.

By_____
    Authorized Signer, Velocity Esports Las Vegas Town Square, LLC

B-1

**EXHIBIT C**

**NON-SOLICITATION AND NON-COMPETITION AGREEMENT**

This Non-Competition and Non-Solicitation Agreement (this "Agreement") is entered into this of __April 14__, 2026 by and between ILLUSION ATTRACTIONS, LLC, a Nevada limited liability company ("Buyer"), and VELOCITY ESPORTS INC., a Nevada corporation and VELOCITY ESPORTS LAS VEGAS TOWN SQUARE, LLC, a Nevada limited liability company ("Sellers") along with the selling shareholders of Sellers (collectively, the "Selling Shareholders," and together with the Sellers, the "Selling Parties."

**RECITALS**

WHEREAS, Buyer wishes to purchase, and Selling Parties wish to sell, all of the assets associated with the ownership and operation of entertainment venue featuring an arcade, bowling alley, lounge, and bar located at 6587 S. Las Vegas Blvd #171, Las Vegas, Nevada, 89119 (the "Business") pursuant to the terms of that certain Asset Purchase Agreement (the "Purchase Agreement") by and among Buyer and the Selling Parties;

WHEREAS, as a material inducement for Buyer to enter into the Purchase Agreement and consummate the transactions contemplated thereby, and to protect the goodwill, confidential information, and other intangible assets of the Business being acquired, the parties desire to enter into this Agreement to set forth certain covenants restricting Selling Parties' ability to compete with or solicit employees or customers of the Business for a limited period following Closing.

**AGREEMENT**

NOW, THEREFORE, in consideration of the promises and covenants contained in this Agreement and the Agreement,

1. **Non-Competition & Non-Solicitation**

The parties hereto agree as follows:

(a)     Selling Parties for a period of five (5) years after the Closing Date of the Agreement, between the parties and within a fifty (50) mile radius of 6587 S. Las Vegas Blvd #171, Las Vegas, Nevada, 89119 ("Protected Territory"), will not, directly or indirectly engage in, or have any ownership interest in any business that operates an entertainment venue that derives a majority of its business' revenue from any combination of arcade and bowling operations, without the prior written consent of Illusion Attractions LLC.

(b)     Selling Parties may not, for a period of five (5) years after the Closing Date of the Agreement between the parties, directly or indirectly solicit for employment any person who is currently employed as an employee or engaged by the Business as an independent contractor as of the Closing Date, provided that this restriction shall not apply to general solicitations not specifically targeted at such persons, or to persons who initiate contact with Selling Parties without solicitation.

(c)     Selling Parties, for a period of five (5) years after the Closing Date of the Agreement between the parties, shall not directly or indirectly solicit any customer

B-2

of the Business with whom the Business had active dealings within the six (6) months prior to Closing for the purpose of providing services substantially similar to those provided by the Business, provided that general advertising and marketing not specifically targeted at such customers shall not constitute solicitation.

(d)     For the purposes of this Agreement, the word "indirectly" shall include the utilization of any person, company or entity in which Sellers may have an interest, receive compensation from, or is acting as an independent contractor, agent, consultant, shareholder, partner, member, manager, officer, director or other representative.

(e)     If any court of competent jurisdiction determines that the period of five (5) years set forth in this Agreement as the duration of the non-competition covenant is unenforceable or unreasonable, the parties agree that such court shall have the authority to enforce the non-competition covenant for a period of three (3) years. If the court further determines that a period of three (3) years is also unenforceable or unreasonable, the court shall have the authority to enforce the non-competition covenant for a period of two (2) years.

## 2.   Acknowledgements

Selling Parties expressly acknowledge that the restrictive provisions of this Agreement are reasonable and necessary for the protection of Buyer's legitimate business interests, that such restrictions impose no undue burden upon Sellers, and that the enforcement of such restrictions will not cause Sellers to be deprived of the ability to earn a livelihood.

## 3.   Rights and Remedies

Upon any breach by Selling Parties of this Agreement, Buyer may institute and prosecute proceedings, at law or in equity, to obtain an injunction to enforce the provisions of this Agreement and to pursue any other remedy to which Buyer may be entitled. Buyer's remedy at law for any breach would be inadequate and Selling Parties agree that temporary or permanent injunctive relief may be granted in any proceeding which may be brought to enforce any provision of this Agreement, without the necessity of posting bond therefore or proof of actual damages, subject to the United States Bankruptcy Court for the District of Nevada, as applicable.

## 4.   Miscellaneous

This Agreement shall not be modified except by a written agreement dated subsequent to the date of this Agreement and signed by both parties.

Failure of either party to enforce any provision of this Agreement shall not constitute waiver of such provision or any other provisions of this Agreement.

If any action at law or in equity is necessary to enforce or interpret the rights arising out of or relating to this Agreement, the prevailing party shall be entitled to recover reasonable attorney's fees, costs and necessary disbursements in addition to any other relief to which it may be entitled.

B-3

This Agreement shall be construed and governed by the laws of the State of Nevada, and both parties further consent to venue and jurisdiction in Clark County Nevada.

[*Remainder of page intentionally left blank; signature page follows*]

B-4

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement by their duly authorized representatives as of the date first set forth below.

**BUYER:**

By:_____
Tim Clothier, Illusion Attractions, LLC

**SELLING PARTIES:**

By:_____
Authorized Signer, Velocity Esports, Inc.

By:_____
Authorized Signer, Velocity Esports Las Vegas Town Square, LLC

**SELLING SHAREHOLDERS:**

By:_____
Leonard Wanger

By:_____
Philip Kaplan

**SCHEDULE 1.1**

(Included Assets)

| TITLE | SERIAL NUMBER | DESCRIPTION | PURCHASE DATE | NOTES |
|---|---|---|---|---|
| SACOA Kiosk | 116830 | Cashless Card System | VES Aquired 2022 | |
| SACOA Kiosk | 116820 | Cashless Card System | VES Aquired 2022 | |
| SACOA Kiosk | 116822 | Cashless Card System | VES Aquired 2022 | |
| SACOA Kiosk | 116814 | Cashless Card System | VES Aquired 2022 | |
| Scanner | | Cashless Card System | VES Aquired 2022 | |
| Scanner | | Cashless Card System | VES Aquired 2022 | |
| DR490 Card Readers | | Cashless Card System | VES Aquired 2022 | 178 each |
| Air FX Air Hockey | AF-28857 | Arcade Game | VES Aquired 2022 | |
| Alpine Racer 2 | Alpine-1341 | Arcade Game | VES Aquired 2022 | |
| Alpine Racer 2 | Alpine-1334 | Arcade Game | VES Aquired 2022 | |
| Axemaster | 456 | Arcade Game | 24-Jan | |
| Big Buck Wild HD | BBHDP-04575 | Arcade Game | VES Aquired 2022 | |
| Big Buck World | BBWDLX-A2050 | Arcade Game | VES Aquired 2022 | |
| Candy Crane House | L-29402 | Arcade Game | Not Purchased - Subject to Master Equipment Lease Number 2025-0269 | Lease Agreement Schedule 2025-0269-01 (dated as of 6/26/2025) – Candy Crane House |
| Carnival Cups Crane | 2300009 | Arcade Game | 24-Jan | |
| Dark Escape 4D | 0000-0333-7035-000-110v | Arcade Game | VES Aquired 2022 | |
| Dead Heat | T001606E80 | Arcade Game | VES Aquired 2022 | |
| Dead Heat | T001907E02 | Arcade Game | VES Aquired 2022 | |
| Dead Storm Pirates | Fc00507E92 | Arcade Game | VES Aquired 2022 | |
| Drakons | DRK000037 | Arcade Game | | VEG 2024 REFRESH |
| Fire Storm Air Hockey Dynamo | 204018360 | Arcade Game | | |
| Ghostbuster Arcade | GBC16#1199 | Arcade Game | | |
| H2 Overdrive | H2042-02454 | Arcade Game | | |
| H2 Overdrive | H2042-02547 | Arcade Game | | |
| HALO 4 Player Tethered Gun | 1209 | Arcade Game | | VEG 2024 REFRESH |
| House of the Dead 4 | UO112230 | Arcade Game | | |
| Hypershoot | ML036997 | Arcade Game | | |
| Hypershoot | ML037003 | Arcade Game | | |
| Hypershoot | ML036999 | Arcade Game | | |
| Hypershoot | ML037004 | Arcade Game | | |
| Injustice | Injustice-42642 | Arcade Game | | |
| Jurassic Park | 6806 | Arcade Game | | |
| King Kong of Skull Island VR | KKOSI-1649 | Arcade Game | 22-Jul | All 2022 Refresh Games purchased in July, arrived between July and November- Can provide exact delivery dates upon request |
| Mach Storm | 000-0335-9733 | Arcade Game | | |
| Marvel vs Capcom | 33331 | Arcade Game | | |
| Maxitune 5DX + 4 Player | MTKTS100196 | Arcade Game | Not Purchased - Subject to Master Equipment Lease Number 2025-0269 | Lease Agreement Schedule 2025-0269-01 (dated as of 6/26/2025) - Maxitune 5DX+ 4 Player |

001

| Maxitune 5DX + 4 Player | MTDR100457 | Arcade Game | Not Purchased - Subject to Master Equipment Lease Number 2025-0269 | Lease Agreement Schedule 2025-0269-01 (dated as of 6/26/2025) - Maxitune 5DX+ 4 Player |
|---|---|---|---|---|
| Maxitune 5DX + 4 Player | MTDR100459 | Arcade Game | Not Purchased - Subject to Master Equipment Lease Number 2025-0269 | Lease Agreement Schedule 2025-0269-01 (dated as of 6/26/2025) - Maxitune 5DX+ 4 Player |
| Maxitune 5DX + 4 Player | MTDR100461 | Arcade Game | Not Purchased - Subject to Master Equipment Lease Number 2025-0269 | Lease Agreement Schedule 2025-0269-01 (dated as of 6/26/2025) - Maxitune 5DX+ 4 Player |
| Maximum Tune Card Station | | Arcade Game | Not Purchased - Subject to Master Equipment Lease Number 2025-0269 | Lease Agreement Schedule 2025-0269-01 (dated as of 6/26/2025) - Maxitune 5DX+ 4 Player |
| Minecraft | 65753 | Arcade Game | 22-Jul | |
| MOTO GP VR | MOTOGPVR-1164 | Arcade Game | | VEG 2024 REFRESH |
| MOTO GP VR | MOTOGPVR1157 | Arcade Game | | VEG 2024 REFRESH |
| Nitro Trucks | NITRO-1985 | Arcade Game | | VEG PAWNEE LEASE 070622-Nitro Trucks |
| Nitro Trucks | NITRO-2012 | Arcade Game | | VEG PAWNEE LEASE 070622-Nitro Trucks |
| Pac Man Battle Royale | FC01300A98 | Arcade Game | | |
| Pac Man Smash Air Hockey | PM01-14600-00 | Arcade Game | | |
| Pinball Game of Thrones | 261363 | Arcade Game | | |
| Pinball Ghost Busters | 261091 | Arcade Game | | |
| Pinball Indiana Jones | 218470 | Arcade Game | | |
| Pinball Kiss | 261812 | Arcade Game | | |
| Pump It Up Prime | GPUT0000001 | Arcade Game | | |
| Quick Shot | QS0109220138 | Arcade Game | | VEG PAWNEE LEASE 070622-Quick Shot |
| Quick Shot | QS0109220135 | Arcade Game | | VEG PAWNEE LEASE 070622-Quick Shot |
| Razing Storm | 026391-811971 | Arcade Game | | |
| Robin Hood | RHC10#1182 | Arcade Game | | |
| Showdown | 300015 | Arcade Game | | |
| Showdown | 300010 | Arcade Game | | |
| SnoCross | SNO-02983 | Arcade Game | | |
| SnoCross | SNO-02981 | Arcade Game | | |
| Step Maniax | AM29DAOAE8904E3EBA | Arcade Game | Not Purchased - Subject to Master Equipment Lease Number 2025-0269 | Lease Agreement Schedule 2025-0269-01 (dated as of 6/26/2025) - Step Maniax |
| Street Fighter 4 | U0117651 | Arcade Game | | |
| Super Bikes 2 | SB2-46027 | Arcade Game | | |
| Super Bikes 2 | SB2-46022 | Arcade Game | | |
| Super Bikes 2 | SB2-46028 | Arcade Game | | |
| Super Bikes 2 | SB2-46031 | Arcade Game | | |
| Target Bravo | U0152653 | Arcade Game | | |
| Tekken 5 | TK50899 | Arcade Game | | |
| Terminator Salvation SD | TSD-02802 | Arcade Game | | |
| Transformers | SMD120706 | Arcade Game | | |
| All About Timing | KM-AAT-10020007 | Arcade Game | | |
| Angry Birds Arcade | ABC6#1532 | Arcade Game | | |
| Angry Birds Coin Pusher 2P | QT221612 | Arcade Game | | VEG PAWNEE LEASE 070622-Angry Birds Coin Crash 2PLYR |
| Barrel of Monkeys | Monkeys-1147 | Arcade Game | | |
| Basketball Pro | BSP220401028-015 | Arcade Game | | |
| Bejewled | SMD118806 | Arcade Game | | |
| Big Bass Wheel | 1080 | Arcade Game | | |
| Big Foot Crush | C63022032400030 | Arcade Game | | |

002

| | | | | |
|---|---|---|---|---|
| Carnival Wheel | 4651 | Arcade Game | | VEG 2024 REFRESH- PAID TEAM PLAY DIRECTLY |
| Carnival Wheel | 4665 | Arcade Game | | VEG 2024 REFRESH- PAID TEAM PLAY DIRECTLY |
| Cocobowl | KM-COC-21090003 | Arcade Game | | |
| Connect 4 Deluxe | 599-D | Arcade Game | | |
| Connect 4 Hoops | 1127 | Arcade Game | | |
| Crane UFO Catcher | 1269720 | Arcade Game | | |
| Crazy Claw | 2025 | Arcade Game | | |
| Crossy Road | CR-0837 | Arcade Game | | |
| DC Superheroes Coin Pusher 2 | DC2211201024-018 | Arcade Game | | VEG PAWNEE LEASE 070622- DC Superheroes Coin-Pusher 2PL |
| Deal or No Deal | DNC10#2696(E) | Arcade Game | | |
| Deal or No Deal | DNC10#2697(E) | Arcade Game | | |
| Dizzy Chicken | 936 | Arcade Game | | |
| DodgeBall Standard | DB-66264 | Arcade Game | | BANK FINANCING- Paid off |
| E Claw 900 – (2 Player Crane Machine) | BE22000084-0106 | Arcade Game | Not Purchased - Subject to Master Equipment Lease Number 2025-0269 | Lease Agreement Schedule 2025-0269-01 (dated as of 6/26/2025) - E Claw 900 – (2 Player Crane Machine) |
| E Claw 900 – (2 Player Crane Machine) | BE22000019-0109 | Arcade Game | Not Purchased - Subject to Master Equipment Lease Number 2025-0269 | Lease Agreement Schedule 2025-0269-01 (dated as of 6/26/2025) - E Claw 900 – (2 Player Crane Machine) |
| Explosive Extreme | 129-2300 | Arcade Game | | |
| FishBowl Frenzy | SN-0532150373060 | Arcade Game | | |
| FishBowl Frenzy | SN-0522150192057 | Arcade Game | | |
| Frogger | GRO11#1088 | Arcade Game | | |
| Fruit Ninja 2X | FN-5341 | Arcade Game | | |
| Hyper Pitch | 39945 | Arcade Game | | VEG PAWNEE LEASE 070622- Hyperpitch |
| ICE Ball FX | ARC14#1281 | Arcade Game | | |
| ICE Ball FX | ARC14#1290 | Arcade Game | | |
| Jet Pong | 72977 | Arcade Game | | |
| King of Rings Jumbo | SN-07w-0480 | Arcade Game | | |
| Kung Fu Panda | KFL15#1214 | Arcade Game | | |
| Lucky Duck Crane | 2305804 | Arcade Game | | SCH BETSON LEASE 081423- Lucky Duck |
| Marvels Avenger 2 Player | AV2230201-036-030 | Arcade Game | Not Purchased - Subject to Master Equipment Lease Number 2025-0269 | Lease Agreement Schedule 2025-0269-01 (dated as of 6/26/2025) - Marvel Avengers 2 Player |
| Mega Prize | L-29471 | | | VEG 2024 REFRESH |
| Mega Stacker | ML034285 | Arcade Game | | |
| Milk Jug Toss | MJC14#2187 | Arcade Game | | |
| Milk Jug Toss | MJC14#2818 | Arcade Game | | |
| Monopoly Roll n Go | RM-52986 | Arcade Game | | |
| Monster Drop X-treme | 121-2376 | Arcade Game | | |
| Monster Drop X-treme | 121-2376 | Arcade Game | | |
| NERF | 2858 | Arcade Game | | |
| NFL 2 Min Drill | FBE08#0201 | Arcade Game | | |
| NFL 2 Min Drill | FBE08#0200 | Arcade Game | | |
| Over The Edge | T39623102100007 | Arcade Game | | SCH BETSON LEASE 081423- Over the Edge |

003

| | | | | |
|---|---|---|---|---|
| Photo Studio Prism | 062200004PSP | Arcade Game | | VEG PAWNEE LEASE 070622-Photo Studio Prism |
| Plants vs Zombies | NSGDQSJI00001071 | Arcade Game | | |
| Power Roll | KM-POR-23070033 | Arcade Game | Not Purchased - Subject to Master Equipment Lease Number 2025-0269 | Lease Agreement Schedule 2025-0269-01 (dated as of 6/26/2025) - Power Roll |
| Price Is Right Shell Game | SGS11#1075 | Arcade Game | | |
| Quik Drop | 661 | Arcade Game | | |
| Really Big Machine | MR5701RBM3037 | Arcade Game | Not Purchased - Subject to Master Equipment Lease Number 2025-0269 | Lease Agreement Schedule 2025-0269-01 (dated as of 6/26/2025) - Really Big Machine |
| Rick & Morty Blips and Chitz | QT23042410 | Arcade Game | | VEG 2024 REFRESH |

| Name | Serial | Type | Status | Notes |
|---|---|---|---|---|
| Showtime 4 Player Crane | 2302470 | Arcade Game | | SCH BETSON LEASE 081423-Showtime 4-Player |
| Skill Fall | Sega20231025205 | Arcade Game | | VEG 2024 REFRESH |
| Slam A Winner | 85-6607 | Arcade Game | | |
| Space Ballz | SN-SB0106140612 | Arcade Game | | |
| Space Invaders Frenzy | 3141 | Arcade Game | | |
| Space Warp | 613-11220 | Arcade Game | | VEG PAWNEE LEASE 070622-Space Wrap 66 DX |
| Speed Demon | 1931 | Arcade Game | | |
| Speed Demon | 1930 | Arcade Game | | |
| Spin & Win | 100773092 | Arcade Game | | |
| SpongeBob Pirate Coin Pusher | SBG220702-024-016 | Arcade Game | | |
| Stacker Giant | ML020443 | Arcade Game | | |
| Stacker Giant | ML020430 | Arcade Game | | |
| Taj Mahal Mini Rings | L-31517 | Arcade Game | | VEG 2024 REFRESH |
| Ticket Dome | T35122041900010 | Arcade Game | | |
| Tons of Tickets 2P | GG-66713/64589/64852MQ | Arcade Game | | BANK FINANCING- Paid off |
| Treasure Quest | VWC14#3060 | Arcade Game | | |
| Whack n Win | WN-64237 | Arcade Game | | SCH BETSON LEASE 081423-Whack n Win 11.2 |
| Wheel Of Fortune | WOF01119 | Arcade Game | | |
| Wicked Tuna 2P | C72522052300044 | Arcade Game | | |
| Winner's Cube | MW1CU17070011 | Arcade Game | | |
| Wizard of Oz Emerald City 2 Pla BE23000495 | -0109 | Arcade Game | | |
| Willy Wonka Coin Pusher 2P | BE22000015-0117 | Arcade Game | | VEG PAWNEE LEASE 070622-Willy Wonka 2PLYR |
| Redeem Machine Kiosk | KIS220401030-011 | Cashless Card System | | VEG PAWNEE LEASE 070622-Redeem Machine Kiosk |
| Redeem Machine Kiosk | KIS231201050025 | Cashless Card System | Not Purchased - Subject to Master Equipment Lease Number 2025-0269 | Lease Agreement Schedule 2025-0269-01 (dated as of 6/26/2025) – Redeem Machine Kiosk |
| Galaxy 3 Plus Dartboard | 39047 | Social Game | | VEG PAWNEE LEASE 070622? |
| Galaxy 3 Plus Dartboard | 39040 | Social Game | | VEG PAWNEE LEASE 070622? |
| Tornado Classic Foosball | | Social Game | | PAWNEE- Tornado Classic Foosball |
| Pool Table | | Social Game | | |
| Pool Table | | Social Game | | |
| Pool Table | | Social Game | | |
| Pool Table | | Social Game | | |
| Pool Table | | Social Game | | |
| Pool Table | | Social Game | | |
| Pool Table | | Social Game | | |
| Pool Table | | Social Game | | |
| Pool Table | | Social Game | | |
| Pool Table | | Social Game | | |
| Pool Table Jack | | | | |
| E-Blue Light Fixtures | | Esports Lounge | | |

004

| TITLE | SERIAL NUMBER | DESCRIPTION | PURCHASE DATE | NOTES |
|---|---|---|---|---|
| Donkey Kong Jr. | 3417 | Arcade Game | VES Aquired 2022 | Condition: used, good |
| Maxitune 5D | MTDR100463 | Arcade Game | 2024-01-01 00:00:00 | some cosmetic damage to one car during transfer from Schaumburg; Condition: used, excellent |
| Stepmaniax Arcade | AM29DAE8904636BA | Arcade Game | 2024-01-01 00:00:00 | Condition: used, excellent |
| Power Roll | ICM-POR-23070033 | Arcade Game | 2024-01-01 00:00:00 | Condition: used, excellent |
| Wizard of Oz Emerald City 2 Player | BE23000495-0109 | Arcade Game | VES Aquired 2022 | Condition: used, excellent |
| Redeem Machine Kiosk | KIS231101-040-010 | Cashless Card System | 2024-01-01 00:00:00 | Condition: used, excellent |
| Station 1 Computer | H3WK9T2 | Esports Lounge | 2024-05-01 00:00:00 | Intel Core i7-8700, 16GB Memory, NVIDIA GTX 1080, 2TB HDD + Intel Optane Memory; Condition: used, excellent |
| Station 2 Computer | H3ZK9T2 | Esports Lounge | 2024-05-01 00:00:00 | Intel Core i7-8700, 16GB Memory, NVIDIA GTX 1080, 2TB HDD + Intel Optane Memory; Condition: used, excellent |
| Station 3 Computer | H3TM9T2 | Esports Lounge | 2024-05-01 00:00:00 | Intel Core i7-8700, 16GB Memory, NVIDIA GTX 1080, 2TB HDD + Intel Optane Memory; Condition: used, excellent |
| Station 4 Computer | H3WM9T2 | Esports Lounge | 2024-05-01 00:00:00 | Intel Core i7-8700, 16GB Memory, NVIDIA GTX 1080, 2TB HDD + Intel Optane Memory; Condition: used, excellent |
| Station 5 Computer | H3XL9T2 | Esports Lounge | 2024-05-01 00:00:00 | Intel Core i7-8700, 16GB Memory, NVIDIA GTX 1080, 2TB HDD + Intel Optane Memory; Condition: used, excellent |
| Station 6 Computer | H3YG9T2 | Esports Lounge | 2024-05-01 00:00:00 | Intel Core i7-8700, 16GB Memory, NVIDIA GTX 1080, 2TB HDD + Intel Optane Memory; Condition: used, excellent |
| Station 7 Computer | H3WL9T2 | Esports Lounge | 2024-05-01 00:00:00 | Intel Core i7-8700, 16GB Memory, NVIDIA GTX 1080, 2TB HDD + Intel Optane Memory; Condition: used, excellent |
| Station 8 Computer | H3WF9T2 | Esports Lounge | 2024-05-01 00:00:00 | Intel Core i7-8700, 16GB Memory, NVIDIA GTX 1080, 2TB HDD + Intel Optane Memory; Condition: used, excellent |
| Station 9 Computer | H3TJ9T2 | Esports Lounge | 2024-05-01 00:00:00 | Intel Core i7-8700, 16GB Memory, NVIDIA GTX 1080, 2TB HDD + Intel Optane Memory; Condition: used, excellent |
| Station 10 Computer | H3XK9T2 | Esports Lounge | 2024-05-01 00:00:00 | Intel Core i7-8700, 16GB Memory, NVIDIA GTX 1080, 2TB HDD + Intel Optane Memory; Condition: used, excellent |
| Station 11 Computer | H40G9T2 | Esports Lounge | 2024-05-01 00:00:00 | Intel Core i7-8700, 16GB Memory, NVIDIA GTX 1080, 2TB HDD + Intel Optane Memory; Condition: used, excellent |
| Station 12 Computer | H3XH9T2 | Esports Lounge | 2024-05-01 00:00:00 | Intel Core i7-8700, 16GB Memory, NVIDIA GTX 1080, 2TB HDD + Intel Optane Memory; Condition: used, excellent |
| Station 13 Computer | H3YH9T2 | Esports Lounge | 2024-05-01 00:00:00 | Intel Core i7-8700, 16GB Memory, NVIDIA GTX 1080, 2TB HDD + Intel Optane Memory; Condition: used, excellent |
| Station 14 Computer | H3YF9T2 | Esports Lounge | 2024-05-01 00:00:00 | Intel Core i7-8700, 16GB Memory, NVIDIA GTX 1080, 2TB HDD + Intel Optane Memory; Condition: used, excellent |
| Station 15 Computer | H3ZF9T2 | Esports Lounge | 2024-05-01 00:00:00 | Intel Core i7-8700, 16GB Memory, NVIDIA GTX 1080, 2TB HDD + Intel Optane Memory; Condition: used, excellent |
| Station 16 Computer | MSB0Y20350103657 | Esports Lounge | VES Aquired 2022 | Alienware Computer Intel Core i7 14th Gen; Condition: used, end of life |
| Station 17 Computer | MSB0Y20350103653 | Esports Lounge | VES Aquired 2022 | Alienware Computer Intel Core i7 14th Gen; Condition: used, end of life |
| Station 18 Computer | MSB0Y20350103708 | Esports Lounge | VES Aquired 2022 | Alienware Computer Intel Core i7 14th Gen; Condition: used, end of life |
| Station 19 Computer | MSB0Y20350103712 | Esports Lounge | VES Aquired 2022 | Alienware Computer Intel Core i7 14th Gen; Condition: used, end of life |
| Station 20 Computer | MSB0Y20350103709 | Esports Lounge | VES Aquired 2022 | Alienware Computer Intel Core i7 14th Gen; Condition: used, end of life |
| Station 21 Computer | MSB0Y20350103717 | Esports Lounge | VES Aquired 2022 | Alienware Computer Intel Core i7 14th Gen; Condition: used, end of life |
| Station 22 Computer | MSB0Y20350103716 | Esports Lounge | VES Aquired 2022 | Alienware Computer Intel Core i7 14th Gen; Condition: used, end of life |
| Station 23 Computer | MSB0Y20350103707 | Esports Lounge | VES Aquired 2022 | Alienware Computer Intel Core i7 14th Gen; Condition: used, end of life |
| Station 24 Computer | MSB0Y20350103715 | Esports Lounge | VES Aquired 2022 | Alienware Computer Intel Core i7 14th Gen; Condition: used, end of life |
| Station 25 Computer | MSB0Y20350103713 | Esports Lounge | VES Aquired 2022 | Alienware Computer Intel Core i7 14th Gen; Condition: used, end of life |
| Station 26 Computer | H3VL9T2 | Esports Lounge | 2024-05-01 00:00:00 | Intel Core i7-8700, 16GB Memory, NVIDIA GTX 1080, 2TB HDD + Intel Optane Memory; Condition: used, excellent |

| | | | | |
|---|---|---|---|---|
| Station 27 Computer | H3VM9T2 | Esports Lounge | 2024-05-01 00:00:00 | Intel Core i7-8700, 16GB Memory, NVIDIA GTX 1080, 2TB HDD + Intel Optane Memory; Condition: used, excellent |
| Station 28 Computer | H3VG9T2 | Esports Lounge | 2024-05-01 00:00:00 | Intel Core i7-8700, 16GB Memory, NVIDIA GTX 1080, 2TB HDD + Intel Optane Memory; Condition: used, excellent |
| Station 29 Computer | H3XG9T2 | Esports Lounge | 2024-05-01 00:00:00 | Intel Core i7-8700, 16GB Memory, NVIDIA GTX 1080, 2TB HDD + Intel Optane Memory; Condition: used, excellent |
| Station 30 Computer | H3XJ9T2 | Esports Lounge | 2024-05-01 00:00:00 | Intel Core i7-8700, 16GB Memory, NVIDIA GTX 1080, 2TB HDD + Intel Optane Memory; Condition: used, excellent |
| Station 31 Computer | MSB0Y20350103714 | Esports Lounge | VES Aquired 2022 | Alienware Computer Intel Core i7 14th Gen; Condition: used, end of life |
| Station 32 Computer | MSB0Y20350103663 | Esports Lounge | VES Aquired 2022 | Alienware Computer Intel Core i7 14th Gen; Condition: used, end of life |
| Station 33 Computer | MSB0Y20350103654 | Esports Lounge | VES Aquired 2022 | Alienware Computer Intel Core i7 14th Gen; Condition: used, end of life |
| Station 34 Computer | MSB0Y20350103706 | Esports Lounge | VES Aquired 2022 | Alienware Computer Intel Core i7 14th Gen; Condition: used, end of life |
| Station 35 Computer | MSB0Y20350103665 | Esports Lounge | VES Aquired 2022 | Alienware Computer Intel Core i7 14th Gen; Condition: used, end of life |
| Station 36 Computer | MSB0Y20350103656 | Esports Lounge | VES Aquired 2022 | Alienware Computer Intel Core i7 14th Gen; Condition: used, end of life |
| Station 37 Computer | MSB0Y20350103641 | Esports Lounge | VES Aquired 2022 | Alienware Computer Intel Core i7 14th Gen; Condition: used, end of life |
| Station 38 Computer | MSB0Y20350103711 | Esports Lounge | VES Aquired 2022 | Alienware Computer Intel Core i7 14th Gen; Condition: used, end of life |
| Station 39 Computer | MSB0Y20350103662 | Esports Lounge | VES Aquired 2022 | Alienware Computer Intel Core i7 14th Gen; Condition: used, end of life |
| Station 40 Computer | MSB0Y20350103710 | Esports Lounge | VES Aquired 2022 | Alienware Computer Intel Core i7 14th Gen; Condition: used, end of life |
| Gaming Station 1 | | Esports Lounge | VES Aquired 2022 | PS4 and 1 external hard drive; Condition: used, good |
| Gaming Station 2 | | Esports Lounge | VES Aquired 2022 | PS4 and 1 external hard drive; Condition: used, good |
| Gaming Station 3 | | Esports Lounge | VES Aquired 2022 | PS4 and 1 external hard drive; Condition: used, good |
| Gaming Station 4 | | Esports Lounge | VES Aquired 2022 | PS4 and 1 external hard drive; Condition: used, good |
| Gaming Station 5 | | Esports Lounge | VES Aquired 2022 | PS4 and No external hard drive; Condition: used, |
| Gaming Station 6 | | Esports Lounge | VES Aquired 2022 | PS4 and 1 external hard drive; Condition: used, good |
| Gaming Station 7 | | Esports Lounge | VES Aquired 2022 | PS4 and 1 external hard drive; Condition: used, good |
| Gaming Station 8 | | Esports Lounge | VES Aquired 2022 | PS4 and 1 external hard drive; Condition: used, good |
| Gaming Station 9 | | Esports Lounge | VES Aquired 2022 | PS4 and 1 external hard drive; Condition: used, good |
| Gaming Station 10 | | Esports Lounge | VES Aquired 2022 | PS4 and 1 external hard drive; Condition: used, good |
| Gaming Station 11 | | Esports Lounge | VES Aquired 2022 | XBOX and 1 external hard drive; Condition: used, |
| Gaming Station 12 | | Esports Lounge | VES Aquired 2022 | XBOX and 1 external hard drive; Condition: used, |
| Gaming Station 13 | | Esports Lounge | VES Aquired 2022 | XBOX and 1 external hard drive; Condition: used, |
| Gaming Station 14 | | Esports Lounge | VES Aquired 2022 | XBOX and 1 external hard drive; Condition: used, |
| Gaming Station 15 | | Esports Lounge | VES Aquired 2022 | XBOX and NO external hard drive; Condition: used, good |
| Gaming Station 16 | | Esports Lounge | VES Aquired 2022 | XBOX and 1 external hard drive; Condition: used, |
| Gaming Station 17 | | Esports Lounge | VES Aquired 2022 | XBOX and 1 external hard drive; Condition: used, |
| Gaming Station 18 | | Esports Lounge | VES Aquired 2022 | XBOX and 1 external hard drive; Condition: used, |
| Gaming Station 19 | | Esports Lounge | VES Aquired 2022 | XBOX and 1 external hard drive; Condition: used, |
| Gaming Station 20 | | Esports Lounge | VES Aquired 2022 | XBOX and 1 external hard drive; Condition: used, |
| Lounge Station 1 | | Esports Lounge | VES Aquired 2022 | 1 PS5, 1 Switch,1 Xbox, 2 hard drives; Condition: used, good |
| Lounge Station 2 | | Esports Lounge | VES Aquired 2022 | 1 switch, 1 xbox Series x, 1 PS5, 1 hard drive; Condition: used, good |
| Lounge Station 3 | | Esports Lounge | VES Aquired 2022 | 1 PS5, 1 Switch , 1 hard drive; Condition: used, good |
| Lounge Station 4 | | Esports Lounge | VES Aquired 2022 | 1 Xbox Series X; Condition: used, good |
| Lounge Station 5 | | Esports Lounge | VES Aquired 2022 | 1 PS5 , 1 switch, 1 hard drive; Condition: used, good |
| Lounge Station 6 | | Esports Lounge | VES Aquired 2022 | 1 Switch, 1 xbox series X; Condition: used, good |
| Nintendo Switch Console | | Esports Lounge | VES Aquired 2022 | Condition: used, good |
| Nintendo Switch Console | | Esports Lounge | VES Aquired 2022 | Condition: used, good |
| NZXT Gaming PC Desktop | | Esports Lounge | 2023-05-01 00:00:00 | Intel Core i9-12900K RTX 3080 32GB RAM; Condition: used, good |
| MSI G273CQ 27in Curved Gaming Monitor | | Esports Lounge | 2023-05-01 00:00:00 | 20 each; Condition: used, good |
| Cougar Gaming Chairs | | Esports Lounge | VES Aquired 2022 | 30 each- number may vary- these are in rough shape; Condition: used, end of life |
| Gaming Accessories Console | | Xbox, Playstation, Switch-games, controllers | VES Aquired 2022 | Can Provide itemized INV upon request; Condition: used, good |
| Gaming Accessories PC | | Headsets, mouse, keyboard, monitors | VES Aquired 2022 | Can Provide itemized INV upon request; Condition: used, good |
| GAMING HUB, VELOCITY "V" ESPORTS Console Stand | | Dining Room/Bar Gaming | 2024-01-01 00:00:00 | 2 each; Condition: used, excellent |
| DILLON SILVER CLUB CHAIR BLACK | | Dining Room/Bar Gaming | 2024-01-01 00:00:00 | 4 each; Condition: used, excellent |
| TCL - 55" Class Q7 Series QLED 4K UHD Smart Google TV | | Dining Room/Bar Gaming | 2024-01-01 00:00:00 | Condition: used, excellent |

| | | | | |
|---|---|---|---|---|
| TCL - 55" Class Q7 Series QLED 4K UHD Smart Google TV | | Dining Room/Bar Gaming | 2024-01-01 00:00:00 | Condition: used, excellent |
| PlayStation 5 console | | Dining Room/Bar Gaming | 2024-01-01 00:00:00 | 2 each; Condition: used, good |
| Nintendo Switch Console | | Dining Room/Bar Gaming | 2024-01-01 00:00:00 | 2 each; Condition: used, good |
| Samsung 65" TV | | Bowling Lounge | TVs last about 3 years and get replaced as needed | 6 each |
| TCL 55" TV | | Bowling Lounge | | 2 each |
| Bowling Lane 1 | 594-056 | Bowling Lounge | VES Aquired 2022 | Installed in 2014 Lanes, Pinsetters, TCL Monitor 50" for Scoring; Condition: used, need minor |
| Bowling Lane 2 | 594-062 | Bowling Lounge | VES Aquired 2022 | Lanes, Pinsetters, TCL Monitor 50" for Scoring; Condition: used, need minor maintenance |
| Bowling Lane 3 | 594-064 | Bowling Lounge | VES Aquired 2022 | Lanes, Pinsetters, TCL Monitor 50" for Scoring; Condition: used, need minor maintenance |
| Bowling Lane 4 | 594-067 | Bowling Lounge | VES Aquired 2022 | Lanes, Pinsetters, TCL Monitor 50" for Scoring; Condition: used, need minor maintenance |
| Bowling Lane 5 | 594-065 | Bowling Lounge | VES Aquired 2022 | Lanes, Pinsetters, TCL Monitor 50" for Scoring; Condition: used, need minor maintenance |
| Bowling Lane 6 | 594-020 | Bowling Lounge | VES Aquired 2022 | Lanes, Pinsetters, TCL Monitor 50" for Scoring; Condition: used, need minor maintenance |
| Bowling Lane 7 | 594-070 | Bowling Lounge | VES Aquired 2022 | Lanes, Pinsetters, TCL Monitor 50" for Scoring; Condition: used, need minor maintenance |
| Bowling Lane 8 | 594-071 | Bowling Lounge | VES Aquired 2022 | Lanes, Pinsetters, TCL Monitor 50" for Scoring; Condition: used, need minor maintenance |
| Bowling Scoring Monitor | | Bowling Lounge | | |
| Wooden Upholstered bowling benches 8' | | Bowling Lounge | VES Aquired 2022 | Bowling Lounge- 8 each; Condition: reupholstered in early 2024 |
| Oval wood coffee tables | | Bowling Lounge | VES Aquired 2022 | Bowling Lounge- 4 each; Condition: used, good |
| Bowling Accessories | | Bowling Lounge | VES Aquired 2022 | Can Provide itemized INV upon request; Condition: used, good |
| bowl bowl racks- round with table top | | Bowling Lounge | VES Aquired 2022 | 3 each; Condition: used, good |
| Plastic bowling ramps | | Bowling Lounge | VES Aquired 2022 | 3 each; Condition: used, good |
| Fiberglass bowling ramp | | Bowling Lounge | VES Aquired 2022 | 3 each; Condition: used, good |
| *1 IT rack POS 100 | | | | *1 IT rack POS 100 |
| *(has file servers, net gear ports, allworx DVR, camera DVR, Dell task manager tower) | | | | *(has file servers, net gear ports, allworx DVR, camera DVR, Dell task manager tower) |
| CXD 4.3 Processing AMP 4 Channel lo-z/hi-z | | A/V System- upgraded | 2022-07-01 00:00:00 | 7 each; Condition: used, good |
| Network HD boxes | | | 2022-07-01 00:00:00 | 6 each; Condition: used, good |
| Wyrestorm Controllers | | | 2022-07-01 00:00:00 | 4 each; Condition: used, good |
| Dream Machine network router | | | 2022-07-01 00:00:00 | Condition: used, good |
| Cisco Stackable manage switch | | | 2022-07-01 00:00:00 | Condition: used, good |
| Zyxel switch | | | 2022-07-01 00:00:00 | Condition: used, good |
| Leviton Switch | | | 2022-07-01 00:00:00 | Condition: used, good |
| Dynex LCD TV | | | 2022-07-01 00:00:00 | Condition: used, good |
| Atlona HDMi with IR receiverRS232 | | Atlona HDMi with IR | 2022-07-01 00:00:00 | Condition: used, good |
| QSC outdoor speaker | | Patio | 2022-07-01 00:00:00 | Condition: used, good |
| QSC outdoor speaker | | Patio | 2022-07-01 00:00:00 | Condition: used, good |
| JBL 2 way speaker | | JBL 2 way speaker | 2022-07-01 00:00:00 | 18 each; Condition: used, good |
| JBL subwoofer | | JBL subwoofer | 2022-07-01 00:00:00 | 2 each; Condition: used, good |
| Samsung TV 55" | | Dining Room/Bar/Social | | 9 each |
| RCA TV 55" | | Dining Room/Bar/Social | | |
| TCL TV 65" | | Dining Room/Bar/Social | | 7 each |
| Viewsonic Projector | | Dining Room/Bar/Social | 2024-02-01 00:00:00 | |
| Hisense TV 65" | | Dining Room/Bar/Social | | 4 each |
| Infocus Projector | | Dining Room/Bar/Social | 2024-01-01 00:00:00 | 2 each |
| Epson LCD Laser Projector EB-L735U | | Dining Room/Bar/Social | 2024-01-01 00:00:00 | 3 each |
| Toshiba TV 55" | | Dining Room/Bar/Social | | 7 each |
| Micros Printer | | POS System-Epson printer | VES Aquired 2022 | 17 each; Condition: used, end of life |
| Micros Terminal | | POS System | VES Aquired 2022 | 17 each; Condition: used, end of life |
| JLG manlift | | | | Scissor Lift |
| CO2 Monitoring System | | CO2 Monitoring System | | |
| LG Laptop 15795P | 402NZMM036387 | | 2025-08-01 00:00:00 | Event Laptop; Condition: used, excellent |
| Dell Poweredge R330 | | Dell Poweredge R330 | 2024-01-01 00:00:00 | Condition: used, excellent |
| intel mini PC | G6PA3120000PA SA M68302 -503 | | 2024-01-01 00:00:00 | Event Computer; Condition: used, excellent |
| Dell OptiPlex (Ops) | 88QKDX3 | | 2024-01-01 00:00:00 | OPS Computer; Condition: used, excellent |
| Dell OptiPlex (Events) | B8QKDX3 | | 2024-01-01 00:00:00 | OPS Computer; Condition: used, excellent |
| LG Laptop 15795P (Events) | | | 2024-01-01 00:00:00 | GM Computer; Condition: used, excellent |
| Security Camera System - GW5564NS-V8 | 620522110008 | Camera System | 2024-01-01 00:00:00 | Server & 48 Individual Cameras- SN#s hidden below; Condition: used, excellent |
| GWP85BF | 47223030628 | | 2024-01-01 00:00:00 | Condition: used, excellent |
| GWP85BF | 47223030427 | | 2024-01-01 00:00:00 | Condition: used, excellent |
| GWP85BF | 47223030645 | | 2024-01-01 00:00:00 | Condition: used, excellent |
| GWP85BF | 47223030635 | | 2024-01-01 00:00:00 | Condition: used, excellent |
| GWP85BF | 47223030184 | | 2024-01-01 00:00:00 | Condition: used, excellent |
| GWP85BF | 47223030622 | | 2024-01-01 00:00:00 | Condition: used, excellent |
| GWP85BF | 47223030629 | | 2024-01-01 00:00:00 | Condition: used, excellent |

| | | | | |
|---|---|---|---|---|
| GWP85BF | 47223030185 | | 2024-01-01 00:00:00 | Condition: used, excellent |
| GWP85BF | 47223030009 | | 2024-01-01 00:00:00 | Condition: used, excellent |
| GWP85BF | 47223030272 | | 2024-01-01 00:00:00 | Condition: used, excellent |
| GWP85BF | 47223030790 | | 2024-01-01 00:00:00 | Condition: used, excellent |
| GWP85BF | 47223030177 | | 2024-01-01 00:00:00 | Condition: used, excellent |
| GWP85BF | 47223030180 | | 2024-01-01 00:00:00 | Condition: used, excellent |
| GWP85BF | 47223030421 | | 2024-01-01 00:00:00 | Condition: used, excellent |
| GWP85BF | 47223030179 | | 2024-01-01 00:00:00 | Condition: used, excellent |
| GWP85BF | 47223030002 | | 2024-01-01 00:00:00 | Condition: used, excellent |
| GWP85BF | 4722303078 | | 2024-01-01 00:00:00 | Condition: used, excellent |
| GWP85BF | 47223030643 | | 2024-01-01 00:00:00 | Condition: used, excellent |
| GWP85BF | 47223030435 | | 2024-01-01 00:00:00 | Condition: used, excellent |
| GWP85BF | 47223030624 | | 2024-01-01 00:00:00 | Condition: used, excellent |
| GWP85BF | 47223030790 | | 2024-01-01 00:00:00 | Condition: used, excellent |
| GW8536MIC | 299723090408 | | 2024-01-01 00:00:00 | Condition: used, excellent |
| GW8536MIC | 299723090348 | | 2024-01-01 00:00:00 | Condition: used, excellent |
| GW8536MIC | 299723090373 | | 2024-01-01 00:00:00 | Condition: used, excellent |
| GW8536MIC | 299723090368 | | 2024-01-01 00:00:00 | Condition: used, excellent |
| GW8536MIC | 299723090411 | | 2024-01-01 00:00:00 | Condition: used, excellent |
| GW8536MIC | 299723090338 | | 2024-01-01 00:00:00 | Condition: used, excellent |
| GW8536MIC | 299723090450 | | 2024-01-01 00:00:00 | Condition: used, excellent |
| GW8536MIC | 299723090345 | | 2024-01-01 00:00:00 | Condition: used, excellent |
| GW8536MIC | 299723090366 | | 2024-01-01 00:00:00 | Condition: used, excellent |
| GW8536MIC | 299723090380 | | 2024-01-01 00:00:00 | Condition: used, excellent |
| GW8536MIC | 299723090369 | | 2024-01-01 00:00:00 | Condition: used, excellent |
| GW8536MIC | 299723090382 | | 2024-01-01 00:00:00 | Condition: used, excellent |
| GW8536MIC | 299723090381 | | 2024-01-01 00:00:00 | Condition: used, excellent |
| GW8536MIC | 299723090197 | | 2024-01-01 00:00:00 | Condition: used, excellent |
| GW8536MIC | 299723090372 | | 2024-01-01 00:00:00 | Condition: used, excellent |
| GW8536MIC | 299723090339 | | 2024-01-01 00:00:00 | Condition: used, excellent |
| GW8536MIC | 299723090335 | | 2024-01-01 00:00:00 | Condition: used, excellent |
| GW8536MIC | 299723090347 | | 2024-01-01 00:00:00 | Condition: used, excellent |
| GW8536MIC | 299723090370 | | 2024-01-01 00:00:00 | Condition: used, excellent |
| FortiGate 100F | FG100FTK23065457 | | 2024-01-01 00:00:00 | Condition: used, excellent |
| FortiSwitch 124F FPOE | S124FFTF23036211 | | 2024-01-01 00:00:00 | Condition: used, excellent |
| FortiSwitch 124F FPOE | S124FFTF23035858 | | 2024-01-01 00:00:00 | Condition: used, excellent |
| FortiAP 231G | FP231GTF23085688 | | 2024-01-01 00:00:00 | Condition: used, excellent |
| FortiAP 231G | FP231GTF23089946 | | 2024-01-01 00:00:00 | Condition: used, excellent |
| FortiAP 231G | FP231GTF23093939 | | 2024-01-01 00:00:00 | Condition: used, excellent |
| FortiAP 231G | FP231GTF23093208 | | 2024-01-01 00:00:00 | Condition: used, excellent |
| Fire Supression System | | | | |
| Metal Stanchions | | | VES Aquired 2022 | 18 each; Condition: used, good |
| Carlisle SIngle hand sinks | | Bar | 2024-07-01 00:00:00 | 4 each |
| Carlisle dual hand sinks | | Bar | VES Aquired 2022 | 2 each; Condition: used, good |
| ice bins with speedrail | | Bar | VES Aquired 2022 | 6 each; Condition: used, good |
| Perlick glass coolers | | Bar | VES Aquired 2022 | Condition: used, good |
| TurboAir fridges | | Bar | VES Aquired 2022 | 3 each; Condition: used, good |
| 3 Compartment slushy Machine I-Pro | | Bar | VES Aquired 2022 | Condition: used, good |
| Carlisle single hand sink | | BOH | VES Aquired 2022 | 4 each; Condition: used, good |
| Everest Refrigeration Sandwich Prep Table | BPBNWR218040036 | BOH | VES Aquired 2022 | Condition: used, good |
| 6' Refrigerated Prep Table | | BOH | VES Aquired 2022 | True Brand; Condition: used, good |
| Refrigerated Prep Table 6" | | BOH | VES Aquired 2022 | Atosa; Condition: used, good |
| Reach In Refrigerator | | BOH | VES Aquired 2022 | Traulsen; Condition: used, good |
| Built in ice cream freezer | | BOH | VES Aquired 2022 | Condition: used, good |
| Shake Mixer | | BOH | VES Aquired 2022 | Hamilton Beach Commercial; Condition: used, good |
| Reach In Refrigerator | | BOH | VES Aquired 2022 | True Brand; Condition: used, good |
| 14.5' X 7' X 8' Walk In Refrigerator | | BOH | VES Aquired 2022 | Condition: used, good |
| Cooling Evaporator | | BOH | VES Aquired 2022 | Condition: used, good |
| 10.5' X 7.5' X 8' Walk In Freezer with Stainless Floor | | BOH | VES Aquired 2022 | Condition: used, good |
| Cooling Evaporator | | BOH | VES Aquired 2022 | Condition: used, good |
| Stainless Steel Dirty Dish Apron with 2 Built in Sinks 8'6" X 3' 6" with Glass Rack Holder | | BOH | VES Aquired 2022 | Condition: used, good |
| Stainless Steel Clean Dish Apron 6' X 42" | | BOH | VES Aquired 2022 | Condition: used, good |
| Ice Machine | | BOH | VES Aquired 2022 | Scotsman; Condition: used, good |
| Halo Heat Holding Cabinet | | BOH | VES Aquired 2022 | 2 each; Condition: used, good |
| 20 qt Mixer with Attachments-Stainless Steel Mixing Bowl | | BOH | VES Aquired 2022 | Galaxy Mixer; Condition: used, good |
| Stainless Steel 2 Compartment Prep Sink with Drain Apron | | BOH | VES Aquired 2022 | 2 each; Condition: used, good |
| 14" X 60" Stainless Steel Wall Shelf with Brackets | | BOH | VES Aquired 2022 | Condition: used, good |
| 24" X 24" Stainless Steel Cabinet with Backsplash | | BOH | VES Aquired 2022 | Condition: used, good |
| 18" X 24" Stainless Stteel Tables with Galvanized Shelf Underneath(2) | | BOH | VES Aquired 2022 | Condition: used, good |
| 6 Burner Counter Top Range | | BOH | VES Aquired 2022 | Radiance; Condition: used, good |

| | | | | |
|---|---|---|---|---|
| Stainless Steel Equipment Stand with Shelf on Casters | | BOH | VES Aquired 2022 | Condition: used, good |
| Refrigerated Food Prep Table 2' | | BOH | VES Aquired 2022 | Asber; Condition: used, good |
| 30" X 36" Counter Top Griddle | | BOH | VES Aquired 2022 | Radiance; Condition: used, good |
| Cheese Melter/Salamander Broiler | | BOH | VES Aquired 2022 | Condition: used, good |
| Avantco Stand up Freezer | | BOH | VES Aquired 2022 | Model 178A19FHC; Condition: used, good |
| 54" X 11' 3" Hoods with Make Up Air | | BOH | VES Aquired 2022 | 2 each; Condition: used, good |
| Pizza Dough Roller & 24" Prep Table | 95186 | BOH | 2024-01-01 00:00:00 | WASSERSTROM INV9421246459- SCH NORTHSTAR LEASE; Condition: used, good |
| Southbend Double Convection oven | 24D05925 | BOH | VES Aquired 2022 | Condition: used, good |
| Henny Penny Fryer Computron 1000 | | BOH | 2024-07-01 00:00:00 | 3 compartment; Condition: used, good |
| Avantco Food warmer countertop | | BOH | VES Aquired 2022 | twin well; Condition: used, good |
| Marshal Pizza oven double decker Gas | | BOH | 2022-08-01 00:00:00 | SD448; Condition: used, good |
| Avantco Glass Chiller | | BOH | VES Aquired 2022 | Condition: used, good |
| Avantco Roll cooler single door | | BOH | VES Aquired 2022 | 2 each; Condition: used, good |
| Drying rack tables in Bar for dishwashers | | BOH | VES Aquired 2022 | Supreme Metal- 4 each; Condition: used, good |
| Smallwares Misc | | BOH- prep, cooking, storage | 2022-10-01 00:00:00 | Can Provide itemized INV upon request; Condition: replaced as needed |
| Smallwares Misc | | FOH- plates, glassware, flatware | 2022-10-01 00:00:00 | Can Provide itemized INV upon request; Condition: replaced as needed |
| Smallwares Misc | | Events- trays, plates, serving tools | 2022-10-01 00:00:00 | Can Provide itemized INV upon request; Condition: replaced as needed |
| Plastic folding event tables 4'x4' square | | Event Supplies | | 4 each |
| Plastic folding event tables 6' Retangle | | Event Supplies | | 33 each |
| Plastic folding event tables Round 6' | | Event Supplies | | 6 each |
| Portable mobile bar metal | | Event Supplies | VES Aquired 2022 | Condition: used, good |
| Chaffers retangle | | Event Supplies | | 20 each |
| chaffers circle | | Event Supplies | | 5 each |
| Metal Folding Chairs | | Event Supplies | | 79 each |
| Cocktail small wood with metal legs | | Dining Room/Bar/Social | 2022-08-01 00:00:00 | 23 each; Condition: used, good |
| High top Bar tables wood 3'x3' | | Dining Room/Bar/Social | 2022-08-01 00:00:00 | 14 each; Condition: used, good |
| Dining room Chairs assorted wood | | Dining Room/Bar/Social | 2022-08-01 00:00:00 | 30 each; Condition: used, good |
| Dining room Metal Chairs | | Dining Room/Bar/Social Lounge | 2022-08-01 00:00:00 | 133 each (some currenlty in esports); Condition: used, good |
| Bar Chairs Metal | | Dining Room/Bar/Social | 2022-08-01 00:00:00 | 103 each; Condition: used, good |
| Dining room Tables wood- 6' | | Dining Room/Bar/Social | 2022-08-01 00:00:00 | 6 each; Condition: used, good |
| Dining room Tables wood- 8' | | Dining Room/Bar/Social | 2022-08-01 00:00:00 | 2 each; Condition: used, good |
| Dining room Tables wood- 4'x4' | | Dining Room/Bar/Social | 2022-08-01 00:00:00 | 21 each; Condition: used, good |
| Dining room Tables wood- 4'x3' | | Dining Room/Bar/Social | 2022-08-01 00:00:00 | 12 each; Condition: used, good |
| Booth single seat | | Dining Room/Bar/Social | 2022-08-01 00:00:00 | 12 each; Condition: used, good |
| Booth double seat | | Dining Room/Bar/Social | 2022-08-01 00:00:00 | 5 each; Condition: used, good |
| High Chairs | | Dining Room/Bar/Social | 2022-08-01 00:00:00 | 6 each; Condition: used, good |
| Booster Seat | | Dining Room/Bar/Social | 2022-08-01 00:00:00 | 6 each; Condition: used, good |
| Metal top round cocktail table | | Dining Room/Bar/Social | 2022-08-01 00:00:00 | 5 each; Condition: used, good |

And, any other unencumbered equipment, inventory, and property located at Space-171, consisting of 36,870 square feet (the "Premises") located at 6587 Las Vegas Boulevard South, Las Vegas, Nevada 89119

**SCHEDULE 1.2(a)**

(Equipment Leases)


Master Equipment Lease No. 2025-0269, dated June 26, 2025, between NFS Capital, LLC, as lessor, and Velocity Esports Las Vegas Town Square, LLC, as lessee, together with Schedule No. 1, Sub-Schedules 1A, 1B, and 1C, the related security agreement, guaranties, and related lease documents

**SCHEDULE 1.2(b)**

(Intellectual Property)

The following Intellectual Property Assets of the Sellers, together with all goodwill associated therewith, are included in the Purchased Assets.

*Buyer intends to grant the Velocity Esports Kentucky operator a fully paid-up, perpetual, non-exclusive, territory-restricted license to use the Velocity / Velocity Esports names, trademarks, tag lines, service marks, logos, trade dress, brand assets, and associated goodwill, including related digital, online, and social media usage rights, solely within the designated geographic territory, and subject at all times to the Kentucky operator's continuing compliance with a separate post-closing license agreement, which shall govern the scope, standards of use, quality control requirements, enforcement rights, and other terms applicable to such use. The license shall be personal to the Kentucky operator and shall not include any right to sublicense, assign, or otherwise transfer.*

*In addition, Buyer intends to provide the Kentucky operator with rights to access and use Kentucky-specific customer names, contact information, and related customer records solely for operation of the Kentucky business, subject to applicable law and the terms of the post-closing license agreement.*

**1. Trademarks, Service Marks, Names, and Branding**
- The Velocity name, brand, and associated goodwill
- The Velocity Esports name, brand, and associated goodwill
- All related brand names, assumed names, trade names, service marks, and trademarks, whether registered or unregistered
- All associated slogans and taglines
- All logos, brand marks, and graphical identity assets
- Trade dress, visual identity systems, and design standards

**2. Marketing and Brand Assets**
- Marketing materials (print, digital, broadcast, and experiential)
- Advertising campaigns, content, creative work product, artwork, and archives
- Branded signage, environmental graphics, and in-venue brand assets
- Photographic libraries, video content, artwork, and media assets
- Branded merchandise designs, artwork, and related creative files

**3. Digital Assets**
- All website content, structure, UX/UI design, and digital creative
- Domain names, URLs, redirects, and associated rights
- Social media accounts, handles, content, analytics, followers, and historical data
- Email branding, templates, layouts, and messaging frameworks

**4. Copyrighted Works and Proprietary Materials**
- Training manuals, instructional materials, handbooks, and educational content
- Operational playbooks, SOPs, systems, guides, and manuals
- Menus, culinary content, menu design, and related creative elements
- Tournament, programming, party, and special-event formats and supporting materials
- Marketing, promotional, and sales frameworks and documentation

**5. Proprietary Concepts, Know-How, and Trade Secrets**
- Game-floor curation concepts and experience-design frameworks
- Pricing strategies, promotional methodology, and sales systems
- Recipes, proprietary service methods, and experiential operations methodology
- Confidential business methods, analytics, insights, strategies, and know-how
- Updates, enhancements, refinements, and evolutions to brand standards and systems

**6. Customer & Business Information**
- Customer databases, customer profiles, and customer contact lists
- CRM, booking, and marketing data structures and schemas
- Historical business, operational, and performance data

**7. Vendor and Support Information**
- Vendor sourcing information, vendor program methodologies, and procurement frameworks (to the extent transferable)

**SCHEUDLE 1.2(d)**

(Assigned Contracts)

SRMF Town Square Owner LLC - the lease of certain premises commonly known as Space B-171 (the "Premises") consisting of approximately 36,870 square feet in the shopping center commonly known as Town Square Las Vegas in Las Vegas, Nevada, subject to any amendments thereto.

**SCHEDULE 1.3**

(Excluded Assets)

**Transferred Customer Data does not include:**
(i) payment card other than the last four numbers of any payment card;
(ii) mailing or residential address information;
(iii) date of birth, state or country of residence, usernames, gamer tags, passwords, credentials, social media handles, photographs, avatars, cookies, pixels, device information, IP address information, analytics, gameplay or competition data, parent/guardian data, or minors' data; and
(iv) any customer or consumer data relating to the Newport, Kentucky location or any non-Las Vegas location.

Avoidance actions, causes of action under chapter 5 of the Bankruptcy Code, or similar estate claims

**SCHEDULE 4.2**

(Assumed Liabilities)

There are no assumed liabilities to be identified on this Schedule.

**SCHEDULE 6.1(a)**

(Third Party Consents Required)


SMRF Town Square Owner, LLC

NFS Capital LLC

Newtek Bank N.A.

Pawnee Leasing Corporation

**SCHEDULE 6.1(f)**

(Unfiled Insurance Claims)


The are no unfiled Insurance claims as of the Effective Date

B-4

**SCHEDULE 8.8**

(Undisclosed Credits or Deposits)

$25,000 in estimated outstanding player rewards and game cards.  Buyer to recieve cash credit at closing.