## INDEX TO STANDARD COMMERCIAL SHOPPING CENTER LEASE

<u>Page No.</u>

**ARTICLE 1. Definitions and Certain Basic Provisions** .................................................................. 1
**ARTICLE 2. Granting Clause** ......................................................................................................... 5
**ARTICLE 3. Construction and Acceptance of Demised Premises** ................................................ 5
**ARTICLE 4. Monthly Payment; Minimum Rental & Percentage Rental** ..................................... 7
**ARTICLE 5. Sales Reports and Records** ......................................................................................... 8
**ARTICLE 6. Additional Rent** .......................................................................................................... 9
**ARTICLE 7. Common Area** ........................................................................................................... 11
**ARTICLE 8. Use and Care of Premises** ........................................................................................ 11
**ARTICLE 9. Maintenance and Repair of Premises** ...................................................................... 15
**ARTICLE 10. Alterations** ............................................................................................................... 16
**ARTICLE 11. Landlord's Right of Access; Use of Roof** .............................................................. 17
**ARTICLE 12. Signs; Store Fronts** ................................................................................................. 17
**ARTICLE 13. Utilities** ................................................................................................................... 17
**ARTICLE 14. Indemnity** ................................................................................................................ 18
**ARTICLE 15. Non-Liability for Certain Damages** ...................................................................... 21
**ARTICLE 16. Damage by Casualty** .............................................................................................. 21
**ARTICLE 17. Eminent Domain** .................................................................................................... 22
**ARTICLE 18. Assignment and Subletting** .................................................................................... 22
**ARTICLE 19. Default by Tenant and Remedies** ........................................................................... 23
**ARTICLE 20. Mechanics' Liens** ................................................................................................... 27
**ARTICLE 21. Holding Over** .......................................................................................................... 27
**ARTICLE 22. Subordination** ......................................................................................................... 27
**ARTICLE 23. Exculpation** ............................................................................................................. 28
**ARTICLE 24. Notices** .................................................................................................................... 28
**ARTICLE 25. Tenant's Restriction** ............................................................................................... 28
**ARTICLE 26. Miscellaneous** ......................................................................................................... 28
**ARTICLE 27. Landlord's Lien** ...................................................................................................... 33
**ARTICLE 28. Hazardous Waste** ................................................................................................... 33

Exhibit A. Premises Description ...................................................................................................... A-37
Exhibit B. Site Plan ........................................................................................................................ B-1
Exhibit C. Work Letter .................................................................................................................... C-5
Exhibit D. Sign Criteria ................................................................................................................... D-6
Exhibit E. Guaranty ......................................................................................................................... E-1
Exhibit F. Renewal Term ................................................................................................................. F-1
Exhibit G. Exclusives/Noxious Uses .............................................................................................. G-1
Exhibit H. Gross Sales Exclusions .................................................................................................. H-1
Exhibit W. Depiction of Gallery Building ....................................................................................... W-1
Exhibit X. Permitted Games ............................................................................................................ X-1

i

**LEASE BETWEEN**

**NOTL Property Owner LLC,**

**a Delaware limited liability company**

**AND**

**VELOCITY ESPORTS NEWPORT KENTUCKY, LLC,**

**A KENTUCKY LIMITED LIABILITY COMPANY**

**AT**

**NEWPORT ON THE LEVEE**
**Newport, Kentucky**

# STANDARD COMMERCIAL
# SHOPPING CENTER LEASE

This Lease is entered into as of _____February 16,_____, 2022 (the "Effective Date"), by Landlord and Tenant.

**ARTICLE 1.** **Definitions and Certain Basic Provisions**.

1.1 "Landlord": NOTL Property Owner LLC, a Delaware limited liability company.

Landlord's address: c/o North American Properties
212 East Third Street, Suite 300
Cincinnati, Ohio 45202
Attn: Tim Perry

With a Required copy to:
Ulmer & Berne LLP
600 Vine Street, 28th Floor
Cincinnati, OH 45202
Attn: Scott P. Kadish

Rent Payment Address:
NOTL Property Owner LLC
Lockbox # 005686
Address: PO BOX 645686
Cincinnati, Ohio 45264-5686

If payment by Wire/ACH:
US Bank ABA# is: 042-000-013
Account #: 130125581459
Account Name: NOTL Property Owner LLC–
Lockbox Account

Landlord's EIN: 38-4097963

1.2 "Tenant": Velocity Esports Newport Kentucky, LLC, a Kentucky limited liability company

Tenant's mailing address: Velocity Esports Newport Kentucky, LLC
3838 N. Kenneth Avenue
Chicago, Illinois 60641
Attn: Leonard Wanger

Tenant's trade name: [TRADE NAME]

Tenant's EIN: 87-4482243

1.3 "**Premises**": Space P130 containing approximately 22,081 square feet as depicted on the space plan attached as Exhibit A (the "Retail Space") and Space G117 containing approximately 2,777 square feet as depicted on the site plan attached as Exhibit B (the "Storage Space") (the Retail Space and Storage Space is collectively referred to herein as the "Premises"). The Premises contains approximately 24,858 square feet and is part of the Shopping Center depicted on Exhibit B. The "Premises" excludes the exterior walls, roof, and the floor slab (excluding floor covering installed by Tenant) and areas beneath the floor slab and all Common Areas. Within 30 days following the Delivery Date, upon request of either Landlord or Tenant, Landlord shall have its architect ("Landlord's Architect") measure the final Premises to determine the Floor Area therein. In making such determination, Landlord's Architect shall measure from the center line of walls partitioning the Premises from other premises and from the exterior surface of exterior walls. If the area reflected by such measurement varies from that set forth in this Lease, then Minimum Rental and Tenant's proportionate share of Taxes shall be appropriately adjusted, provided, however, that in no event shall Minimum Rental be increased by more than 2% because of a variance in area of the Premises. If neither party requests a measurement within such 30 day period, then the area specified in this Lease shall be deemed to be the Floor Area of the Premises. If Tenant disputes the measurement of Landlord's Architect, Tenant shall notify Landlord within five days after receipt by Tenant of such measurement. Tenant shall then have 15 days to have an architect selected by Tenant ("Tenant's Architect") measure the Premises using the procedures set forth herein. If Tenant's Architect disputes the findings of Landlord's Architect, both Architects shall meet in good faith for a period not to exceed 15 days and try to reach agreement on the Floor Area of the Premises. If the Architects cannot reach agreement within such period, the Architects shall in good faith select a third, independent architect (the "Resolution Architect") to measure the Premises. The measurement of the Resolution Architect shall be final and binding on all parties. All fees and costs payable to Landlord's Architect shall be paid by Landlord. All fees and costs payable to Tenant's Architect, shall be paid by Tenant. Tenant and Landlord shall each be responsible for one-half of the fees and costs payable to the Resolution Architect.

1.4 "**Shopping Center**": The property shown on the Site Plan (the "Site Plan" attached as Exhibit B (but excluding any hotel, office or residential space), together with such additions and other changes as Landlord may from time to time designate as included within the Shopping Center. The Shopping Center is a part of a larger mixed use project that includes residential, office and other uses (the "Project"). Tenant acknowledges that the Site Plan is intended only to show the general layout of the Shopping Center and is not a warranty of the specific dimensions of any specific building or amenity or the presence of any occupant. Notwithstanding the attachment of the Site Plan, Landlord may, subject to the terms hereof, modify it from time to time without Tenant's consent.

1.5 "**Floor Area**": When used in reference to the Shopping Center, "Floor Area" means the gross leasable area of the Shopping Center available for occupancy by retail tenants, excluding mezzanines, balcony areas, basement space, kiosks and pushcarts and subject to changes in the Shopping Center after the date hereof. When used in reference to the Premises,

2

"Floor Area" means the gross leasable area of the Premises as set forth in Section 1.3 above. As used herein, "retail tenants" mean non-hotel, non-residential, non-office space tenants.

1.6    "**Term**": 10 Lease Years, commencing on the Commencement Date specified in Section 3.2.

1.7    "**Estimated Delivery Date**": Five business days after the Leasing Contingency Satisfaction Date.

1.8    "**Permitted Use**":  The Premises shall be used solely for be used only for the purpose of a retail facility:

(a)    providing technology-based interactive and non-interactive electronic entertainment for the public, which may include, without limitation, the use and/or rental of large scale attractions, ride simulators, arcade games, video arcade games, pinball games, computer and other Internet games, redemption games, virtual reality equipment and attractions, computer-generated photographic and photomorphing booths or machines, laser equipment, billiard tables, go-carts and any new uses related to any of the foregoing games and entertainment uses which may occur or arise during the natural evolution of Tenant's business (and/or any substitutes for such items which are a technological evolution of the foregoing items), and miniature golf, provided such use does not use greater than 10% of the Premises, but Tenant shall not be entitled to operate a movie theater in the Premises;

(b)    the sale of food and beverages for consumption within the Premises including, without limitation, the operation of a full or self-service restaurant and/or the operation of a bar offering the sale of beer, wine and other alcoholic beverages, as well as the presentation of live entertainment and/or live or recorded music in connection therewith; provided, however, that the area for such restaurant or bar shall not exceed 10,000 square feet (excluding banquet areas), and the menu for such restaurant or bar shall be substantially similar to the menu attached hereto as Exhibit J (which menu may be modified from time to time provided it does not conflict with, or violate any exclusives of, other restaurant tenants in the Shopping Center as of the date of such modification, as reasonably determined by Landlord); and

(c)    the incidental sales and/or rental of various media and other merchandise relating to the foregoing including, without limitation, Sega products and computer and/or entertainment software and hardware, electronic products, audio and video related products (but no more than 30 titles of pre-recorded music and no more than 30 titles of pre-recorded movie videos, except for pre-recorded music or pre-recorded movie videos related to Tenant's and Tenant's affiliated companies' products, characters or properties (which shall not be subject to said 30-title limitation), shall be permitted), video and computer games, virtual reality games, simulators and other games and attractions for amusement and entertainment containing any related technology now or hereafter developed (and/or any substitutes for such items which are a technological evolution of the foregoing items), logo merchandise, books, magazines and other publications (but no more than 30 titles within any such category shall be permitted), and other products sold in Tenant's other locations from time-to-time or otherwise related to Tenant's and Tenant's affiliated companies' products, characters and other properties, and on-premises

promotions conducted by Tenant, any partner or member or affiliated entity of Tenant, or any sponsors selected by Tenant.

The uses described in subparagraphs (a), (b) and (c) above are referred to herein collectively as the "Permitted Use". In no event shall Tenant conduct any business in the Premises which would violate the exclusives heretofore granted to other tenants of the Shopping Center set forth in Exhibit G or any noxious use set forth in Exhibit G, or any exclusive hereafter granted by Landlord to a tenant of the Shopping Center of which Tenant receives written notice and which does not preclude any of Tenant's then uses.

(d)    For so long as Tenant operates any part of the Premises for the Permitted Use set forth in Section 1.7(a) above and Tenant is not in default under this Lease beyond any applicable notice or cure period, Tenant shall have the exclusive right to occupy and operate a business within the existing Gallery Building (as depicted on Exhibit W attached hereto) for a retail facility providing games for the public as its primary use, including arcade games, video arcade games, LAN games and redemption games (the "Exclusive Use").  Notwithstanding the foregoing, nothing in this Section 1.7(d) shall prohibit; (i) the operation of large screen or multi-screen theaters in the Shopping Center, (ii) the operation of up to 16 games and other amusement devices (electronic or otherwise) in the multi-screen theater in the Shopping Center, so long as access is restricted to paying customers of the theater; or, (iii) the operation of up to eight games and other amusement devices (electronic or otherwise) in the bowling facility in the Shopping Center, so long as such games and amusement devices are incidental to the primary business of bowling and subject to Tenant's prior review and reasonable approval, which shall not be unreasonably withheld. In addition, the games listed on Exhibit X attached hereto shall be deemed approved by Tenant.

(e)    Tenant shall not be prohibited from serving any permitted item on its then-current menu due to Landlord granting another tenant an exclusive right.

1.9    "**Minimum Rental**":

| Lease Year | Per Sq. Ft. | Per Year | Per Month |
|---|---|---|---|
| 1-5* | $23.50 | $584,163.00 | $48,680.25 |
| 6 -10 | $26.25 | $652,522.50 | $54,376.88 |

* During the first and second months of the first Lease Year, Tenant shall have no obligation to pay Minimum Rental. During the last month of the first and second Lease Year, Minimum Rental shall be doubled to $97,360.50.

1.10    "**Percentage Rental**":  The product of (1) the amount of Gross Sales in excess of the Breakpoint, multiplied by (2) 16%.  The "**Breakpoint**" is $3,300,000.00.

1.11    "**Tenant's Construction Period**":   60 days, commencing on the Delivery Date.

1.12    "**Lease Year**":   A 12 month period.  The first Lease Year shall commence on the Commencement Date, provided that if the Commencement Date is a date other than the first day of a calendar month, the first month of the first Lease Year shall include the partial calendar

4

month during which the Commencement Date occurs plus the immediately following full calendar month.

1.13   "**Renewal Term**":   Tenant shall have the right to extend the Term of this Lease on the terms and conditions set forth in Exhibit F of this Lease.

1.14   **"Security Deposit"**: $48,680.25, payable upon execution of this Lease by Tenant.  In the case of an Event of Default, the Security Deposit may be used by Landlord to cure Tenant's obligation hereunder, in which event Tenant shall restore the Security Deposit to its full amount within five days after written request.

1.15   "**Prepaid Rent**":   None.

1.16   "**Guarantor**": Velocity Esports, Inc., a Nevada corporation, in accordance with Exhibit E executed simultaneously herewith.

**ARTICLE 2.  Granting Clause**.

2.1   Subject to the terms of this Lease, Landlord leases to Tenant, and Tenant leases from Landlord, the Premises.

**ARTICLE 3.  Construction and Acceptance of Demised Premises**.

3.1   Landlord shall within 30 days after the Effective Date prepare and submit to Tenant for Tenant's approval proposed plans and specifications (the "Landlord's Proposed Plans"), including, as applicable and possible, reuse of the existing conditions. If Tenant fails to approve or disapprove, in writing, the Landlord's Proposed Plans within 15 business days after receipt thereof from Landlord, then such approval will be deemed to have been granted.  If Tenant furnishes Landlord a written response, Landlord agrees to resubmit revised Landlord's Proposed Plans within 10 business days after having received Tenant's response and Tenant will then have a 10 business day period within which to review the same.  If Tenant fails to respond within said 10 business days, then such revision will be deemed approved.  Such review process will continue, with each party exercising good faith, until the Landlord's Proposed Plans are acceptable to both Landlord and Tenant (said approved Landlord's Proposed Plans shall be referred to as the "Landlord's Approved Plans").

It is the intention of Landlord and Tenant that the cost to Landlord to perform Landlord's Work shall not exceed $497,160.00.00 (the "Expenditure Cap"), including without limitation, the cost of design, permit, impact, and connection fees.  If Landlord's Work is anticipated to exceed the Expenditure Cap, Landlord and Tenant shall promptly meet and review the Construction Plans and use commercially reasonable efforts to agree upon modifications to the Construction Plans to reduce the cost of Landlord's Work below the Expenditure Cap within thirty days of Landlord's written notice of the overage.  In connection with this review, Landlord agrees to disclose costs to Tenant that have been or are anticipated to be incurred in connection with expediting performance of the Landlord's Work in order to complete the Landlord's Work by the Anticipated Opening Date.  Tenant shall be responsible for the cost of any work that exceeds the Expenditure Cap. If and to the extent Landlord's Work costs less than the Expenditure Cap, Tenant may use such

amounts for repairs and upgrades to the HVAC system, provided any such amount not used within 18 months of the Commencement Date shall be forfeited and void.

In the event Tenant or Tenant's Architect directly requests a change order related to Landlord's Work, Landlord shall, within 10 days after such request, obtain a cost estimate on such change order from Landlord's general contractor, and Landlord shall provide such cost estimate to Tenant for approval. Within five days after receipt of such cost estimate, Tenant shall either approve such cost estimate or reject such cost estimate. If approved by Tenant, such change order shall be deemed effective and Tenant shall reimburse Landlord for all documented costs for construction pursuant to such change order, up to the amount of the estimate provided by Landlord's general contractor. If Tenant rejects the cost estimate provided by Landlord's general contractor, the change order shall be deemed ineffective, provided that if the work provided by the proposed change order proceeds without Tenant's approval, Landlord shall be solely responsible for the cost of such change order work as part of Landlord's Work.

The Premises shall be ready for occupancy by Tenant when possession of the Premises is delivered to Tenant free and clear of any other tenant (said date may be referred to herein as the "Delivery Date"). In all events, the Delivery Date shall be deemed to occur not later than the date on which Tenant takes possession of the Premises and commences Tenant's Work.

Tenant shall accept possession of the Premises on the Delivery Date AS IS and diligently perform Tenant's Work and install its fixtures, furniture and equipment during the Construction Period to make cosmetic and branding changes ("Tenant's Work"). Any personal property in the Premises on the Delivery Date shall be considered abandoned property by the prior tenant and Tenant shall take possession of such property, subject to any liens or agreements regarding such property. Landlord quitclaims any ownership right in the abandoned property and makes no representations or warranties to Tenant as to the condition of any of the abandoned property, nor regarding any liens or agreements affecting the abandoned property. The Tenant is responsible to field verify all conditions. Suitability of any systems to be re-used shall be determined solely by the Tenant. Tenant is responsible for any required demolition in the Premises as well as the removal of any existing systems that the Tenant elects to abandon. Tenant shall make any subsequent repairs to Landlord's shell construction and/or sealing of any existing penetrations that are not to be re-used by Tenant. All permits for Tenant's Work shall be obtained by Tenant at Tenant's sole cost and expense. Tenant shall not commence Tenant's Work until Tenant has delivered to Landlord evidence of the insurance required under Section 14.2 of this Lease, although Tenant's failure to deliver such evidence shall not delay or extend Tenant's Construction Period or the Commencement Date.

Tenant agrees to diligently perform all Tenant's Work in accordance with this Lease, the Newport on the Levee Design Criteria Manual previously furnished to Tenant ("Design Manual") and all laws, rules, regulations and ordinances applicable thereto. The contents of the Design Manual, the Sign Criteria and Contractor Rules & Regulations are subject to change at Landlord's reasonable discretion and upon reasonable prior, written notice to Tenant. Tenant and Tenant's general contractor shall abide by and comply with all terms, conditions, rules and regulations set forth in the Design Manual, the Sign Criteria and the Contractor Rules & Regulations. In the event of any conflict between the Design Manual, the Sign Criteria, the Contractor Rules & Regulations, or this Lease, this Lease shall prevail.

Landlord shall supervise and manage the performance of Tenant's Work and shall be paid a fee equal to 5% of the cost of Tenant's Work. Landlord is authorized to pay such fee from the Tenant Finish Allowance otherwise due hereunder.

3.2     Upon the approval of such plans, and subject to Section 3.1 above, Landlord shall install in the Premises all wall coverings, floor coverings, and other leasehold improvements contemplated by Landlord's Approved Plans ("Landlord's Work"). Landlord's Work shall be completed when Landlord substantially completes Landlord's Work and certifies to Tenant that it has substantially completed such Landlord's Work.

3.3     The Premises shall be ready for occupancy by Tenant upon completion of Landlord's Work (said date may be referred to herein as the "Delivery Date"). Tenant shall accept possession of the Premises on the Delivery Date and diligently install its fixtures, furniture and equipment. In all events, the Delivery Date shall be deemed to occur not later than the date on which Tenant takes possession of the Premises and commences Tenant's Work. If Landlord is unable to deliver the Premises to Tenant within one year after the Estimated Delivery Date, Landlord may terminate this Lease by written notice to Tenant delivered at any time thereafter prior to delivery, in which event neither party shall have any further obligations hereunder.

3.4     The "Commencement Date" shall be the first of (a) the date upon which Tenant opens the Premises to the public for business, or (b) the expiration of Tenant's Construction Period. Occupancy of the Premises by Tenant prior to the Commencement Date shall be subject to all of the provisions of this Lease excepting only those requiring the payment of Rent (as defined in Section 4.1). At the request of either, Landlord and Tenant will, following the Commencement Date, execute and deliver a commencement date agreement reciting the exact Commencement Date and termination date of this Lease. In the event Tenant fails to open for business to the public from substantially all of the Premises by the expiration of Tenant's Construction Period, Tenant shall thereupon, without the requirement of any additional notice or cure period, be in default hereunder and in addition to any and all other available remedies Tenant shall pay Landlord two times the aggregate Rent otherwise payable for each day such default continues.

3.5     Upon completion of Tenant's Work, Tenant shall deliver to Landlord the following:

(a)     An affidavit signed by Tenant certifying that Tenant has substantially completed Tenant's Work in compliance with the requirements of this Lease.

(b)     A final notarized original, unconditional waiver of lien with respect to the Premises executed by Tenant's general contractor and final notarized original, unconditional waiver of liens executed by each subcontractor, laborer, and material supplier engaged in or supplying materials or services for Tenant's work. All waiver of lien documentation must, in every circumstance, be totally unconditional releases.

3.6     Tenant's contractors shall obtain and maintain such insurance as Landlord may reasonably require.

**ARTICLE 4.  <u>Monthly Payment; Minimum Rental & Percentage Rental</u>**.

4.1     All Rent shall accrue from the Commencement Date, and shall be payable where designated by Landlord, without demand therefor and without any right of abatement, set-off or deduction, for any reason whatsoever.  Minimum Rental, Percentage Rental and all other amounts payable by Tenant pursuant to this Lease are herein referred to as "**Rent**." All payments shall be payable in United States funds, at the address indicated in Section 1.1 (unless otherwise specified by written notice from Landlord to Tenant). No payment by Tenant of a lesser amount than the correct rent shall be deemed to be other than a payment on account, and no endorsement or statement on any check or other communication accompanying a check shall be deemed an accord and satisfaction, and Landlord may accept such check as partial payment without prejudice to Landlord's right to recover the balance owed by Tenant or to pursue against Tenant any additional remedies available under this Lease or provided at law or in equity. The obligations of Tenant to pay Rent that have accrued as of the date of expiration or sooner termination of the Term shall survive the expiration or earlier termination of this Lease.

4.2     The first Minimum Rental payment shall be due and payable on the Commencement Date, and subsequent Minimum Rental payments shall be due and payable, in advance, on or before the first day of each succeeding calendar month during the Term; if the Commencement Date is other than the first day of a month, the initial Minimum Rental payment shall be appropriately prorated.

4.3     Percentage Rental shall accrue as provided above, and shall be calculated on a Lease Year basis.  Percentage Rental shall be due, in arrears, within 30 days after the month in which Tenant's reports of Gross Sales exceed the Breakpoint for any year and within 30 days after each month of such Lease Year thereafter.

4.4     "**Gross Sales**" shall include the entire amount of the sales price, whether for cash or otherwise, of all sales of goods, merchandise, food,  beverages and services, and all other receipts whatsoever, of all business conducted in or from the Premises, including mail or telephone orders received or filled at the Premises, deposits not refunded to purchasers, orders taken, although filled elsewhere, sales to employees, sales through vending machines or other devices, and sales by any sublessee, concessionaire or licensee or otherwise in the Premises.  Gross Sales shall not include those items set forth on Exhibit H to this Lease.

4.5     The Security Deposit shall be the amount provided in Section 1.12 hereof. In the case of an Event of Default, the Security Deposit may be used by Landlord to cure Tenant's obligations hereunder, in which event Tenant shall restore the Security Deposit to its full amount within five days after written request. Any balance of the deposit shall be returned to Tenant within 60 days after the end of the term of this Lease, together with a reasonable itemization of any deductions.  Upon a bona fide sale of the Shopping Center, Landlord shall have the right to transfer such deposit to the purchaser to be held under the terms of this Lease, and Landlord shall thereafter be released from all liability for the return of such deposit to Tenant.  The fact that the Security Deposit may be sufficient to cover any unpaid rent or other damages suffered by Landlord shall not impair the Landlord's right to exercise any power of termination or other remedy which Landlord may have upon default by Tenant.

**ARTICLE 5.  Sales Reports and Records**.

8

5.1    By the 15th day of each month Tenant shall deliver to Landlord a statement of Gross Sales for the preceding calendar month and for the Lease Year to date, certified by Tenant to be accurate; such statement shall reflect total Gross Sales, Gross Sales per square foot of Floor Area in the Premises, and whether the Breakpoint has been reached or exceeded, and the amount of Kentucky sales tax paid or payable by Tenant for such month with respect to its business at the Premises.  Within 60 days after the expiration of each calendar year and within 60 days after termination of this Lease, Tenant shall deliver to Landlord a like statement of Gross Sales for the preceding calendar year, certified to be correct by an independent certified public accountant or by an officer of Tenant if Tenant is a publicly held corporation.  Tenant shall furnish similar statements for any licensees, concessionaires and subtenants.  All such statements shall be in such form and shall be accompanied by such supporting information as Landlord may require.  If any such statement discloses an error in the calculation of the Percentage Rental for any period, an appropriate adjustment shall be made.  If Tenant fails to timely furnish any Gross Sales statement, and does not cure same within 10 days after written notice, Landlord may charge a fee of $100.00 per day until the required statement is furnished, from and after the date on which such statement was due.  Tenant shall obtain prior to the Commencement Date and maintain during the entire Term of this Lease a Kentucky Sales Tax Identification Number which applies solely to the Premises.

5.2    Tenant shall keep at the Premises or at Tenant's principal office within the United States a complete and accurate set of books and records of Gross Sales and all supporting records such as tax reports, banking records, cash register tapes, sales slips and other sales records, which shall be preserved for at least 36 months after the end of the Lease Year to which they relate, and shall be subject to inspection and audit by Landlord and its agents at all reasonable times. Landlord's audit right shall be contingent upon at least fifteen (15) day advance written notice and Landlord shall not be permitted to audit Tenant's records more than once every twelve (12) months.  If any Gross Sales statements are not submitted by Tenant or if the statements submitted are found to be incorrect, Tenant shall promptly pay Landlord any deficiency owed, and if the statements submitted are found to be incorrect to an extent of more than 2% over the figures submitted by Tenant, Tenant shall pay for Landlord's inspection or audit on demand.

**ARTICLE 6.  <u>Additional Rent</u>.**

6.1    Common Area Maintenance Costs – None, provided that Tenant acknowledges that Landlord has allocated a portion of the Minimum Rental due hereunder to the payment of common area maintenance costs.

6.2    Marketing Payment – None, provided that Tenant acknowledges that Landlord has allocated a portion of the Minimum Rental due hereunder to the payment of marketing expenses.

6.3    Insurance Payment - None, provided that Tenant acknowledges that Landlord has allocated a portion of the Minimum Rental due hereunder to the payment of Landlord's insurance expenses.

6.4    Real Estate Tax Payment – From and after the Commencement Date, Tenant shall pay a portion of all taxes, public, special and private assessments, contractual

9

payments in lieu of taxes, community development charges, and other governmental charges of any kind and nature whatsoever now or subsequently levied or assessed against all or any portion of the Shopping Center, upon the privilege of renting the Premises, or upon the amount of rent collected therefor (the "Taxes"). Taxes shall not include federal income taxes or inheritance taxes. Landlord may employ professionals to attempt to assure a fair tax burden on the Shopping Center, and the cost thereof, as well as any fees, expenses and costs incurred in contesting any assessments, levies or the tax rate applicable to the Shopping Center, shall be included in Taxes. Tenant's obligation to pay a portion of such Taxes shall be determined by multiplying the Adjusted Taxes by a fraction, the numerator of which is the Floor Area of the Premises, and the denominator of which is the greater of the Adjusted Leased Floor Area, or the 90% Minimum Floor Area. Tenant shall pay its portion of Taxes in monthly installments concurrently with each payment of Minimum Rental. The initial monthly tax payment is based upon the estimated Taxes for the calendar year in question, and the monthly tax payment is subject to increase or decrease as determined by Landlord to reflect an accurate estimate of Tenant's portion of the Taxes. The estimated initial monthly tax payment is $8,596.73 (based on $4.15 per square foot per year). Tax payments shall be reconciled annually on a calendar year basis, and if Tenant's total tax payments are less than Tenant's actual portion of the Taxes, Tenant shall pay to Landlord upon demand the difference; if the total tax payments exceed Tenant's actual portion of the Taxes, Landlord shall retain such excess and credit it to future tax payments or return it to Tenant. "Adjusted Leased Floor Area" means (a) the Floor Area of the Shopping Center, multiplied by (b) the percentage of the Floor Area of the Shopping Center leased by tenants (measured on a weighted average basis for the year), minus (c) the Floor Area of any Anchor that pays less than its full pro rata share of the expense at issue. "90% Minimum Floor Area" means (a) the Floor Area of the Shopping Center, multiplied by (b) 90%, minus (c) the Floor Area of any Anchor that pays less than its full pro rata share of the expense at issue. "Adjusted Taxes" means the aggregate Taxes, minus all contributions towards Taxes by Anchors that pay less than their pro rata share of such Taxes. "Anchor" means any tenant of the Shopping Center leasing 10,000 square feet of Floor Area or more.

6.5     Tenant shall pay all taxes levied against personal property and trade fixtures placed in the Premises. If any such taxes are levied against Landlord or Landlord's property and Landlord elects to pay the same, or if the assessed value of Landlord's property is increased by inclusion of Tenant's personal property and trade fixtures and Landlord elects to pay the taxes based on such increase, Tenant shall pay to Landlord upon demand that part of such taxes for which Tenant is primarily liable as additional rent hereunder. Tenant hereby acknowledges that it must, and hereby agrees to, collect all applicable State, local and district sales tax from its customers and pay such sales tax to the appropriate taxing authority when and as due.

6.6     Tenant acknowledges that Landlord has obtained or may obtain industrial development revenue bond financing ("IRB Financing") to assist in the financing of certain improvements necessary for the successful development of the Shopping Center (the "Authority"), as a result of which the ad valorem taxes payable with respect to the Shopping Center will be reduced (the "Tax Abatement"). Tenant acknowledges that Landlord has made a significant investment in order to obtain such Tax Abatement. Accordingly, Landlord shall be the sole beneficiary of the Tax Abatement. For the period commencing on the Commencement Date and ending on the date that the Tax Abatement is no longer in effect (the "Tax Abatement Period"), the amount payable by Tenant as Taxes shall be deemed to be an amount equal to the product of Tenant's Proportionate Share multiplied by the amount of the Taxes that would have been assessed

10

against the Shopping Center but for the Tax Abatement; provided, however, in no event shall Tenant be required to pay Taxes in an amount in excess of its Proportionate Share of the Taxes that would otherwise be levied against the Shopping Center were the Tax Abatement not in effect.

6.7    Landlord shall at its expense arrange for trash removal from the Common Areas.  Tenant shall pay a reasonable charge for the removal of trash and garbage from the Premises, provided that because the cost of trash and garbage removal for restaurants, nightclubs, and food service operations is greater than that for retail operations, Landlord will allocate such costs between these types of tenants so as to take such increased costs into account.  Such amount shall be payable within 30 business days after receipt of written invoice from Landlord, or may be billed directly by the entity providing such service.

6.8    Tenant shall reimburse Landlord within five days after written demand for all work and services performed by Landlord at the request of Tenant, including directory changes/additions, and any other service performed by Landlord that is Tenant's responsibility hereunder and not performed by Tenant within 30 days after written notice, plus an administrative charge of 15%.

ARTICLE 7.  **Common Area**.

7.1    The "**Common Area**" is the part of the Shopping Center designated by Landlord from time to time for the common use of all tenants, including without limitation parking areas (including multi-level parking structures), sidewalks, landscaping, curbs, loading areas, private streets and alleys, lighting facilities, hallways, malls, and restrooms, all of which are subject to Landlord's sole control.  Landlord shall maintain the Common Area and keep it clean and free of snow and ice.  Landlord may from time to time: change the dimensions and location of the Common Area, as well as the location, dimensions, identity and type of buildings; construct additional buildings or additional stories on existing buildings or other improvements in the Project or Shopping Center; and eliminate buildings.  Tenant and its employees, customers, subtenants, licensees and concessionaires shall have a non-exclusive license to use the Common Area in common with Landlord, other tenants of the Shopping Center and other persons permitted by Landlord to use the same.  Landlord may promulgate and modify from time to time rules and regulations for the safety, care or cleanliness of the Shopping Center which shall be complied with by Tenant and its employees, agents, visitors and invitees.  Landlord may temporarily close any part of the Common Area for such periods of time as may be necessary for construction, repair or maintenance, promotional activities or to prevent the public from obtaining prescriptive rights or to make repairs or alterations.  Landlord may designate areas in which Tenant's employees shall be required to park (which may be located off the Shopping Center if Landlord provides a reasonable shuttle service), and Tenant shall cause its employees to park in such areas.  Landlord shall also have the right to designate office and residential parking areas.  Landlord reserves the right to charge for use of any multi-level parking structures.

7.2    Landlord may from time to time substitute for any parking area serving the Shopping Center with other areas or multi-level parking facilities reasonably accessible to the tenants of the Shopping Center.

ARTICLE 8.  **Use and Care of Premises**.

11

8.1     The Premises may be used only for the purpose specified in Article 1 and for no other purpose.  Tenant shall utilize the trade name specified in Article 1 and no other trade name in conducting business at the Premises.  Tenant shall in good faith continuously throughout the Term carry on in the entire Premises the type of business for which the Premises are leased, except during any Excused Closure. Tenant shall operate its business fully staffed and fully stocked and in an efficient and reputable manner so as to produce the maximum amount of profitable sales from the Premises, and shall, except to the extent Tenant may be prohibited from being open for business by applicable law and except during reasonable periods for repairing, cleaning and decorating, keep the Premises open for business with adequate and competent personnel in attendance during the following minimum hours: Mondays through Saturdays, 10:00 AM – 9:00 PM, and Sundays, Noon – 6:00 PM.  Tenant may, subject to applicable law, open for such additional hours as it deems appropriate. If Tenant fails to thereafter operate its business from the Premises during all of the days and hours required hereunder, Tenant shall pay Landlord $200.00 per day for each day Tenant is in violation of such requirement and then Landlord may, in addition to all other remedies provided herein, elect to reduce the Breakpoint by 1/365th thereof for each day that Tenant fails to open on time or to remain open for all of the Shopping Center hours as required herein. "Excused Closures" shall mean closure of the Premises under any of the following circumstances: (A) to inventory merchandise, which closures may not exceed a total of 12 days in any Lease Year; (B) as a result of Unavoidable Delay for so long as such condition continues and prevents Tenant from reopening its business at the Premises; (C) repairs, remodeling or renovations of the Premises but only for such time as reasonably required for the making of such repairs or for the remodeling or renovation work, (D) special events and/or preparation for new product launches, which may not exceed a total of six days in any Lease Year, (E) nationally recognized holidays, (F) fire or other casualty, affecting the Premises; (G) condemnation affecting the Premises; or (H) when to keep the Premises open for business would violate any legal requirement, criminal or civil, or subject Tenant or its employees to a fine or penalty, whether criminal or civil in nature.

8.2     All property kept, stored or maintained within the Premises by Tenant shall be at Tenant's sole risk.

8.3     Tenant shall not (a) suffer, allow or permit any vibration, noise, odor or flashing or bright light to emanate from the Premises or from any machine or other installation located therein, (b) place or permit any radio, television, loudspeaker or amplifier on the roof or outside the Premises or where the same can be seen or heard from outside the building or in the Common Area, (c) place an antenna, awning or other projection on the exterior of the Premises, (d) solicit business or distribute leaflets or other advertising material in the Common Area, (e) take any other action which would constitute a nuisance or disturb or endanger other tenants of the Shopping Center or unreasonably interfere with their use of their respective premises, (f) conduct within or from the Premises any fire, auction or bankruptcy sales, (g) place or install any automated teller machine anywhere within the Premises or any part of the Common Areas, or (h) do anything which would tend to injure the reputation of the Shopping Center.

8.4     Tenant shall take good care of the Premises and keep the same free from waste.  Tenant shall keep the Premises neat, clean and free from dirt, rubbish, insects and pests, and shall store all trash and garbage within the area designated by Landlord for such trash pickup and removal in receptacles of the size, design and color from time to time prescribed by Landlord.

12

Receiving and delivery of goods and merchandise and removal of garbage and trash shall be made only in the manner and areas from time to time prescribed by Landlord. Tenant shall reimburse Landlord for its costs incurred, plus an administrative charge 15% promptly within five days of written notice therefore, to perform any maintenance of sidewalks, service-ways or loading areas adjacent to the Premises required as a result of Tenant's business operations which are beyond the maintenance required generally at the Shopping Center.

8.5    Tenant shall maintain all display windows in a neat, attractive condition, and shall keep all display windows and exterior electric signs in front of the Premises lighted from dusk until such time as Landlord may from time to time designate.

8.6    Tenant shall include the name and address of the Shopping Center and identity of its business activities in the Premises in all advertisements made by Tenant in which the address and identity of any similar local business activity of Tenant is mentioned.

8.7    Tenant shall procure all permits and licenses required for the transaction of business in the Premises and shall comply with all laws, ordinances and regulations applicable to the use or occupancy of the Premises (including making necessary alterations).

8.8    Tenant shall not establish, or conduct any solicitation of other tenants of the Shopping Center to join, any tenants' association or establish any web site purporting to be sponsored by, linked to, representing or in any way involving any tenants' association of the Shopping Center or designed to solicit, post, publish or receive complaints from tenants of the Shopping Center.

8.9    Upon the expiration or termination of this Lease, Tenant shall: (a) remove all of its signage and repair any damage caused by such removal; (b) deliver possession of the Premises to Landlord in a broom clean condition free of debris; (c) repair any damage to the Premises caused by Tenant; and (d) remove all of its trade fixtures and personal property and repair any damage caused by such removal. Regardless of any statutory provision or case authority to the contrary, in the event that Tenant becomes involved in any bankruptcy case filed under Title 11 of the United States Code, and Tenant rejects this Lease either voluntarily or by operation of law, to the extent Landlord incurs any damages arising from Tenant's post-petition failure to fulfill any of the provisions set forth in subsections (a) through (d), Tenant's obligations to repair or remediate such damages shall be deemed to have occurred at the time the conduct causing such damages occurred; and Landlord shall be entitled to an allowed administrative expense claim under Bankruptcy Code Section 503(b)(1)(A) in the amount of such damages.

8.10    If the Permitted Use is a restaurant use under Article 1 hereof or otherwise includes food sales or service, then without limiting Tenant's other obligations under this Lease, Tenant's use of the Premises shall be further subject to the following:  (1) Tenant shall cause extermination services (including treatment for insects, spiders, rats, mice, moles and other rodents, as applicable) to be provided to the Premises by a reputable exterminator on a monthly basis throughout the Lease Term, or more often as may be reasonably necessary. (2) Tenant shall not dispose of waste grease, oil or other materials which tend to cause clogging or blockage of pipes and drains (hereinafter collectively referred to as "grease") by pouring or permitting the grease to flow into any drains or pipes (in the event that Tenant shall do so, Tenant, and any other

13

responsible tenants, shall reimburse Landlord for the entire cost of cleaning of all drains, pipes, sewers or other waste liquid disposal facilities damaged thereby).  For this purpose, the term "cleaning" shall be deemed to include the replacement of all or any portion of the waste liquid disposal facilities necessitated by Tenant's improper disposal of grease.  Tenant shall regularly and adequately clean or provide for the cleaning of all grease interceptors (unless the grease interceptor is used by more than one tenant and Landlord has notified Tenant that Landlord shall assume primary responsibility for the cleaning and maintenance of such grease interceptor in which case Tenant shall reimburse Landlord its proportionate share of such cleaning and maintenance costs within 10 days following receipt of Landlord's bill), grease traps, catch basins, plumbing waste lines and similar facilities serving the Premises and shall, at its sole cost and expense, during the Lease Term, maintain and repair the necessary piping, connections, grease interceptors, grease traps, catch basins and other facilities for the removal of all waste liquids from the Premises in compliance with all applicable Governmental Regulations, and as is necessary to prevent the backing-up or discharge of any such waste liquids into the Premises or into the Shopping Center. Tenant shall not use any chemicals or other cleaning methods which could damage the drain pipes or other portions of the drainage and/or sewer system in the Premises or the Shopping Center.  Tenant shall provide to Landlord, upon demand, reasonable proof that Tenant is regularly performing such cleaning or causing it to be performed.  (3) Tenant will immediately transfer all goods and merchandise received to proper and adequate storage facilities within the Premises so as to retard any spoilage thereof, to prevent any odors emanating therefrom and to prevent the infestation thereof.  Tenant shall store all garbage, trash and other waste within the Premises in leak, odor and vermin proof containers, and such containers to be kept in temperature controlled areas of the Premises not visible to members of the public.  If any leaking or spilling shall occur or if any goods and merchandise shall fall out of any containers or packages, Tenant shall be responsible for and shall immediately cause the same to be cleaned and removed and restore any damage to the common areas that may result.  Tenant shall dispose of such trash and garbage only during such times, through such routes and in such receptacles as Landlord shall designate. (4) Tenant shall not permit any odors, fumes or smells to emanate from the Premises nor shall Tenant commit or suffer to be committed any waste upon the Premises or any nuisance or other act or thing which may disturb the quiet enjoyment of any other tenant or occupant of the Shopping Center, or which may adversely affect Landlord's fee interest in the Premises or the Shopping Center.  (5) Tenant shall regularly clean kitchen hood systems, the exhaust ducts and any flues exclusively serving the Premises so that the same are clean, safe and do not contain any buildup of grease or debris. (6) Tenant shall ensure that the bathroom fixtures, walls, accessories, partitions, toilets and sinks are maintained and repaired on a regular basis and kept in a fresh-smelling, sanitary manner. (7) Tenant shall maintain all of the Premises in a first class manner, including the ceiling tiles, which shall be free of stain, dirt and debris, the windows and doors shall be clean of adhesives, stickers, applied signage and fingerprints, the flooring shall be free of cracked or worn tiles and maintained in a first-class appearance, all light bulbs, lamps and signage lights (if any) shall be replaced immediately when out, and kept clean of grease, dirt and debris. (8) If Tenant is connected to Landlord's grease interceptor system, Tenant shall pay its pro rata share of the costs to maintain such system, including the cost to empty all waste.  Tenant's pro rata share shall be determined by dividing the Floor Area of the Premises by the aggregate Floor Area of all tenants using the same interceptor.  Such amount shall be payable within 30 business days after receipt of written invoice from Landlord, or may be billed directly by the entity providing such service.

14

8.11     Should the Tenant's operation include the serving of alcoholic beverages: (a) Tenant must obtain prior serving such beverages, and maintain for the entire Term thereafter, an appropriate liquor license (the "Liquor License") for such operations; (b) Tenant may not sell or assign the Liquor License during the Term; (c) upon the expiration or termination of this Lease, Tenant shall assign the Liquor License to Landlord or its designee at no charge to Landlord; (d) any termination or suspension of the Liquor License shall be an automatic Event of Default hereunder; and (e) Tenant shall indemnify and hold Landlord harmless from and against any violation of the Liquor License by Tenant and any tax, fee (including any renewal fee) or other payment due under the license or from the sale of alcoholic beverages at the Premises.

8.12     Tenant shall use its best efforts to obtain as soon as reasonably possible an Kentucky liquor license for the Premises (the "License"), and to obtain as soon as reasonably possible all necessary approvals for the issuance of the License to Tenant, so as to allow Tenant to sell beer, wine and liquor at the Premises for consumption in the Premises during normal and reasonable opening hours. Tenant hereby warrants to Landlord that: (i) Tenant is corporation duly qualified and in good standing under the laws of the State of Kentucky; (ii) no shareholder, director or officer of Tenant has ever been arrested for any offense or crime which would prevent the License from being issued, nor has any such person ever been served with a summons for violation of any  Alcohol Beverage Control Law in the State of Kentucky; and (iii) no license of or application made by Tenant or any Affiliate of Tenant under the Alcohol Beverage Control Law of Kentucky has ever been suspended, canceled, revoked, disapproved, or otherwise involuntarily terminated, and Tenant knows of no reason why the License should not be issued. If within one year after the Commencement Date, Tenant is not reasonably certain that it will be able to obtain a License for any reason other than a breach by Tenant of the agreement or any warranty contained in this section, Tenant shall have the right to terminate this Lease as its sole and exclusive remedy. To terminate this Lease under this section, Tenant must: provide written notice of termination (the "Termination Notice") to Landlord within one year of the Commencement Date.  If Tenant does not provide the Termination Notice within such time, Tenant shall have waived its right to terminate the Lease under this section.

## ARTICLE 9.  <u>Maintenance and Repair of Premises</u>.

9.1     Landlord shall keep the foundation, the exterior walls, and the roof of the Premises in good repair, ordinary wear and tear excepted; Landlord shall not be responsible for maintaining or repairing the Premises, store fronts, plate glass windows, doors, door closure devices, window and door frames, moldings, locks and hardware, and painting or other treatment of interior and exterior walls.  Any repairs required to be made by Landlord that are occasioned by the act or negligence of Tenant, its agents, employees, invitees, subtenants, licensees and concessionaires shall be paid for by Tenant upon demand to the extent not covered by net insurance proceeds paid to Landlord therefor.  If the Premises need repairs that are Landlord's responsibility, Tenant shall notify Landlord; Landlord shall not be obligated to make any such repairs until a reasonable time after delivery of such notice.

9.2     Tenant shall furnish, maintain and replace all electric light bulbs, tubes and tube casings in the Premises.

9.3     Tenant shall maintain the Premises in good condition and make all needed repairs and replacements, except for repairs and replacements expressly required to be made by Landlord under this Lease, and shall keep all plumbing pipes and connections free from obstruction and protected against ice and freezing.  At the end of the Term, Tenant shall surrender the Premises in good condition, reasonable wear and tear and loss by fire or other casualty not caused by Tenant excepted; surrender all keys for the Premises to Landlord; and inform Landlord of all combinations on locks, safes and vaults in the Premises. Tenant shall not install, operate or maintain in the Premises, or in any other area of the Shopping Center, electrical or other equipment which would overload the electrical or other system or any part thereof beyond its capacity for proper, efficient and safe operation.

9.4     In the event Tenant is served by a common heating, air-conditioning and air conditioning equipment, Landlord shall repair and maintain in good condition and replace as necessary such equipment and Tenant shall pay to Landlord a pro rata share of all costs of maintaining, repairing and replacing such equipment as well as a pro rata share of all utility usage for their respective Premises, as reasonably allocated by Landlord, which may at Landlord's option be payable in monthly estimated payments with an annual reconciliation.  Tenant shall repair and maintain in good condition and replace as necessary all air conditioning, heating and ventilating equipment solely serving the Premises, shall pay for all utility usage which is separately metered directly to the utility company providing such utility service, and shall enter into a preventive maintenance/service contract with a maintenance contractor approved by Landlord for servicing such equipment.  Within the 30 day period preceding move out, Tenant shall have the systems and equipment checked and serviced to insure proper functioning and shall furnish Landlord satisfactory proof thereof upon request.

**ARTICLE 10.  <u>Alterations</u>**.

10.1     Tenant shall not make any alterations, additions or improvements to the Premises ("Alterations") without the prior written consent of Landlord; Tenant may install unattached, movable trade fixtures if the same can be installed without drilling, cutting or otherwise defacing the Premises.  All Alterations, carpeting, floor coverings, and fixtures (other than unattached, movable trade fixtures) installed by either party upon the Premises shall remain upon the Premises and become the property of Landlord at the end of the Term, unless Landlord requests their removal, in which event Tenant shall remove the same and restore the Premises to their original condition at Tenant's expense.

10.2     All Alterations done by Tenant within the Premises shall be performed in a good and workmanlike manner, in compliance with all governmental requirements and so as to cause a minimum of interference with other construction in progress and with the transaction of business in the Shopping Center.  All Alterations shall be performed by a general contractor approved by Landlord, pursuant to plans and specifications approved by Landlord; Tenant shall reimburse Landlord for costs incurred in reviewing and approving Tenant's plans.  Prior to commencement of any such work Tenant shall provide evidence that its contractors have in effect adequate insurance for all risks of loss associated with the Alterations (naming Landlord as an additional insured), and, if requested by Landlord, furnish a bond or other security satisfactory to Landlord against any loss, liability or damage therefrom.

10.3    All venting, opening, sealing, waterproofing or any altering of the roof (including any work done as part of Tenant's Work) shall only be performed by Landlord's roofing contractor at Tenant's expense in accordance with plans and specifications approved by Landlord.

**ARTICLE 11.  Landlord's Right of Access; Use of Roof**.

11.1    Landlord may enter the Premises at any reasonable time for the purposes of inspecting the same, of making repairs or additions to the Premises, the Building or other premises, or showing the Premises to prospective purchasers, lessees or lenders.

11.2    Use of the roof above the Premises is exclusively reserved to Landlord, and Tenant shall not go on the roof without Landlord's prior written consent.

**ARTICLE 12.  Signs; Store Fronts**.

12.1    Tenant shall not, without Landlord's prior written consent (a) make any changes to or paint the store front; or (b) install any exterior lighting, decorations or paintings; or (c) erect or install any signs, banners, window or door lettering, placards, decorations or advertising media of any type visible from the exterior or interior of the Premises.  All signs, decorations and advertising media shall conform to the sign criteria attached as Exhibit D.

12.2    At the end of the Term and upon the removal or alteration of a sign, Tenant shall repair to a like or original condition any damage caused by such removal.

12.3    Subject to applicable law, compliance with Exhibit D and Landlord's reasonable approval of the design and installation, Tenant may place its signage in the same locations used by the former occupancy of the Premises and in the same size used by such occupant.

**ARTICLE 13.  Utilities**.

13.1    Landlord shall provide and maintain the facilities necessary to supply water, electricity, gas (if applicable), and sewerage service to the Premises in accordance with Exhibit C. Tenant shall be responsible for providing any meters or other devices for the measurement of utilities supplied to the designated point of service.  Landlord may elect to directly supply any of the utilities furnished to the Premises, so long as the rates charged therefor do not exceed commercially reasonable rates which Tenant would otherwise pay if it contracted directly with a utility company for such services.  Tenant hereby authorizes Landlord to obtain utilities on the terms and conditions contained herein on Tenant's behalf.  Tenant shall not use an alternate service provider in lieu of the public utility except with landlord's prior written consent.

13.2    Tenant shall promptly pay all charges for electricity, water, gas, telephone service, sewerage service and other utilities furnished to the Premises and any maintenance charges therefor.

13.3    Landlord shall not be liable for any interruption or failure whatsoever in utility services and Tenant shall comply with all provisions of this Lease notwithstanding any such failure or interruption.  Any furnishing by Landlord of utilities shall be  conditioned upon the

availability of adequate energy sources.  Landlord shall have the right to reduce such utilities within the Shopping Center, including, without limitation, the Premises and Common Area, as required by any mandatory or voluntary fuel or energy saving allocation, or any similar statute, regulation, order or program, and Tenant shall comply with any such energy conservation program and all related measures and regulations promulgated by Landlord or applicable governmental authorities.

13.4    Tenant may select the telecommunications service carrier to provide Tenant's voice and data communications service, subject to the prior consent of Landlord not to be unreasonably withheld. Tenant shall be responsible for payment of all services provided by the carrier selected. Tenant must obtain Landlord's written approval, not to be unreasonably withheld, before installing, replacing, removing, using or modifying any wiring, cables, risers, lines or similar equipment or installations ("Wiring"). Tenant shall be responsible for ensuring that its telecommunications carrier and contractors comply with all laws, codes, ordinances and regulations, the applicable provisions of this Lease and any other rules and requirements which may be imposed by Landlord. Upon the expiration or earlier termination of this Lease, Tenant shall, at Tenant's sole cost, remove all of the Wiring from the Premises, Shopping Center and grounds and repair any property that is disturbed by such removal to its pre-existing condition.  If, however, prior to the expiration or earlier termination of this Lease, Landlord notifies Tenant that Landlord expects to retain the Wiring, then Tenant agrees that Tenant shall surrender all of the Wiring to Landlord, free and clear of all liens and encumbrances, in good and safe condition, in working order and properly labeled at each end and in each telecommunications/electrical closet and junction box. Landlord may require Tenant to remove, within 10 days, notice, any Wiring (i) which is installed or is at any time in violation of the applicable provisions of this Lease or applicable laws, regulations, ordinances or codes or (ii) which at any time presents a dangerous or potentially dangerous condition to persons or serious threat of damage to the Shopping Center.  If Tenant uses telecommunications equipment that creates an electromagnetic field that interferes with or otherwise interferes with the use by Landlord or other tenants of their telecommunications equipment, Landlord can required Tenant to take action within seven days' notice to reduce the field, including removing the equipment.  If Tenant fails to timely take any action required by Landlord under this paragraph, Landlord may perform such action at Tenant's expense.

**ARTICLE 14.  <u>Indemnity</u>**.

14.1    Notwithstanding anything else contained herein, Landlord shall not be liable to Tenant or to Tenant's employees, agents or visitors for injury to person occurring within the Premises during the Term of this Lease from and after the date possession of the Premises is delivered to Tenant, and Tenant shall indemnify and defend Landlord and its affiliate's respective members, managers and their respective agents, employees and contractors from all loss, expense, claims or actions arising out of such injury (including any court costs and attorneys' fees).  The provisions of this section shall survive the termination or expiration of this Lease with respect to any claims or liability occurring prior to such termination or expiration.

14.2    Tenant shall procure and maintain throughout the Term from and after the date possession of the Premises is delivered to Tenant, at its sole expense, (a) Commercial General Liability Insurance insuring Landlord and Tenant against all claims arising out of Tenant's use or occupancy of the Premises or the condition of the Premises, in an amount not less than

18

$1,000,000.00 per occurrence and $2,000,000.00 aggregate for bodily injury, personal injury and property damage and at least $500,000.00 for fire legal liability, (b) All Risk or Special Form property coverage, including earthquake and flood (as reasonably available if Premises is located in a flood zone), protecting Tenant against loss of or damage to Tenant's Alterations, including Tenant's Work, carpeting, floor coverings, plate glass, paneling, decorations, fixtures, inventory and other business personal property situated in or about the Premises to the full replacement value of the property so insured, (c) Business Interruption Insurance with limit of liability representing loss of at least six months of income, (d) Workers Compensation in an amount not less than the statutory minimum and including Employers Liability in an amount not less than $1,000,000.00 each accident, $1,000,000.00 disease policy limit, $1,000,000.00 diseases-each employee, (e) umbrella/excess liability in amount not less than $5,000,000.00, (f) intentionally deleted, and (g) such other insurance and increased limits as Landlord may hereafter reasonably require.  The policy limits required under this Section 14 may be met with any combination of primary, umbrella or excess policies of insurance.  All policies of insurance under clauses (a), (e) and (f) shall name Landlord, and any other entity as required by Landlord, as an additional insured. All policies of insurance under clauses (b) and (c) shall name Landlord and Landlord's mortgagee as a loss payee. All policies of insurance shall be on an occurrence (as opposed to a claims made) basis; be issued by an insurance company acceptable to Landlord; and shall be primary and non-contributory with any insurance carried by Landlord for occurrence on or within the Premises. Tenant shall cause its insurer to endeavor to provide Landlord with at least 30 days prior written notice of any cancellation, non-renewal or amendment to any insurance policy obtained hereunder. Tenant shall deliver evidence satisfactory to Landlord of the insurance required hereunder prior to commencing Tenant's Work hereunder and not less than 10 days prior to each renewal of coverage.  Such evidence shall be in the form of, (a) a Certificate of Insurance, and (b) an Additional Insured Endorsement or a Blanket Additional Insured Endorsement.  If Tenant does not provide evidence of insurance in compliance with this Section 14.2 within the time required herein, and does not cure same within three business days after written notice, in addition to all other available remedies, Tenant shall pay Landlord $100.00 per day until such evidence is delivered.

14.3    If and while the Premises are utilized for the sale and/or consumption of alcoholic or other beverages, including, without limitation, the sale of on or off-Premises consumption of alcohol, distilled spirits, beer, malt beverage, wine, or fortified wine (hereinafter sometimes referred to as "alcoholic beverages"), then Tenant shall obtain and maintain (by endorsement to the general liability policy required to be maintained by Tenant hereunder or by separate policy) throughout the term of the Lease so-called "liquor liability" or "dram shop" insurance (hereinafter sometimes referred to as "liquor liability insurance") causing Landlord, and such other entities as Landlord shall designate from time to time, to be additional insureds, in combined single limit coverage per occurrence of not less than $1,000,000.00 (or such higher amount which Landlord may proscribe from time to time in its sole judgment) with not less than a $6,000,000.00 umbrella policy limit.  Such liquor liability insurance shall (i) be written in form acceptable to Landlord and its counsel, by a licensed insurance carrier in good standing in the State of Kentucky acceptable to Landlord, and (ii) specifically include, without limitation, liability coverage for the violation of any governmental statute, ordinance, regulation or rule pertaining to the sale, gift, distribution or use of any alcoholic beverages, or liability by reason of the selling, serving, or giving of alcoholic beverages to a minor or to person under the influence of alcohol, or which causes or contributes to the intoxication of any persons.  The aforementioned liquor liability insurance policies shall be for the mutual and joint benefit and protection of Landlord, Tenant, and

19

such other entities as Landlord shall designate from time to time, and executed copies of such policies of insurance and certificates shall be delivered to the Landlord within 10 days prior to the delivery of possession of the Premises to Tenant, and thereafter within 30 days prior to the term of each such policy.  Additionally, all such insurance shall contain a provision stating that the Landlord, although named as an additional insured, shall nevertheless be entitled to recovery under said policies for any loss occasioned to it, its servants, agents and employees by reason of the negligence of Tenant, its servants, agents and employees.  As often as any such policy shall expire or terminate, renewal or additional policies shall be maintained and procured by Tenant in like manner and like extent, subject at all times to the approval of Landlord and its counsel. All such insurance policies shall likewise contain a provision stating that the insurance carrier of said policies shall grant to Landlord 30 days prior written notice of any cancellation or lapse of the effective date of any reduction in the amounts of insurance.  Notwithstanding the foregoing to the contrary, in the event Tenant shall fail to procure and maintain any insurance required by this provision, or fails to carry insurance required by law or governmental regulations, Tenant shall be deemed in default under this Lease and Landlord may, but shall not be required or obligated to, at any time (without the granting of notice) procure such insurance and pay the premium therefore, in which event Tenant shall repay all sums so paid by Landlord, together with interest thereon at the Default Rate provided in this Lease, and any and all other incidental costs and expenses incurred by Landlord in connection therewith, within five days after demand by landlord or its designated representative or legal counsel.  Tenant shall also provide an Accord 25 Certificate Form to be issued to Landlord to reflect the above described liquor liability insurance has been purchased.  This Certificate must confirm that Landlord is an additional insured on the Liquor Liability policy.

In furtherance of the foregoing, Tenant hereby agrees and covenants to indemnify and hold Landlord, its servants, agents, employees, and representatives, wholly harmless from any and all claims, liabilities, losses, damages and expense of whatever kind or nature, including, without limitation, court costs and attorney's fees, incurred by Landlord in connection with the sale, gift, distribution or use of any alcoholic beverages in or from the Premises, including, without limitation, the violation by Tenant of any statutes, ordinance, regulation or rule of whatever kind or nature which shall be established from time to time by any governmental agency or insurance carrier in connection therewith.

14.4    Landlord shall maintain during the Term: (a) Commercial General Liability Insurance in an amount not less than $1,000,000 per occurrence and $2,000,000 aggregate; (b) windstorm insurance and property insurance on a "special peril" broad form coverage basis, including earthquake and flood (as reasonably available if Shopping Center is located in a flood zone),  covering the replacement cost of all real property alterations, additions, partitions, improvements, and personal property installed by Landlord at the Shopping Center (excluding improvements made by tenants and tenants' personal property); and (c) such other insurance as Landlord shall determine to be appropriate.

14.5    Notwithstanding anything to the contrary contained herein, Landlord and Tenant hereby waive and release all claims against each other, and against the agents and employees of each other, for any loss or damage sustained by each other to the extent such claims are or could be insured against under any standard broad form policy of fire and extended coverage insurance, or under any fire and extended casualty insurance policy maintained by Landlord or

20

Tenant under this Lease, or required to be maintained by Landlord or Tenant under this Lease, regardless of whether such policy is in effect at the time of the loss and assuming a zero deductible in all cases.  Landlord and Tenant will cause their respective insurance carriers to issue appropriate waiver of subrogation rights endorsements to all policies of insurance carried in connection with damage to the Shopping Center or the Premises or any portions thereof or any personal property thereon; provided, however, that failure to obtain such endorsements shall not affect the release hereinabove given.

ARTICLE 15. **Non-Liability for Certain Damages**.  Landlord and Landlord's agents and employees shall not be liable to Tenant or any other person for any injury to person or damage to property caused by the Premises or other portions of the Shopping Center becoming out of repair or damaged or by defect in or failure of equipment, pipes or wiring, or broken glass, or by the backing up of drains or by gas, water, steam, electricity or oil leaking, escaping or flowing into the Premises, nor shall Landlord be liable to Tenant or any other person for any loss or damage that may be occasioned by or through the acts or omissions of other tenants of the Shopping Center or of any other persons or entities whomsoever, excepting only duly authorized employees and agents of Landlord.

ARTICLE 16. **Damage by Casualty**.

16.1    Tenant shall give immediate written notice to Landlord of any damage to the Premises by fire or other casualty.

16.2    If the Premises or the building in which the Premises are located shall be (a) destroyed or damaged by a casualty not covered by Landlord's insurance; (b) destroyed or rendered untenantable to an extent in excess of 35% of the Floor Area of the Premises by a casualty covered by Landlord's insurance; or (c) damaged to such extent that the remaining Term is not sufficient to amortize the cost of reconstruction, or if then Landlord may elect to either terminate this Lease or to rebuild and repair the Premises.  In addition, Landlord may terminate this Lease in the event of damage to or destruction of the Shopping Center or Project if: (i) the cost of repair or restoration exceeds 25% of the replacement value of the Shopping Center; or (ii) the reasonable period for substantial completion of the repair and restoration exceeds 270 days. If the Premises or Shopping Center are so damaged or destroyed and Landlord does not elect to terminate this Lease, Landlord shall proceed with reasonable diligence to rebuild and repair the Premises and/or Shopping Center.  Should Landlord elect to terminate this Lease it shall give written notice of such election to Tenant within 90 days after the occurrence of such casualty.  In the event of any damage or destruction to the Premises, Tenant shall, upon notice from Landlord, remove, at Tenant's expense, such portion or all of Tenant's shelves, bins, equipment, trade fixtures and other property from such portion of the Premises as Landlord shall request.

16.3    Landlord's obligation to rebuild and repair under this Article 16 shall be limited to restoring the Premises and/or Shopping Center to substantially the condition in which the same existed prior to the casualty, to the extent of the insurance proceeds available to Landlord for such restoration.  Promptly after completion of such work by Landlord, Tenant will proceed with reasonable diligence to rebuild, repair and restore its signs, fixtures and equipment and other items of Tenant's Work and Alterations, and reopen for business in the entire Premises as required hereunder.

16.4    During any repair of the Premises, Tenant will continue the operation of its business within the Premises to the extent practicable.  There shall be no abatement of the Rent hereunder after any casualty.

16.5    If the holder of any indebtedness secured by a mortgage or deed of trust covering the Premises requires that the insurance proceeds be applied to such indebtedness, then Landlord may terminate this Lease by delivering written notice of termination to Tenant.

**ARTICLE 17.  <u>Eminent Domain</u>**.

17.1    If more than 20% of the Floor Area of the Premises should be taken by eminent domain or by purchase in lieu thereof, this Lease shall terminate effective on the date physical possession is taken by the condemning authority.

17.2    If less than 20% of the Floor Area of the Premises should be so taken this Lease shall not terminate; however, Minimum Rental shall be reduced in proportion to the area taken, effective on the date physical possession is taken by the condemning authority and Percentage Rental shall be adjusted to reflect such change in the Minimum Rental.  Following such partial taking, Landlord shall make all necessary repairs or alterations within the scope of Landlord's Work necessary to make the Premises an architectural whole. Landlord's obligation to rebuild and repair under this Article 17 shall be limited to the extent of the condemnation proceeds available to Landlord for such restoration.

17.3    If any part of the Common Area shall be taken, this Lease shall not terminate, nor shall the Rent payable hereunder be reduced, except that either Landlord or Tenant may terminate this Lease if the area of the Common Area remaining following such taking plus any additional parking area provided by Landlord in reasonable proximity to the Shopping Center shall be less than 70% of the area of the Common Area immediately prior to the taking.  Any election to terminate this Lease in accordance with this provision shall be exercised by written notice delivered within 30 days after the date physical possession is taken by the condemning authority.

17.4    If any part of the Project is taken such that Landlord determines that the balance of the Project cannot be effectively operated as an integrated commercial development, Landlord may terminate the Lease by written notice to Tenant delivered within 60 days after the date physical possession is taken by the condemning authority.

17.5    All compensation awarded for any taking (or the proceeds of private sale in lieu thereof) of the Premises or Common Area shall be the property of Landlord and Tenant hereby assigns its interest in any such award to Landlord; however, Landlord shall have no interest in any separate award made to Tenant for loss of business or for the taking of Tenant's fixtures and other property to the extent such award does not diminish Landlord's award.  Tenant shall not be entitled to any award for the value of the unexpired term of this Lease.

**ARTICLE 18.  <u>Assignment and Subletting</u>**.

18.1    Tenant shall not (a) assign, encumber, mortgage, or in any other manner transfer this Lease or any estate or interest therein; (b) sublet the Premises or any part thereof, or

22

grant any license, concession or other right to occupy any portion of the Premises; (c) if Tenant is an entity other than a corporation whose stock is publicly traded, permit the transfer of ownership interests in Tenant so as to result in a change in the control of Tenant; or (d) permit any other person to become Tenant by merger, consolidation, or otherwise (each a "**Transfer**") without the prior written consent of Landlord.  All rent paid in respect of a Transfer in excess of the Rent due hereunder shall be paid to Landlord as received by Tenant.  Consent by Landlord to one or more Transfers shall not operate as a waiver of Landlord's rights as to any subsequent Transfer. Notwithstanding any Transfer, Tenant and any guarantor of Tenant's obligations under this Lease shall remain fully and jointly and severally liable under this Lease.  Upon any Transfer made in accordance with the terms hereof, any renewal options, expansion options, rights of first refusal, co-tenancy provisions and/or exclusive use provisions shall terminate.

18.2    Tenant shall give Landlord at least 30 days advance written notice of any proposed Transfer, accompanied by a copy of the proposed Transfer documents and a fee equal to $2,500.00 to defray Landlord's costs in reviewing Tenant's request, including such additional information, including financial information, as Landlord may request regarding such transferee.

**ARTICLE 19.  Default by Tenant and Remedies**.

19.1    The following shall be "**Events of Default**" by Tenant:

(a)    The failure to pay Rent or any other amount payable hereunder within 10 days after receiving notice thereof from Landlord; provided that after Landlord has given two such notices in any 12 month period, it shall not be required to give further notice under this Section, and any subsequent failure to pay during the Term hereof shall immediately be an Event of Default.

(b)    The failure to comply with any other provision of this Lease that is not cured within 30 days after written notice thereof to Tenant; provided, however, if the matter in question is not reasonably susceptible of being cured within 30 days, then it shall not be an Event of Default hereunder if Tenant commences to cure such matter within such 30 day period and thereafter diligently and with continuity prosecutes such cure to completion in a period not to exceed 90 days after the giving of such notice.

(c)    If petition is filed by or against Tenant (the term "Tenant" shall include, for the purpose of this paragraph, any guarantor of Tenant's obligations hereunder): (1) in any bankruptcy or other insolvency proceeding; (2) seeking any relief under any state or federal debtor relief law; (3) for the appointment of a liquidator or receiver for all or substantially all of Tenant's property or for Tenant's interest in this Lease; (4) for the reorganization or modification of Tenant's capital structure; (5) in any assignment for the benefit of creditors proceedings, or (6) Tenant shall be liquidated or dissolved or shall begin proceedings toward such liquidation or dissolution, or shall in any manner permit the divestiture of all or any substantial part of Tenant's assets.

(d)    Tenant or any guarantor of this Lease is insolvent, fails to pay its debts generally as they become due, makes an assignment for the benefit of its creditors, or a

23

receiver, trustee or liquidator of Tenant or any guarantor of this Lease or of any material part of their assets or of Tenant's interest in this Lease is appointed in any proceeding.

(e)    The vacating of any portion of the Premises.

(f)    Closure of Tenant's business for any reason (other than because of casualty loss or condemnation or as otherwise permitted herein)

(g)    Any annual statement of Gross Sales submitted by Tenant is found to understate Gross Sales by more than 5%, provided Tenant has previously understated Gross Sales by more than 5% and received written notice from Landlord notifying Tenant of such an event.

19.2    Upon the occurrence of an Event of Default, Landlord may pursue any one or more of the following remedies without further notice or demand:

(a)    Terminate this Lease and recover damages therefor.

(b)    Terminate Tenant's right to possess the Premises by re-entering the Premises by force, summary proceedings, ejection or otherwise, without terminating this Lease and recover damages.  In such event, Landlord may alter or change locks and other security devices at the Premises.  Landlord shall have no obligation to furnish a new key unless and until Tenant cures all existing Events of Default and delivers to Landlord additional security, as determined by Landlord, for performance of Tenant's obligations.

(c)    Perform any of Tenant's obligations under this Lease, and Tenant shall reimburse Landlord on demand for all costs incurred by Landlord in doing so.

(d)    Exercise any other remedy provided in this Lease or under applicable law.

19.3    Exercise by Landlord of any one or more remedies hereunder or otherwise available shall not be an acceptance of surrender of the Premises.  If Landlord terminates this Lease or Tenant's right to possess the Premises, Tenant shall immediately deliver possession of the Premises to Landlord, and if Tenant fails to do so, Landlord may, without prejudice to any other right, take possession of the Premises and remove Tenant and any other occupants.  Tenant shall have no (and hereby waives) claim for damages by reason of any entry, repossession or alteration of locks or other security devices.

19.4    If Landlord terminates this Lease under Section 19.2(A), Tenant shall be liable for all rental and other amounts payable accrued to the date of termination, plus, as damages, an amount equal to excess of (a) the total Rent for the remaining Term, over (b) the fair market rental value of the Premises (taking into account a reasonable estimate of the time it will take to relet the Premises) for the remaining Term.  The periodic Percentage Rental for which Tenant shall be liable after termination of Tenant's right to possession or termination of this Lease shall be determined by averaging the amount Tenant was obligated to pay as Percentage Rental during the 24 month period before such termination (or, if shorter, the period from the Commencement Date to termination). Landlord shall have the right to elect to immediately receive a payment from the

Tenant of 12 months' Rent, calculated as set forth above, in lieu of the full accelerated Rent otherwise due under this Section 19.4.

19.5    If Landlord terminates Tenant's right of possession without terminating the Lease under Section 19.2(B), Tenant shall remain liable for all rent and other amounts payable to Landlord pursuant to this Lease (Percentage Rental shall be calculated as provided in Section 19.4) diminished by any net sums thereafter received by Landlord through reletting the Premises (after deducting expenses incurred by Landlord as provided in Section 19.6). Tenant shall not be entitled to any excess obtained by reletting over the rental herein reserved. Actions to collect amounts due by Tenant to Landlord as provided in this Section 19.5 may be brought from time to time, on one or more occasions. If Landlord terminates Tenant's right of possession under Section 19.2(B), it may at any time thereafter elect to terminate this Lease under Section 19.2(A).

19.6    In case of an Event of Default, Tenant shall also be liable for any broker's fees incurred by Landlord in connection with reletting the whole or any part of the Premises; the costs of removing and storing Tenant's or other occupant's property; the cost of repairing, altering, remodeling or otherwise putting the Premises into condition acceptable to new tenants; and all reasonable expenses incurred by Landlord in enforcing or defending Landlord's rights including reasonable attorneys' fees.

19.7    Following termination of Tenant's right of possession under Section 19.2(B), Landlord may relet the Premises or any part thereof for such rent and upon such terms as it shall determine. If Landlord elects to relet the Premises, it shall use the same efforts it then uses to lease other space, but shall not be required to give any preference to the leasing of the Premises over any other space that Landlord may have available.

19.8    If Landlord takes possession of the Premises following an Event of Default, Landlord may keep in place and use all of the furniture, fixtures and equipment at the Premises. Landlord may also remove from the Premises (without legal process) any such furniture, fixtures, equipment and other property and place same in storage at Tenant's expense. Landlord may relinquish possession of any furniture, fixtures, equipment and other property to any person claiming to be entitled to possession thereof pursuant to an agreement with Tenant without inquiring into the authenticity of such agreement.

19.9    If Tenant should fail to timely pay any installment of Rent or other sum to be paid hereunder, Tenant will pay Landlord on demand a late charge of up to 5% of the past due amount. Further, if Tenant fails to timely pay any Rent or other amount due hereunder, and does not pay such amount in full within 10 days after written notice, then the amount in question shall bear interest at the lesser of the maximum rate permitted by law or 18% per year (the "Default Rate") from the date due until paid.

19.10    The rights and remedies of Landlord herein stated shall be in addition to any and all other rights and remedies which Landlord has or may hereafter have at law or in equity.

19.11    Rights and Obligations Under the Bankruptcy Code.

(a)    If this Lease is assigned or subleased to any person or entity pursuant to the provisions of the Bankruptcy Code, any and all monies or other considerations payable or

otherwise to be delivered in connection with such assignment or sublease shall be paid or delivered to Landlord, shall be and remain the exclusive property of Landlord and shall not constitute property of Tenant or its bankruptcy estate. Any and all monies or other considerations constituting Landlord's property under the preceding sentence not paid or delivered to Landlord shall be held in trust for the benefit of Landlord and shall be promptly paid or delivered to Landlord.

(b) Upon the filing of a petition by or against Tenant under the Bankruptcy Code, Tenant, as debtor and as debtor in possession, and any trustee who may be appointed agree as follows: (i) to perform each and every obligation of Tenant under this Lease including, but not limited to, the manner of "operation" as provided in this Lease (including the operating covenant and permitted use clause) until such time as this Lease is either rejected or assumed by order of the United States Bankruptcy Court; (ii) to pay monthly in advance on the first day of each month, as reasonable compensation for use and occupancy of the Premises, an amount equal to all Minimum Rental and other charges otherwise due pursuant to this Lease and to pay Percentage Rent monthly at the percentage set forth in this Lease for the lease year in which such month falls on all Gross Sales during such month in excess of one twelfth of the Breakpoint for such lease year, with payment of all such Percentage Rent to be made by the 10th day of the succeeding month.

(c) No default of this Lease by Tenant, either prior to or subsequent to the filing of petition by or against Tenant under the Bankruptcy Code, shall be deemed to have been waived unless expressly done so in writing by Landlord.

(d) It is understood and agreed that this is a Lease of real property in a shopping center and that, therefore, Section 365(b)(3) of the Bankruptcy Code is applicable to any proposed assumption of this Lease in a bankruptcy proceeding.

(e) Any person or entity to which this Lease is assigned pursuant to the provisions of the Bankruptcy Code shall be deemed without further act or deed to have assumed all of the obligations arising under this Lease on and after the date of such assignment. Any such assignee shall, upon demand, execute and deliver to Landlord an instrument confirming such assumption.

(f) In the event of the initiation of any bankruptcy case or insolvency proceeding of any kind, Landlord shall be indefeasibly entitled to and Tenant or any successor (including without limitation, a bankruptcy trustee, receiver, assignee for the benefit of creditors, or purchase—hereinafter "Successor") shall immediately pay all amounts due under the Lease for the month in which such case or insolvency proceeding is filed, irrespective of: (1) the date such bankruptcy case or insolvency proceeding is filed; (2) whether the Lease is assumed or rejected, or the Lease is terminated by Tenant or any successor; (3) Tenant or any Successor vacates the premises; or (4) Whether any case law has been or could be construed to provide treatment to Landlord other than immediate payment of all amounts due under the Lease during the month in which any bankruptcy case or insolvency proceeding is filed. This provision shall not be construed to limit or restrict Landlord's rights set provided for in the Lease, 11 U.S.C. § 365, or any other applicable law.

19.12   In the event of any default by Landlord, Tenant will give Landlord written notice specifying such default with particularity, and Landlord shall have 30 days (or such longer period as may be required in the exercise of due diligence) in which to cure any such default. Unless and until Landlord fails to so cure any default after such notice, Tenant shall not have any remedy or cause of action by reason thereof.  In any such event, Tenant's remedies shall be limited to those damages actually incurred by Tenant directly on account thereof.  In no event shall Landlord be liable for consequential damages (including lost profits) or punitive damages.  All obligations of Landlord hereunder will be construed as covenants, not conditions.  The term "Landlord" shall mean only the owner, from time to time, of the Shopping Center, and in the event of the transfer by an owner of its interest in the Shopping Center, such owner shall be released from all obligations of the Landlord thereafter accruing, but such obligations shall be binding upon each new owner for the duration of such owner's ownership.  Notwithstanding any other provisions hereof, in the event of any breach or default by Landlord under this Lease, Tenant agrees to look solely to the equity or interest then owned by Landlord in the land and improvements which constitute the Shopping Center, and in no event shall any deficiency judgment or any money judgment of any kind be sought or obtained against Landlord.

**ARTICLE 20.  <u>Mechanics' Liens</u>**.  Tenant shall not permit any lien or encumbrance of any kind to be placed against the Premises and shall discharge any such lien by payment or bonding within 10 days after filed, failing which Tenant shall automatically thereupon be in default hereunder and Landlord may, but shall not be obligated to and in addition to any and all other available remedies, discharge or bond such lien at Tenant's expense.

**ARTICLE 21.  <u>Holding Over</u>**.  If Tenant remains in possession of the Premises after the expiration or termination of this Lease, it shall be a tenant at will occupying the Premises at a rental equal to the rent herein provided plus 50% of such amount and otherwise subject to all the conditions, provisions and obligations of this Lease (except that any co-tenancy provision, exclusive rights, renewal right or any other right to offset or abate any item of rent or to pay any reduced or alternative rent shall be inapplicable). Tenant shall also be liable for all damages resulting from retention of possession by Tenant.

**ARTICLE 22.  <u>Subordination</u>**.  Tenant accepts this Lease subject and subordinate to any mortgage, deed of trust or other lien presently existing or hereafter created upon the Premises or the Shopping Center, and to any renewals and extensions thereof, but Tenant agrees that any mortgagee shall have the right at any time to subordinate such mortgage, deed of trust or other lien to this Lease, provided that any such lender delivers to Tenant a commercially reasonable subordination, non-disturbance and attornment agreement. Tenant shall execute such further instruments subordinating this Lease as Landlord may request, and as Landlord's lender may reasonably require. Tenant agrees that if the holder of any mortgage, deed of trust or other lien presently existing or hereafter created upon the Premises or the Shopping Center (the "Holder") succeeds to the interest of the Landlord hereunder: (a) Tenant shall attorn to any such Holder upon notice thereof and Tenant shall execute such documents requested by Holder to confirm or evidence such attornment; (b) the Holder shall not be liable for any liabilities, damages or claims arising prior to the date Holder succeeds to the interest of Landlord hereunder; and (c) Tenant shall upon notice pay Rent to Holder or its designee at the address designated by Holder.  Tenant also agrees that any mortgagee or beneficiary may elect to have this Lease constitute a prior lien to its mortgage or deed of trust, and in the event of such election and upon notification by such

27

mortgagee or beneficiary to Tenant to that effect, this Lease shall be deemed prior in lien to such mortgage or deed of trust, whether this Lease is dated prior to or subsequent to the date of said mortgage or deed of trust. Tenant further agrees that this Lease shall be subordinate to any ground leases or underlying leases (including, without limitation, any lease entered into in connection with the IRB Financing) that are now, or may hereafter be, placed upon the Shopping Center or any portion thereof and all amendments, modifications, renewals, replacements and extensions thereof. Tenant also agrees that any ground lessor or underlying lessor may elect to have this Lease constitute a prior lien to its ground lease or underlying lease, and in the event of such election and upon notification by such ground lessor or underlying lessor to Tenant to that effect, this Lease shall be deemed prior in lien to such ground lease or underlying lease, whether this Lease is dated prior to or subsequent to the date of said ground lease or underlying lease.

**ARTICLE 23. <u>Exculpation</u>**. It is expressly understood and agreed that nothing in this Lease contained shall be construed as creating any liability whatsoever against Landlord personally, and in particular, without limiting the generality of the foregoing, there shall be no personal liability to pay any indebtedness accruing hereunder or to perform any covenant, either express or implied, herein contained, or to keep, preserve or sequester any property of Landlord, and that all personal liability of Landlord, to the extent permitted by law, of every sort, if any, is hereby expressly waived by Tenant, and by every person now or hereafter claiming any right or security hereunder; and that so far as the parties hereto are concerned, the owner of any indebtedness or liability accruing hereunder shall look solely to the Premises and the Shopping Center for the payment thereof.

**ARTICLE 24. <u>Notices</u>**. Any notice or communication required by this Lease must be in writing. Notices and other communications shall be given by overnight courier or by United States Mail, postage prepaid, certified mail, return receipt requested. Notices shall be given at the addresses herein set forth or such other address as Landlord or Tenant may specify in writing. All notices to Tenant may be given at the Premises. Notices shall be effective upon receipt or refusal of receipt.

**ARTICLE 25. <u>Tenant's Restriction</u>**. If Tenant or any business controlling, controlled by, or under common control with Tenant (an "**<u>Affiliate</u>**") shall, directly or indirectly own, operate or become financially engaged in any business similar to or in competition with the business for which the Premises are leased hereunder within a radius of 10 miles measured from the outside boundary of the Shopping Center (the "**<u>Restricted Area</u>**"), then all revenues derived from such competing business shall be included in Tenant's Gross Sales for the purposes of determining Percentage Rental under this Lease without adjustment in the Breakpoint. Upon request, Tenant shall provide Landlord with complete information concerning all revenues and sales made from any competing business located within the Restricted Area in the same manner as provided herein for determining Percentage Rental and Landlord shall be entitled to all rights, remedies and recourses provided for in this Lease in enforcing the provisions of this Section. This Article 25 shall not apply to any competing business within the Restricted Area that is being operated by Tenant on the date this Lease is executed.

**ARTICLE 26. <u>Miscellaneous</u>**.

28

26.1     One or more waivers of any provision of this Lease by either party shall not be construed as a waiver of a subsequent breach of the same provision.

26.2     Time is of the essence with respect to all provisions of this Lease, provided that except as otherwise expressly provided herein, if either party is delayed or hindered in or prevented from the performance of any obligation required hereunder by Unavoidable Delay, the time for performance of such obligation shall be extended for the period of the delay, provided that Unavoidable Delay will not excuse prompt and timely payments, including Rent.  However, no delay will be excused by this section unless (1) the delayed party notifies the other party in writing of the delay within five days of the event giving rise to such delay; (2) the delayed party has exhausted all other resources available at reasonable costs to avoid such delay; and (3) the delayed party diligently pursues completion of the activity that was delayed. Notwithstanding anything to the contrary in this Lease, under no circumstances will Unavoidable Delay extend the time for performance of any obligation by more than 90 days. "Unavoidable Delay" means a material delay beyond the reasonable control of the delayed party caused by labor strikes, lock-outs, labor troubles, industry-wide inability to procure materials, failure of power, extraordinary restrictive governmental laws or regulations (such as gas rationing), riots, war, military or usurped governmental power, acts of terrorism, sabotage, material fire or other material casualty, or an extraordinary and material act of God (such as a tornado or earthquake), but excluding inadequacy of insurance proceeds, litigation or other disputes, financial inability, lack of suitable financing, delays of the delayed party's contractor and failure to obtain approvals or permits unless otherwise caused by an event of Unavoidable Delay.

26.3     At any time when there is outstanding a mortgage, deed of trust or similar security instrument encumbering Landlord's interest in the Premises, Tenant may not exercise any remedies for default by Landlord hereunder unless and until the holder of the indebtedness secured by such mortgage, deed of trust or similar security instrument shall have received written notice of such default and a reasonable time for curing such default shall thereafter have elapsed.

26.4     Provided Tenant is not in default under this Lease beyond any applicable notice and cure period, Tenant shall, subject to the terms of this Lease, at all times during the Term have the peaceable and quiet enjoyment and possession of the Premises.

26.5     This Lease (including all Exhibits and Schedules attached hereto) contains the entire agreement between the parties, and no agreement shall be effective to supplement, change, modify or terminate this Lease in whole or in part unless such agreement is in writing and duly signed by the party against whom enforcement is sought. Without limiting the foregoing, one or more emails from one party to the other shall not constitute an amendment to this Lease unless expressly agreed to by Landlord and Tenant.

26.6     Tenant warrants that it has had no dealing with any broker or agent in connection with the negotiation or execution of this Lease and agrees to defend and indemnify Landlord from and against any claims by any other broker, agent or other person claiming compensation by virtue of having dealt with Tenant with regard to this leasing transaction.

26.7     Tenant agrees to furnish from time to time, within 10 days after request by Landlord, an estoppel certificate signed by Tenant addressed to such party as Landlord requests,

confirming and containing such factual certifications and representations as may be reasonably requested.

26.8   The laws of the State of Kentucky shall govern this Lease and any action brought to enforce this Lease or otherwise arising out of the transactions hereunder shall be brought exclusively in Campbell County, Kentucky.

26.9   Subject to Article 18, this Lease shall inure to the benefit of and be binding upon the parties hereto and their respective heirs, successors in interest and legal representatives.

26.10   Landlord reserves the right at any time to change the name by which the Shopping Center is designated.

26.11   The person executing this Lease on behalf of Tenant represents and warrants that such execution has been duly authorized by all requisite action and this Lease is binding upon and enforceable against Tenant in accordance with its terms.

26.12   This Lease shall be effective only when it is signed by both the Landlord and Tenant.  The Tenant's submission of a signed Lease for review by the Landlord does not give the Tenant any interest, right, or option in the Premises.

26.13   To the maximum extent permitted by law, except for those express warranties contained herein Tenant hereby waives the benefit of all warranties and covenants, express or implied, with respect to the Premises including, without limitation, any implied warranty that the Premises are suitable for any particular purpose and any implied covenant of fair dealing or good faith.

26.14   Upon request from time to time by Landlord, Tenant shall provide to Landlord a copy of its most recent annual financial statements (balance sheet and income statement) certified by an officer of Tenant as being true and correct.

26.15   If either party retains an attorney to enforce this Lease, the prevailing party in any action brought thereon is entitled to recover reasonable attorneys' fees.

26.16   Tenant represents and warrants to and covenants with Landlord that (i) neither Tenant nor any of its owners or affiliates currently are, or shall be at any time during the term hereof, in violation of any laws relating to terrorism or money laundering (collectively, the "Anti-Terrorism Laws"), including without limitation Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001, and regulations of the U.S. Treasury Department's Office of Foreign Assets Control (OFAC) related to Specially Designated Nationals and Blocked Persons (SDN's OFAC Regulations), and/or the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Public Law 107-56) (the "USA Patriot Act"); (ii) neither Tenant nor any of its owners, affiliates, investors, officers, directors, employees, vendors, subcontractors or agents is or shall be during the term hereof a "Prohibited Person" which is defined as follows: (1) a person or entity owned or controlled by, affiliated with, or acting for or on behalf of, any person or entity that is identified as an SDN on the then-most current list published by OFAC at its official website, http://www.treas.gov/offices/eotffc/ofac/sdn/t11sdn.pdf, or at any replacement website or other

30

replacement official publication of such list, and (2) a person or entity who is identified as or affiliated with a person or entity designated as a terrorist, or associated with terrorism or money laundering pursuant to regulations promulgated in connection with the USA Patriot Act; (iii) Tenant is not acting, directly or indirectly, for or on behalf of any person, group, entity, or nation named by any Executive Order or the United States Treasury Department as a terrorist, "Specially Designated National and Blocked Person", or other banned or blocked person, group, entity, nation, or transaction pursuant to any law, order, rule, or regulation that is enforced or administered by the Office of Foreign Assets Control and that it is not engaged in this transaction, directly or indirectly, on behalf of, or instigating or facilitating this transaction, directly or indirectly, on behalf of any such person, group, entity, or nation; and (iv) Tenant has taken appropriate steps to understand its legal obligations under the Anti-Terrorism Laws and has implemented appropriate procedures to assure its continued compliance with such laws. Tenant agrees that any breach of the foregoing shall at Landlord's election be a default under this Lease for which there shall be no cure and Tenant hereby agrees to defend, indemnify, and hold harmless Landlord, its officers, directors, agents and employees, from and against any and all claims, damages, losses, risks, liabilities and expenses (including attorney's fees and costs) arising from or related to any breach of the foregoing representations, warranties and covenants. At any time and from time-to-time during the term, Tenant shall deliver to Landlord within 10 days after receipt of a written request therefor, a written certification or such other evidence reasonably acceptable to Landlord evidencing and confirming Tenant's compliance with this paragraph. Tenant acknowledges and agrees that as a condition to the requirement or effectiveness of any consent to any transfer by Landlord pursuant to Section 18.1, Tenant shall cause each transferee, for the benefit of Landlord, to reaffirm, on behalf of such transferee, the representations of, and to otherwise comply with the obligations set forth in, this Section 26.16, and it shall be reasonable for Landlord to refuse to consent to a transfer in the absence of such reaffirmation and compliance. Tenant agrees that breach of the representations and warranties set forth in this Section shall at Landlord's election be a default under this Lease for which there shall be no cure. This Section 26.16 shall survive the termination or earlier expiration of the Lease.

26.17   The parties hereto irrevocably waive trial by jury in any action, proceeding or counterclaim brought by either party against the other on any matter arising out of or in any way connected with this Lease, the relationship of Landlord and Tenant, or Tenant's use and occupancy of the Premises.

26.18   Neither this Lease nor any memorandum hereof may be recorded without the express written consent of Landlord.

26.19   It is intended that all Rent payable by Tenant to Landlord, which includes all sums, charges, or amounts of whatever nature to be paid by Tenant to Landlord in accordance with the provisions of this Lease, shall qualify as "rents from real property" within the meaning of both Sections 512(b)(3) and 856(d) of the Internal Revenue Code of 1986, as amended (the "Code") and the U.S. Department of Treasury Regulations promulgated thereunder (the "Regulations"). If Landlord, in its sole discretion, determines that there is any risk that all or part of any Rent shall not qualify as "rents from real property" for the purposes of Sections 512(b)(3) or 856(d) of the Code and the Regulations, the Tenant shall (i) cooperate with Landlord by entering into such amendment or amendments to this Lease as Landlord reasonably deems necessary to qualify all Rent as "rents from real property," and (ii) permit an assignment of this Lease; provided,

31

however, that any adjustments required under this section shall be made so as to produce the equivalent (in economic terms) Rent as payable before the adjustment.

26.20    Landlord and/or any other owners of property within the Shopping Center or Project will be permitted to sell, lease, transfer or otherwise convey any building, condominium unit within any building, building pad, outlot or other portion of the Shopping Center or Project as a separate and independent development from the remainder of the Shopping Center or Project with the understanding that any such portion and the remainder of the Shopping Center or Project will nevertheless constitute an integrated development. In the event of a sale, lease, transfer or other conveyance of any portion of the Shopping Center or Project (separate from the balance of the Shopping Center), Landlord may enter into an agreement with the transferee granting appropriate easement and other rights, and containing such other matters as the Landlord and such transferee may agree, to the extent not inconsistent with this Lease.  Landlord and the other owners of property within the Shopping Center or Project will at all times have full control, management and direction of the Shopping Center or Project, subject to the rights of Tenant in the Premises, and the right is hereby reserved at any time and from time to time to reduce, increase, enclose or otherwise change the size, height and air rights, number and location of buildings, layout and nature of the Shopping Center or Project, to construct additional buildings and additions to any building, to create additional rentable areas through use, withdrawal of, and/or enclosure of the Common Area, or otherwise, to place signs on the Shopping Center or Project, to increase the land size of the Shopping Center or Project, and to change the name, address, number or designation by which the Shopping Center or Project is commonly known.  No implied easements are granted by this Lease.

26.21    Landlord shall have the right to submit any portions of the Shopping Center or Project to condominium ownership pursuant to the provisions of Chapter 381 of the Kentucky Revised Statutes. At Landlord's request, Landlord and Tenant will execute an amendment of this Lease evidencing such conversion to condominium ownership and Tenant shall enter into an agreement subordinating its rights under the Lease to the Condominium Declaration. The Condominium Declaration shall include such provisions as are customary for similar projects and do not materially and adversely affect Tenant's rights hereunder. This Lease, and the rights of Tenant hereunder, shall be subject to the terms and provisions of the Condominium Declaration and any amendments thereto provided that they do not materially and adversely affect Tenant's rights or obligations hereunder.

26.22    It is agreed and understood that Tenant may acknowledge only the existence of this Lease by and between Landlord and Tenant, and that Tenant may not disclose any of the terms and provisions contained in this Lease to any other tenant or occupant in the Shopping Center or to any agent, employee, subtenant or assignee of such tenant or occupant. Tenant acknowledges that any breach by Tenant of the agreements set forth in this Section 26.22 shall cause Landlord irreparable harm. The terms and provisions of this Section 26.22 shall survive the termination of this Lease (whether by lapse of time or otherwise).

26.23    This Agreement may be executed in multiple counterparts, each of which shall constitute an original and all of which taken together shall constitute one and same agreement binding upon the parties, notwithstanding that all the parties are not signatories to the same counterpart. In order to facilitate the finalization of this Agreement, the parties agree that docusign

32

signatures or signatures transmitted via e-mail in a "PDF" format may be used in place of original signatures on this Agreement.  Each party intends to be bound by such party's docusign or "PDF" format signature on this Agreement, is aware that the other parties are relying on such party's docusign or "PDF" format signature, and hereby waives any defenses to the enforcement of this Agreement based upon the form of signature.  Promptly following any docusign transmittal or e-mail transmittal of "PDF" format signatures, the parties shall deliver to the other parties the original executed Agreement (it being agreed and understood that the delivery of such original shall not be a condition to the binding nature of the facsimile or electronic copy of the document provided such document is received by the parties).

26.24  The parties acknowledge and agree that: (i) under no circumstances whatsoever is this Lease an assignment, sublease, restatement or amendment of any lease agreement and shall not be deemed as such, and (ii) by entering into this Lease, agree to not be bound by, assume, or be subject to any prior lease agreement of any kind or nature and no prior lease agreement shall be used in the application, interpretation or enforcement of this Lease. Landlord shall defend, indemnify and hold harmless Tenant in connection with the foregoing.

**ARTICLE 27. <u>Landlord's Lien</u>**.  To secure performance of Tenant's obligations hereunder, Tenant grants to Landlord a security interest in all goods, equipment, fixtures, furniture, inventory, accounts, contract rights, chattel paper, general intangibles, and other personal property of Tenant situated on the Premises and in the proceeds thereof.  Such property shall not be removed from the Premises until all of Tenant's obligations hereunder have been performed and Landlord acknowledges such performance by notice to Tenant.  If an Event of Default occurs, Landlord shall have, in addition to all other remedies provided herein or by law, all rights and remedies under the Uniform Commercial Code.  The statutory lien for rent is not hereby waived.  Tenant shall execute such other instruments requested by Landlord to perfect this security interest.  This Lease may be filed as a financing statement or Landlord may, on Tenant's behalf and as its agent, execute and file a financing statement to perfect the security interest.

**ARTICLE 28. <u>Hazardous Waste</u>**.  The term "**<u>Hazardous Substances</u>**," shall mean pollutants, contaminants, toxic or hazardous wastes, or any other substances, the removal of which is required, or the use of which is restricted, regulated, prohibited or penalized by any "**<u>Environmental Law</u>**," which term shall mean any federal, state or local law or ordinance relating to pollution or protection of the environment.  Tenant agrees that (a) no activity will be conducted on the Premises that will produce any Hazardous Substance, except for such activities that are part of the ordinary course of Tenant's business activities (the "**<u>Permitted Activities</u>**"), provided said Permitted Activities are conducted in accordance with all Environmental Laws and have been approved in advance in writing by Landlord; (b) the Premises will not be used in any manner for the storage of any Hazardous Substances except for the temporary storage of such materials that are used in the ordinary course of Tenant's business (the "**<u>Permitted Materials</u>**") provided such Permitted Materials are properly stored in a manner and location meeting all Environmental Laws and approved in advance in writing by Landlord; (c) Tenant will not install any underground tanks of any type; (d) Tenant will not allow any surface or subsurface conditions to exist or come into existence that constitute, or with the passage of time may constitute, a public or private nuisance; (e) Tenant will not permit any Hazardous Substances to be brought onto the Premises, except for the Permitted Materials, and if so brought or found located thereon, the same shall be immediately removed, with proper disposal, and all required cleanup procedures shall be diligently undertaken

33

pursuant to all Environmental Laws at Tenant's sole cost and expense.  If, at any time during or after the Term, the Premises are found to be so contaminated or subject to said conditions, Tenant shall indemnify, defend, and hold Landlord harmless from all claims, demands, actions, liabilities, costs, expenses, damages and obligations of any nature arising from or as a result of the use of the Premises by Tenant.  The foregoing indemnification shall survive the termination or expiration of this Lease.

EXCEPT AS EXPRESSLY SET FORTH HEREIN: (1) LANDLORD AND TENANT EXPRESSLY DISCLAIM ANY IMPLIED WARRANTY THAT THE PREMISES ARE SUITABLE FOR TENANT'S INTENDED COMMERCIAL PURPOSES; (2) TENANT'S OBLIGATION TO PAY RENT HEREUNDER IS NOT DEPENDENT UPON THE CONDITION OF THE PREMISES OR THE PERFORMANCE BY LANDLORD OF ITS OBLIGATIONS HEREUNDER; AND (3) TENANT SHALL CONTINUE TO PAY THE RENT, WITHOUT ABATEMENT, SET OFF, OR DEDUCTION, NOTWITHSTANDING ANY BREACH BY LANDLORD OF ITS DUTIES OR OBLIGATIONS HEREUNDER, WHETHER EXPRESS OR IMPLIED.

EXECUTED BY LANDLORD, this __14__ day of ___February___, 2022.

NOTL Property Owner LLC,
a Delaware limited liability company

By: ___Tim Perry_____
Timothy Perry, Vice President

SR

35

EXECUTED BY TENANT, this __10th__ day of __February_____, 2022.

Velocity Esports Newport Kentucky, LLC, a
Kentucky limited liability company


By:__Len Wanger_____

Title: __President_____

36

DocuSign Envelope ID: 9666A6B9-E25E-4928-A53D-29390C8F8G77

EXHIBIT A

PREMISES DESCRIPTION

(SEE ATTACHED)



PROMENADE LEVEL

TENANT
P-130
22,081 SF

STAIR
ABOVE

MECH.

BRACING
LOCATIONS,
TYP.

GROUND LEVEL

LL STOR.

LL STOR.

LL STOR.

BRACING
LOCATIONS, TYP.

TENANT
STORAGE
G-117
2,777 SF

MECH.

TENANT
P-130

TENANT
STORAGE
G-117

NOTE: ALL DIMENSIONS AND COLUMN LOCATIONS SHALL BE FIELD VERIFIED BY TENANT

**reztark**
NORTH AMERICAN PROPERTIES

801 Main Street
Suite 200
Cincinnati, Ohio 45202
T 513.233.3333
F 513.233.3434
www.reztark.com

| PROJ. NAME: | Newport On the Levee |
|---|---|
| PROJ. ADDRESS: | 1 Levee Way, Newport, KY 41071 |
| PROJ. NO: | 18032 |
| SHEET TITLE: | Tenant P-130 - Existing |
| SHEET NUMBER: | P-130_LOD-1 |

| DRAWN: | MLG |
|---|---|
| REVIEWED: | IMR |
| DATE: | 10/30/19 |
| SCALE: | 1" = 30'-0" |
| SIZE: | 11" x 17" |
| COPYRIGHT: | reztark design studio, llc. |



NOTE: ALL DIMENSIONS AND COLUMN LOCATIONS SHALL BE FIELD VERIFIED BY TENANT

| PROJ. NAME: | Newport On the Levee | DRAWN: | MLG |
| --- | --- | --- | --- |
| PROJ. ADDRESS: | 1 Levee Way, Newport, KY 41071 | REVIEWED: | IMR |
| PROJ. NO. | 18032 | DATE: | 10/30/19 |
| | | SCALE: | 1" = 30'-0" |
| SHEET TITLE: | Tenant P-130 - Existing | SIZE: | 11" x 17" |
| SHEET NUMBER: | P-130_LOD-4 | COPYRIGHT: | reztark design studio, llc. |

EXHIBIT B

SITE PLAN



1



NEWPORT
ON THE LEVEE

PROMENADE LEVEL - LEASE PLAN
8-31-2021

NORTH AMERICAN PROPERTIES

2



NEWPORT
ON THE LEVEE

MEZZANINE LEVEL - LEASE PLAN
8-31-2021

NORTH AMERICAN PROPERTIES



MEZZANINE LEVEL

THIRD STREET

**NEWPORT**
ON THE LEVEE

AMC LEVEL - LEASE PLAN
8-31-2021

NORTH AMERICAN PROPERTIES

4

EXHIBIT C

WORK LETTER

LANDLORD SHALL DELIVER THE PREMISES TO TENANT IN AN "AS-IS" CONDITION.

EXHIBIT D

SIGN CRITERIA

**GENERAL SIGNAGE CRITERIA**

1.      All Tenant signage shall have Landlord written approval.  Signing shall be limited to name, logo and decorative treatment.

2.      Animated components such as flashing lights, or chasers, formed plastic, injection molded plastic or channel letters with Plexiglas faces will be permitted with Landlord's approval.

3.      No sign maker's labels, underwriters or other identification shall be permitted on the exposed surface of signs, except those required by local ordinance.

4.      No exposed conduit, tubing or raceways, as well as transformers or other equipment shall be permitted unless approved by Landlord.

5.      Postal numbers, if required on storefront, will be designed and installed by Tenant at Tenant's expense. Design shall be submitted, and subject, to Landlord approval.

6.      Electrical service to Tenant's signage shall be a part of Tenant's business' operating costs.

7.      All sign illumination shall be on a 7-day, 24-hour time clock set in accordance with the Shopping Center's operating hours.

8.      No advertisements, notices, sale signs or other lettering, other than the permanent display of store name or logo, shall be affixed or exhibited on the storefront, or be visible from the mall, or common area, without specific written approval of Landlord.

9.      All state and local sign permit fees, if any, shall be the responsibility of Tenant.

**STOREFRONT SIGNAGE**

All Tenants shall engage a professional sign painter to paint their name and/or logo directly on the inside face of their storefront that is glass. Decals and vinyl applications may be submitted as an exception. All exceptions are subject to Landlord approval. Landlord reserves the right to disallow any letter/graphics it deems not in accordance with Shopping Center standards.   Such signage shall be of letters and graphics only, without opaque backgrounds.

**EXTERIOR SIGNAGE**

1.      All tenants are required to design, fabricate, and maintain a projection double-sided blade sign. Such sign will be installed by Tenant at Tenant's expense. Installation specifications/details shall be submitted to Landlord for approval.  The sign will be mounted to the exterior of the building, directly centered over Tenant's storefront entry doors.  The blade sign may be fabricated of painted wood with incised, painted letters and logo, painted aluminum with channel letters or

high quality colored acrylic letters. The Blade Sign may have integrated spotlights on both faces to illuminate the sign, or be internally lit with neon or LED lights. Tenant will circuit the electrical wiring of the sign to Tenant's electrical system time clock (photocell on, clock off). This time clock shall be separate from Tenant's time clock used to regulate interior lighting.

2. All neon transformers will be mounted inside the wall of the Premises. Tenant shall circuit the electrical writing to the sign to its electrical system time clock. This time clock shall be separate from Tenant's time clock used to regulate interior lighting. See details and plans that follow for locations and required dimensions and specifications for the one-sided horizontal sign.

3. Tenants with awnings are required to submit photo-ready artwork of their store name and/or logo, in order for Landlord to apply this artwork to the face of those awnings shading Tenant's windows. Tenant will fabricate and install such signage at Tenant's expense.

4. Any Tenant with special architectural features (such as an architectural tower) fronting its space may use painted and neon signage. All such tenants are required to design, fabricate and maintain the neon signage. Such signage must be approved by Landlord and will be installed by Tenant. The sign will be a neon sign on a painted metal backing designed as a self-contained unit. The transformer shall be located in the Premises. Tenant shall circuit the electrical wiring of the sign to its electrical system time clock. This time clock shall be separate from Tenant's time clock used to regulate interior lighting.

Any Tenant at "end cap" locations is permitted up to two (2) signs mounted on the exterior-facing (i.e. parking areas) building fascia. These signs may be painted and neon with a total combined area (for one or both signs) not to exceed 120 sq. ft. Any such tenant shall design, fabricate, and maintain the neon signage. Such signage must be approved by Landlord and will be installed by Tenant. The sign will be a neon sign on a painted metal backing designed as a self-contained unit. The transformer shall be located in the Premises. Tenant shall circuit the electrical wiring of the sign to its electrical system time clock. This time clock shall be separate from Tenant's time clock used to regulate interior lighting.

EXHIBIT E

GUARANTY

THIS GUARANTY is executed this 10th day of February , 2022, by Velocity Esports, Inc., a Nevada corporation ("Guarantor").

WHEREAS, a certain lease of even date herewith (the "Lease") has been, or will be, executed by and between NOTL Property Owner LLC, a Delaware limited liability company (referred to therein and herein as "Landlord"), and Velocity Esports Newport Kentucky, LLC, a Kentucky limited liability company (referred to therein and herein as "Tenant"), relating to the lease of certain premises located in Newport, Kentucky, to which this Guaranty is attached and which Lease is fully incorporated herein by reference; and

WHEREAS, Landlord requires as a condition to its execution of the Lease that the Guarantor guarantee the full performance of the obligations of Tenant under the Lease; and

WHEREAS, the Guarantor is desirous that Landlord enter into the Lease with Tenant.

NOW, THEREFORE, in consideration of the execution of the Lease by Landlord, and in exchange for other good and valuable consideration, the sufficiency of which is hereby acknowledged, the undersigned Guarantor hereby absolutely and unconditionally guarantees the full and timely performance of each and all of the terms, covenants and conditions of the Lease to be kept and performed by Tenant, including the payment of all rentals and other charges to accrue thereunder.

The undersigned Guarantor further agrees as follows:

That this covenant and agreement on its part shall continue in favor of Landlord notwithstanding any extension, modification, or alteration of the Lease entered into by and between the parties thereto, or their successors or assigns, and notwithstanding any assignment of said Lease, with or without the consent of Landlord, and no extension, modification, alteration or assignment of the Lease shall in any manner release or discharge the undersigned Guarantor and Guarantor does hereby consent thereto.

That the liability of Guarantor hereunder is continuing and shall in no way be affected, modified or diminished by reason of any unilateral action of either Landlord or Tenant, or by reason of any dealings or transactions or agreements entered into or occurring between Landlord and Tenant, including without limitation any adjustments, compromises, settlements, accord and satisfactions, or releases, or any termination of the Lease, whether or not notice thereof is Given to Guarantor, all of which notices Guarantor hereby expressly waives.

That this Guaranty will continue unchanged by any bankruptcy, reorganization or insolvency of Tenant or any successor or assignee thereof or by any disaffirmance or abandonment by a trustee of Tenant.

That Landlord may, without notice, assign this Guaranty and/or the Lease in whole or in part and no assignment or transfer of this Guaranty or the Lease shall operate to extinguish or diminish the liability of the undersigned Guarantor hereunder.

1

That the liability of the undersigned Guarantor under this Guaranty shall be primary and that in any right of action which shall accrue to Landlord under the Lease, Landlord may, at its option, proceed against the undersigned Guarantor without having commenced any action, or having obtained any judgment against Tenant.

That Guarantor shall further be liable for and shall pay Landlord's reasonable attorney's fees and all costs and other expenses incurred in any collection or attempted enforcement or collection under the Lease or this Guaranty ("Legal Costs").

That the undersigned Guarantor does hereby waive notice of any demand by Landlord, as well as any notice of default in the payment of rent or any other amounts contained or reserved in the Lease.

That the undersigned Guarantor warrants that the information set forth below his or her signature hereto is true and correct.

That Guarantor shall deliver to Landlord:  (i) within 75 days after each calendar year a balance sheet dated as of the end of the calendar year certified to be true by Guarantor; and (ii) a copy of Guarantor's federal tax return within 30 days after filing. In addition, Guarantor agrees to furnish from time to time, within 10 days after request by Landlord, an estoppel certificate signed by Guarantor addressed to such party as Landlord requests, confirming and containing such factual certifications and representations as may be reasonably requested. All financial information provided by the Guarantor to Landlord under this Lease shall be kept in the strictest confidence by Landlord and its representatives and shall not be disclosed to any other party, other than to mortgagees and bona fide prospective purchasers of the Shopping Center, provided such parties likewise agree to keep such information confidential.

Guarantor irrevocably waives trial by jury in any action, proceeding or counterclaim brought by Landlord hereunder.

Any default by Guarantor hereunder not cured within 30 days after written notice from Landlord shall constitute an Event of Default under the Lease.

The use of the singular herein shall include the plural.  The obligations of two or more parties shall be joint and several.  The terms and provisions of this Guaranty shall be binding upon and inure to the benefit of the respective successors and assigns of the parties herein named.

Notwithstanding the foregoing, Guarantor's liability under this Guaranty during Lease Years six through ten shall not exceed one year's worth of Minimum Rental for any specific instance of liability. Guarantor shall not have any liability for any of Tenant's actions which occur after Lease Year ten

[REST OF PAGE INTENTIONALLY BLANK, SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the undersigned has caused this Guaranty to be executed as of the date set forth above.

GUARANTOR:

Velocity Esports, Inc.,
a Nevada corporation

By: _____
   1C13E610E34249A…

Title:   President   _____

DocuSign Envelope ID: 0666A6B0-E25E-4928-A53D-29390C8F8G77

EXHIBIT F

RENEWAL TERM

Provided that as of the date Tenant exercises this renewal right pursuant to this Exhibit F no Event of Default exists, Tenant is occupying the entire Premises for its permitted use, and Tenant's Gross Sales in the twelve months prior to Landlord's receipt of the Renewal Notice exceeds $3,000,000.00, Tenant may renew this Lease for one additional period of five Lease Years (the "Renewal Term"). To exercise its renewal right hereunder, Tenant shall deliver written notice of the exercise thereof (the "Renewal Notice") to Landlord at least six months before the expiration of the initial Term. If Tenant exercises its renewal right hereunder, then on or before the expiration date of the initial Term, Landlord and Tenant shall execute an amendment to this Lease extending the Term on the same terms as provided in this Lease, except: (1) Minimum Rental payable during each month of the Renewal Term shall be $68,939.52, based on $33.28 per square foot per annum; (2) Tenant shall accept the Premises AS IS and without any allowance or free rent period; and (3) Tenant shall have no further renewal option unless expressly granted hereafter by Landlord in writing.

Tenant's rights under this Exhibit shall terminate if Tenant fails to timely exercise its renewal right under this Exhibit, time being of the essence, or if the Lease is terminated for any reason prior to the expiration of the then term

1

EXHIBIT G

EXCLUSIVES/NOXIOUS USES

**NOXIOUS USES**:

(a)      a second hand or surplus store (except that second-hand retail stores such as "Second Swing", "Play It Again Sports" or other types of tenants that specialize in the sale of specific types or lines of secondhand goods (e.g., used sporting goods or used computer or video games) and are commonly found in a first-class shopping center and retail stores specializing in vintage items or antiques shall be permitted);  (b) a laundry or dry cleaning operation (provided a store that has drop off and pick up dry cleaning only with no dry cleaning operations on site shall be permitted; (c) mortuary or funeral home; (d) any adult book store or store selling or exhibiting sexually explicit materials (except as incidental to a retail book store and typically sold in a Borders or Barnes and Noble); (e) an auto parts store or gas station; (f) any church, synagogue, mosque, temple or other place of worship;  (g) a marijuana dispensary, "head" shop or any establishment displaying or selling drug paraphernalia; (h) a massage parlor (provided therapeutic massage in connection with an upscale salon or spa such as Massage Envy is permitted), topless bar or club or restaurant which provides striptease or "adult" entertainment;  (i) any dollar store, odd lots, liquidation or close out store or any store selling primarily distressed or damaged merchandise; (j) a temporary placement service; (k) a drug or alcohol recovery or treatment facility; or (l) an abortion clinic, aids clinic or bodily fluid collection facility.

**EXCLUSIVES:**

1.      AMC. A movie theater. The sale of nachos, popcorn, candy, hot dogs, yogurt, soft drinks or lemonade within the Common Area or any premises fronting on the AMC Concession Restriction Area; provided, however, that such restriction shall not apply to sit-down restaurants serving such items for on-premises consumption only. No video arcade or game room within the AMC Concession Restriction Area except as incidental to the primary business operated in such space.

2.      Cold Stone.   The retail sale of ice cream, frozen yogurt, frozen desserts or other directly competing products, including but not limited to other ice cream stores, other frozen yogurt stores and ice cream/yogurt vending units whether freestanding or in kiosks; provided nothing herein shall prevent any tenant of the Center from selling such products on an incidental basis.

3.      Five Guys.    Quick service burger concept restaurant tenant, such as Steak & Shake, Johnny Rockets, Smashburger, Fatburger, Cheeburger, and In and Out.

4.      Tom + Chee.   Retail facility providing primarily grilled cheese sandwiches and grilled cheese donuts.

5.      Brio.   A full service, sit-down, upscale Italian restaurant.

6.      Bon Mi.       A Vietnamese restaurant whose primary business is the sale of Pho, "bahn mi" Vietnamese sandwiches, boba, Milktea or bubble tea. As used herein, "primary business" means that a restaurant derives more than 30% of its Gross Sales from any of the foregoing exclusive items in the singular or in the aggregate.

1

7.  <u>Little Spoon</u>.  A tenant whose primary business is a coffee shop.  "Primary business" as used herein means a restaurant or shop that derives more than 10% of its annual gross sales from the sale of coffee-based drinks.

8.  <u>Colonel de Spices</u>.    Landlord shall not hereafter during the initial Term lease any store space in the Shopping Center during the Lease Term to a tenant whose primary business is the retail sale of herbs and spices (a "Competing Use").

9.  <u>Sage Yoga</u>.    Landlord shall not hereafter lease any store space in the Shopping Center during the Lease Term to a fitness tenant offering yoga, hot yoga or pilates (a "Competing Use").

2

DocuSign Envelope ID: 9666A6B9-E25F-4928-A53D-29390C8F8G77

EXHIBIT H

GROSS SALES EXCLUSIONS

(SEE ATTACHED)

3

## EXHIBIT H

### Exclusions to Gross Sales

Gross Sales shall exclude the following:

1.      exchanges and transfer of goods and merchandise between Tenant's stores/locations made for the convenient operation of Tenant's business and not to consummate a sale made in, at, or from the Premises, and goods returned to their sources or transferred to a warehouse owned by or affiliated with Tenant;

2.      returns to manufacturer;

3.      sales of fixtures, machinery, games (except games sold to consumers in the ordinary course of Tenant's business), and equipment after use in the conduct of Tenant's business in the Premises;

4.      discounted or complimentary use of games or entertainment attractions by, or discounted or complimentary merchandise given or sold to, employees, guests, or invitees of Tenant, but only to the extent of the discounted price;

5.      special promotional use of games or other entertainment attractions, provided any sales proceeds collected at the special promotional price shall be included within Gross Sales;

6.      revenue received from the sale of "debit cards," "game cards" or "smart cards," or tokens, except to the extent that such cards or tokens are redeemed for use of games or other entertainment devices within the Premises, and so long as the unused portion of such cards may be redeemed for use of games or other entertainment devices within the Premises at a later date;

7.      sales of gift certificates (unless redeemed at the Premises);

8.      the selling price of all merchandise returned by customers and accepted for full credit or the amount of discounts and allowances made thereon;

9.      goods returned to sources or transferred to another store or warehouse owned by or affiliated with Tenant;

10.     sums and credits received in the settlement of claims for loss of or damage to merchandise to the extent previously reported as Gross Sales;

11.     alteration workroom charges and delivery charges, if the amount of any such charge received by Tenant is no greater than Tenant's cost of providing the service;

H-1

4

12.     amount received from sales of "distressed," damaged, unreasonable, or absolute merchandise sold in bulk buyers other than regular retail customers;

13.     any penalty charged by Tenant for a returned check;

14.     reimbursement of the amount paid for minor service charges, such as postage or delivery expenses;

15.     all proceeds from sales of lottery tickets or other forms of government-sponsored gambling; provided, however, that Gross Sales shall include that portion of such lottery or gambling proceeds retained by Tenant minus awards paid to customers and/or gambling authorities;

16.     cash refunds made to customers in the ordinary course of business;

17.     receipts from any public telephones, stamp machines or public toilet locks installed with Landlord's approval in areas not open to the public;

18.     the amount of and license fee, or any city, county, state, or federal sales taxes, so-called luxury taxes, consumers' excise taxes, gross receipts taxes, use taxes, entertainment and so-called "drop taxes," and other similar taxes now or hereafter imposed upon the sale of merchandise or services (including the playing of games), whether collected as a part of or separately from the selling price of merchandise or services and collected from customers;

19.     sales of fixtures, equipment or property which are not Tenant's stock in trade;

20.     receipts from sales of food and beverages by third-party subtenants, licensees or concessionaires within the Premises; provided, however, the amount of rent, subrent, or license fee paid by any subtenant, licensee, concessionaire operating within the Premises shall be included within Gross Sales;

21.     fees paid by Tenant to credit card companies and/or banking institutions (to the extent previously reported as Gross Sales) in accordance with credit card purchases plans not to exceed five percent (5%) of the merchandise sales price and not to exceed a total of five percent (5%) of Tenant's Gross Sales in any single calendar year; and

22.     tips and gratuities passed through and/or paid directly to Tenant's employees.

5

## EXHIBIT W

## DEPICTION OF GALLERY BUILDING



PROMENADE LEVEL - LEASE PLAN
8-31-2021

1

DocuSign Envelope ID: 9666A6B0-E25F-4928-A53D-29390C8F8G77

EXHIBIT X

PERMITTED GAMES

The bowling facility at Newport on the Levee may incorporate the following games:

Bowling Arcade
Bocce
Table Tennis
Shuffleboard
Foosball
Air Hockey

1