**FIRST AMENDMENT TO LEASE**
**(Newport on the Levee – Velocity)**

This **FIRST AMENDMENT TO LEASE** (the "**Amendment**"), dated and effective as of _____December 21_____, 2022 (the "**Effective Date**"), is among **NOTL PROPERTY OWNER LLC**, a Delaware limited liability company (the "**Landlord**"), **VELOCITY ESPORTS NEWPORT KENTUCKY, LLC**, a Kentucky limited liability company (the "**Tenant**"), and **VELOCITY ESPORTS, INC.**, a Nevada corporation ("**Guarantor**").

**RECITALS:**

**WHEREAS**, Landlord and Tenant entered into a Standard Commercial Shopping Center Lease dated as of February 16, 2022 (the "**Lease**"), for premises known as Space P130, consisting of approximately 22,081 square feet (the "**Retail Space**"), and Space G117 consisting of approximately 2,777 square feet (the "**Storage Space**") (collectively, the "**Existing Premises**"), located in Newport on the Levee in Newport, Kentucky, and as further described in the Lease; and

**WHEREAS**, Guarantor guaranteed Tenant's obligations under the Lease on the terms and conditions set forth in the Guaranty attached to the Lease as Exhibit E (the "Guaranty"); and

**WHEREAS,** Landlord and Tenant desire to extend and amend the Lease as set forth herein; and

**WHEREAS**, terms capitalized, but not defined in this Amendment, shall be given the respective meanings ascribed to them in the Lease; and

**NOW**, **THEREFORE**, the parties agree as follows:

1.      **Expansion**.  Effective at and as of January 1, 2023 (the "**Expansion Premises Delivery Date**"), the Existing Premises are expanded to include the additional space containing approximately 24,947 square feet of space known as Space G112 and shown on Exhibit A attached hereto (the "**Expansion Premises**").  The "**Expansion Premises Commencement Date**" shall be January 1, 2023.  The Expansion Premises shall be occupied by Tenant subject to all of the terms and conditions set forth in the Lease, as modified by this Amendment.  From and after the Expansion Premises Commencement Date, any reference in the Lease to the term "Premises" shall be deemed to refer to the Existing Premises plus the Expansion Premises, totaling approximately 49,805 rentable square feet.

2.      **Extension of Term**.  The Lease is due to expire on March 31, 2032.  Landlord and Tenant hereby agree to extend the Term of the Lease so that the new expiration date of the Lease is December 31, 2032.

3.      **Lease Year**. From and after the Expansion Premises Commencement Date, the term "**Lease Year**" shall mean a 12 month period, with the first Lease Year commencing on January 1, 2023.

1

4.        **Permitted Use of Expansion Premises**. The Expansion Premises shall be used solely for the purpose of a retail facility: (a) providing entertainment for the public including but not limited to bowling, arcade games, video arcade games, pinball games, billiard tables and golf simulators; and (b) the sale of food and beverages for consumption within the Expansion Premises including, without limitation, the sale of beer, wine, and other alcoholic beverages using the same menu items offered in the Existing Premises (which menu may be modified from time to time provided it does not conflict with, or violate any exclusives of, other restaurant tenants in the Shopping Center as of the date of such modification, as reasonably determined by Landlord).

In no event shall Tenant conduct any business in the Expansion Premises which would violate the exclusives heretofore granted to other tenants of the Shopping Center set forth in Schedule 3 (attached hereto) or any noxious use set forth in Schedule 3, or any exclusive hereafter granted by Landlord to a tenant of the Shopping Center of which Tenant receives written notice and which does not preclude any of Tenant's then uses.

5.        **Minimum Rental**.

(A)        From and after the Expansion Premises Commencement Date, Minimum Rental for the Existing Premises shall be as follows:

| Lease Year | Per Sq. Ft. | Per Month | Per Year |
|---|---|---|---|
| LY 1 – LY 5 | $27.65 | $57,276.98 | $687,323.70 |
| LY 6 – LY 10 | $30.42 | $63,015.03 | $756,180.36 |

(B)        From and after the Expansion Premises Commencement Date, Minimum Rental for the Expansion Premises shall be as follows:

| Lease Year | Per Sq. Ft. | Per Month | Per Year |
|---|---|---|---|
| LY 1 – LY 5 | $15.00 | $31,183.75 | $374,205.00 |
| LY 6 – LY 10 | $16.50 | $34,302.13 | $411,625.50 |

(C)    Notwithstanding anything contained herein, if Tenant has Gross Sales in excess of $4,600,000.00 in two consecutive Lease Years after the Expansion Premises Commencement Date, Minimum Rental for each subsequent Lease Year shall be increased by 90% of the average Percentage Rental paid by Tenant during such two Lease Years, and the Breakpoint for each subsequent Lease Year shall be increased by the average Gross Sales in excess of the Breakpoint for such two Lease Years.

By way of example, if Tenant has Gross Sales of $4,800,000 in Lease Year one and $5,000,000.00 in Lease Year two: (i) the aggregate annual Minimum Rental for each of Lease Year one and two will  equal to $1,061,528.70,  and (ii) Percentage Rental will equal $40,000 in Lease Year one and $80,000.00 in Lease Year two, for an average Percentage Rental equal to $60,000.00 and average Gross Sales in excess of the Breakpoint of $300,000.00.

Minimum Rental and Percentage Rental shall thereafter be adjusted as follows: (a) Minimum Rental for Lease Years three, four and five shall then equal $1,115,528.70 ($1,061,528.70 being the otherwise applicable annual Minimum Rental plus $54,000.00 being 90% of the average Percentage Rental for Lease Years one and two); (b) Minimum Rental for Lease Years six through 10 shall then equal $1,221,805.80 ($1,167,905.80 being the otherwise applicable annual Minimum Rental plus $54,000.00 being 90% of the average Percentage Rental for Lease Years one and two); and (c) the Breakpoint for Lease Years three through 10 would be increased to $4,900,000.00 ($4,600,000.00 being the otherwise applicable Breakpoint plus $300,000.00 being the average Gross Sales in excess of the Breakpoint during Lease Years one and two).

6.    **Percentage Rental**.    Effective at and as of the Expansion Premises Commencement Date, Section 1.10 of the Lease is hereby deleted in its entirety and replaced with the following:

1.10    "**Percentage Rental**": The product of (1) the amount of Gross Sales from the Premises in excess of the Breakpoint, multiplied by (2) 20%. The "**Breakpoint**" is $4,600,000.00.

7.    **Taxes**.    Effective at and as of the Expansion Premises Commencement Date, Section 6.4 of the Lease is hereby deleted in its entirety and replaced with the following:

6.4    From and after the Expansion Premises Commencement Date, Tenant shall pay its Pro Rata Share of any increase in Taxes (as defined below) over the Base Year.  The "Base Year" is calendar year 2023.  "Taxes" means all taxes, public, special and private assessments, contractual payments in lieu of taxes, community development charges, and other governmental charges of any kind and nature whatsoever now or subsequently levied or assessed against all or any portion of the Property, upon the privilege of renting the Premises, or upon the amount of rent collected therefor.  Taxes shall not include federal income taxes or inheritance taxes.  Landlord may employ professionals to attempt to assure a fair tax burden on the Property, and the cost thereof, as well as any fees, expenses and costs incurred in contesting any assessments, levies or the tax rate applicable to the Property, shall be included in Taxes.  Tenant's "Pro Rata Share" shall

3

equal a fraction, the numerator of which is the rentable square feet of the Premises, and the denominator of which is the aggregate rentable square feet of all retail space in the Property. Tenant shall pay its Pro Rata Share of such increased Taxes semi-annually within 30 days after receipt of an invoice from Landlord.

8.        **Landlord's Work**. Landlord's shall construct a staircase connecting the Existing Premises to the Expansion Premises (the "**Landlord's Work**"). The total cost of Landlord's Work is capped at $250,000.00 (the "**Landlord's Work Cap**"), which shall include, without limitation, the cost of design, permits, and other installation related costs. Any amounts incurred by Landlord over the Landlord's Work Cap shall be paid by Tenant. If Landlord's Work costs less than Landlord's Work Cap, the Tenant Allowance shall be increased by an amount equal to 50% of the amount that the cost of Landlord's Work is less than the Landlord's Work Cap.

9.        **Tenant's Work**.    The Expansion Premises shall be delivered to Tenant on January 1, 2023 (the "**Expansion Premises Delivery Date**"). On the Expansion Premises Delivery Date, Tenant shall perform construction and remodel work relating to the Premises, which is to include, but shall not be limited to, to those items set forth on Schedule 8 attached hereto, and as further detailed in its Approved Plans (as said term is defined below) (the "**Tenant's Work**").    Tenant's Work shall be performed by Tenant at its sole cost and expense, except for the Tenant Allowance as set forth below. Prior to commencing Tenant's Work and in no instance later than 30 days following the date of this Amendment, Tenant shall deliver to Landlord for Landlord's approval not to be unreasonably withheld, a copy of Tenant's proposed plans and specifications (the "**Proposed Plans**") for Tenant's Work at the Premises. If Landlord furnishes Tenant with comments to the Proposed Plans, Tenant will resubmit revised Proposed Plans within 10 days after having received Landlord's comments.  Such review process will continue until the Proposed Plans are acceptable to both Landlord and Tenant (and once approved by Landlord and Tenant such plans may be referred to herein as the "**Approved Plans**"). Tenant shall thereupon diligently perform Tenant's Work in accordance with the Approved Plans, and shall have Tenant's Work completed within 60 days after the Expansion Premises Delivery Date (the "**Expansion Premises Construction Period**").  Upon completion of Tenant's Work, Tenant shall deliver to Landlord the following:

(a)      A final notarized original affidavit of Tenant's general contractor performing Tenant's Work, or Tenant's Vice President of Construction, stating that Tenant's Work has been completed in accordance with the final working drawings and that all subcontractors, laborers, and material suppliers engaged in furnishing materials or rendering services for Tenant's Work have been paid in full.

(b)      A final notarized original, unconditional waiver of lien with respect to Tenant's Work executed by Tenant's general contractor and final notarized original, unconditional waiver of liens executed by each subcontractor, laborer, and material supplier engaged in or supplying materials or services for Tenant's Work in excess of $5,000.00.  All waiver of lien documentation must, in every circumstance, be totally unconditional releases.

4

(c)    As Built drawings of the Premises with Tenant's Work as one hard copy and in digital format on a CD in Autocad and in PDF format

10.    **Tenant Allowance**.  Landlord shall pay to Tenant a tenant allowance in the amount of $125,000.00 (the "**Tenant Allowance**"), which shall be used by Tenant only for those matters described as Tenant's Work pursuant to Schedule 8, attached hereto. So long as Tenant is not in default under this Lease and has otherwise performed its obligations hereunder, the Tenant Allowance shall be disbursed 30 days following the end of the month in which Tenant has (a) completed Tenant's Work; and (b) delivered to Landlord the documents set forth in Section 9 above. Tenant acknowledges and agrees that Landlord's provision of the Tenant Allowance is to allow Tenant to determine the location, quality and design of certain leasehold improvements that Landlord would otherwise install in the Premises at its cost.  The Tenant Allowance is not a loan or advance by Landlord.  No part of the Rent hereunder is included to pay, reimburse or compensate Landlord for the Tenant Finish Allowance.  Rather, the Rent hereunder is the current fair market rental rate for the Premises as agreed to by Landlord and Tenant after arms-length negotiation considering the location and condition of the Premises in relation to other premises generally available in this geographic region.

11.    **Inventory**.    Subject to the terms hereof, Landlord hereby assigns to Tenant all of Landlord's interest in and to all inventory and personal property listed on Schedule 11 attached hereto (the "Inventory"), but without any warranty of title by Landlord or any warranty or representation of any other kind.

12.    **Guaranty**.    By its execution hereof, Guarantor hereby agrees that notwithstanding the amendment and extension of the Lease hereby, the Guaranty remains fully valid and effective and enforceable in accordance with its terms.

13.    **PDF/Counterparts.**  This Amendment may be executed in multiple counterparts, each of which shall constitute an original and all of which taken together shall constitute one and same agreement binding upon the parties, notwithstanding that all the parties are not signatories to the same counterpart. In order to facilitate the finalization of this Amendment, the parties agree that signatures transmitted via e-mail or by docusign in a "PDF" format without notary acknowledgement may be used in place of original signatures on this Amendment.  Each party intends to be bound by such party's e-mail or docusign "PDF" format signature on this Amendment, is aware that the other parties are relying on such party's facsimile or "PDF" format signature, and hereby waives any defenses to the enforcement of this Amendment based upon the form of signature or the lack of a notary acknowledgement.  Promptly following any e-mail transmittal of "PDF" format signatures, the parties shall deliver to the other parties the original executed Amendment by reputable overnight courier to the notice addresses listed herein (it being agreed and understood that the delivery of such original shall not be a condition to the binding nature of the electronic copy of the document).

14.    **Miscellaneous.**    Except as modified by this Amendment, the Lease remains unchanged, valid, and in full force and effect.  In the event of any ambiguity or inconsistency between the terms of the Lease and the terms of this Amendment, the terms of this Amendment shall control.  Captions are included for convenient reference only. This Amendment shall bind and inure to the benefit of the successors and assigns of the parties. Neither party shall be

5

deemed the drafter of this Amendment. This Amendment shall be governed by Kentucky law without regard to conflict of laws principles. To the best of Tenant's knowledge, Landlord is not in breach of, nor in default under, the Lease, and Tenant knows of no event or condition which, with the passage of time or the giving of notice or both, would constitute such a breach or default by Landlord under the Lease.

IN WITNESS WHEREOF, the parties have executed this Amendment as of the Effective Date.



**LANDLORD:**
**NOTL PROPERTY OWNER LLC,**
a Delaware limited liability company

By: _____
      *Tim Perry*
      494BD64CCCAB48B...
Timothy Perry, Vice President


**TENANT:**
**VELOCITY ESPORTS NEWPORT**
**KENTUCKY, LLC,**
a Kentucky limited liability company

By: _____
      *Pat Deane*
      F2E612F688CF4BC...

Name:   Pat Deane
_____

Title:   Chief Financial Officer
_____


**GUARANTOR:**
**VELOCITY ESPORTS, INC.**
a Nevada corporation

By: _____
      *Pat Deane*
      F2E612F688CF4BC...

Name:   Pat Deane
_____

Title:   Chief Financial Officer
_____

6

# EXHIBIT A

## PREMISES DESCRIPTION





SCHEDULE 3

EXCLUSIVES/NOXIOUS USES

**NOXIOUS USES**:

(A)    a second hand or surplus store (except that second-hand retail stores such as "Second Swing", "Play It Again Sports" or other types of tenants that specialize in the sale of specific types or lines of secondhand goods (e.g., used sporting goods or used computer or video games) and are commonly found in a first-class shopping center and retail stores specializing in vintage items or antiques shall be permitted);  (b) a laundry or dry cleaning operation (provided a store that has drop off and pick up dry cleaning only with no dry cleaning operations on site shall be permitted;  (c) mortuary or funeral home; (d) any adult book store or store selling or exhibiting sexually explicit materials (except as incidental to a retail book store and typically sold in a Borders or Barnes and Noble); (e) an auto parts store or gas station; (f) any church, synagogue, mosque, temple or other place of worship;  (g) a marijuana dispensary, "head" shop or any establishment displaying or selling drug paraphernalia; (h) a massage parlor (provided therapeutic massage in connection with an upscale salon or spa such as Massage Envy is permitted), topless bar or club or restaurant which provides striptease or "adult" entertainment;  (i) any dollar store, odd lots, liquidation or close out store or any store selling primarily distressed or damaged merchandise; (j) a temporary placement service; (k) a drug or alcohol recovery or treatment facility; or (l) an abortion clinic, aids clinic or bodily fluid collection facility.


**EXCLUSIVES:**

1.  <u>AMC</u>. A movie theater. The sale of nachos, popcorn, candy, hot dogs, yogurt, soft drinks or lemonade within the Common Area or any premises fronting on the AMC Concession Restriction Area; provided, however, that such restriction shall not apply to sit-down restaurants serving such items for on-premises consumption only. No video arcade or game room within the AMC Concession Restriction Area except as incidental to the primary business operated in such space.

2.  <u>Cold Stone</u>. The retail sale of ice cream, frozen yogurt, frozen desserts or other directly competing products, including but not limited to other ice cream stores, other frozen yogurt stores and ice cream/yogurt vending units whether freestanding or in kiosks; provided nothing herein shall prevent any tenant of the Center from selling such products on an incidental basis.

3.  <u>Five Guys</u>. Quick service burger concept restaurant tenant, such as Steak & Shake, Johnny Rockets, Smashburger, Fatburger, Cheeburger, and In and Out.

4.  <u>Tom + Chee</u>. Retail facility providing primarily grilled cheese sandwiches and grilled cheese donuts.

5.  <u>Brio</u>. A full service, sit-down, upscale Italian restaurant.

6. <u>Bon Mi</u>. A Vietnamese restaurant whose primary business is the sale of Pho, "bahn mi" Vietnamese sandwiches, boba, Milktea or bubble tea. As used herein, "primary business" means that a restaurant derives more than 30% of its Gross Sales from any of the foregoing exclusive items in the singular or in the aggregate.

7. <u>Little Spoon</u>. A tenant whose primary business is a coffee shop. "Primary business" as used herein means a restaurant or shop that derives more than 10% of its annual gross sales from the sale of coffee-based drinks.

8. <u>Colonel de Spices</u>. Landlord shall not hereafter during the initial Term lease any store space in the Shopping Center during the Lease Term to a tenant whose primary business is the retail sale of herbs and spices (a "Competing Use").

9. <u>Sage Yoga</u>. Landlord shall not hereafter lease any store space in the Shopping Center during the Lease Term to a fitness tenant offering yoga, hot yoga or pilates (a "Competing Use").

<u>SCHEDULE 8</u>

TENANT'S WORK

<u>EXPANSION PREMISES</u>
Bathroom remodel / refresh in lower unit
Updated bowling pinsetters, lane resurfacing, and other bowling upgrades
Update lighting
Install new counters
Other cosmetic updates to upscale the appeal
Move social gaming area downstairs

<u>EXISTING PREMISES</u>
Add either an archery range with social lounge and/or expand the existing arcade area including addition of sports simulators

## SCHEDULE 11

## INVENTORY

Personal Property Asset List *

| Back Bar / VIP Lounge |
| --- |
| 4 keg coolers-built ins - 8 towers |
| 2 roll top coolers for cans on wheels |
| 1 custom built liquor shelf |
| 2 misc shelves |
| 1 Stand up Pepsi cooler |
| 1 CO2 set up for whole house - soft drink & beer |
| 14 tables |
| 55 stools |
| 6 couches |
| 4 benches |
| 6 Tufted chairs |
| 3 projectors - 1 very expensive |
| 3 TV's for watching |
| 4 TV's for scoring |
| 2 pepsi ice bins |
| 2 bathrooms 10 stalls |
| 1 ball return |
| 1 walk in beer cooler |
| 1 red bull cooler |
| 150 glasses |
| 1 hand sink |
| 1 triple sink |
| 1 toast comp |

| Patios |
| --- |
| 8 couches |
| 16 lounge chairs |
| 6 end tables |
| 12 umbrella stands |
| 3 plumbed gas fire pits |
| 3 fans |
| 1 tin roof |
| 4 picnic tables |
| 12 adirondack chairs |
| 4 speakers |
| 2 TV's |
| Cushions for all |

| Banquet / Storage Closets |
| --- |
| 10 chafer |
| 18 hot lamps |
| 1 carving set up |
| 3 coat racks |
| 12 misc shelves |
| 1 security system with 10 outdatedcameras |
| 1 entire network comm tower |
| 2 firewalls |
| Misc Holiday deco |
| 6 entire Clover POS set ups |

| Main Lanes / Main Bar / FOH |
| --- |
| 1 keg cooler - on wheels - 8 Towers |
| 2 roll top coolers for cans on wheels |
| 3 built in coolers under bar top |
| 4 custom built liquor shelves |
| 1 ice machine |
| 12 TV's for watching |
| 6 projectors |
| 12 TV's for scoring |
| 1 shufflebord table |
| 2 foosball tables |
| 1 Bocce Court |
| 12 tufted chairs |
| 12 couches |
| 12 benches |
| 6 tables with 24 chairs |
| 70 stools |
| 2 leather couches |
| 1 Air Hockey table |
| 2 bathrooms 5 stalls |
| 15 tables including scooter tables |
| 3 misc shelves |
| 140 bowling balls |
| 400 pairs of shoes |
| 6 ball returns |
| 1 toast comp |
| 2 comps for stelltronic |
| 1 A/V Rack system |
| 28 speakers |
| 4 Sub woofers |
| 8 Black light attraction lights |
| 2 bar top pepsi coolers |
| 1 red bull cooler |
| 400 glasses |
| 1 hand sink |
| 1 triple sink |
| 2 pepsi ice bins |
| 3 a/v hookups |
| 2 toast comps at bar |
| 3 toast handheld devices |

| Back Office |
| --- |
| 3 ops computers |
| 2 stelltronic bowling brain comps |
| 1 safe |
| 6 filing cabinets |
| Misc Office Supplies |
| 6 phones in house |

| Bowling |
| --- |
| 16 complete lanes with all backend functioning |
| Misc parts |
| 350 pins |
| 1 extra bowling set up in case a lane goes down |
| Misc lighting |
| Misc tools |
| 6 extra tray tables |
| 8 extra motors |
| 1 extra chasis |
| 1 outdated lane oiler |
| misc belts |

| Kitchen |
| --- |
| 1 broiler |
| 2 double pizza ovens |
| 1 convection over |
| 1 mixer |
| 1 flat top |
| 3 fryers |
| 2 panini presses |
| 1 microwave |
| 3 wheeled cooler |
| 1 walk in cooler |
| 1 walk in freezer |
| 1 reach-in home deep freezer |
| 1 steam well |
| 4 prep tables |
| 1 leased dish washer |
| 8 misc shelving |
| 5 speed racks |
| 1 hot holding cabinet |
| 6 carts |
| 1 low boy refrugerator under broil/flat top |
| 1200 plates various sizes |
| 1000 various untensils |
| 1 slicer |
| 1 triple sink |
| 3 hand sinks |
| 1 prep sink |
| 8 cutting boards |
| 2 toast comps |

* the following list is an initial assesment of the personal property to be transferred to Velocity Esports; it is therefore not meant to be an ehaustive list of all possible personal property that will transfer; any other personal property not included above but necessary to the ordinary course of business will also be included