STEVEN T. GUBNER – NV Bar No. 4624
JESSICA L. BAGDANOV – CA Bar No. 281020 – Admitted *Pro Hac Vice*
JESSICA S. WELLINGTON – CA Bar No. 324477 – Admitted *Pro Hac Vice*
BG LAW LLP
300 S. 4th Street, Suite 1550
Las Vegas, NV 89101
Telephone: (702) 835-0800
Facsimile: (866) 995-0215
Email: sgubner@bg.law
jbagdanov@bg.law
jwellington@bg.law

Attorneys for Creditor Woodfield Mall LLC

**UNITED STATES BANKRUPTCY COURT**

**DISTRICT OF NEVADA**

In re

Velocity Esports, Inc.,

☐ Affects Velocity Esports, Inc.

☐ Affects Velocity Esports Las Vegas Town Square, LLC

☐ Affects Velocity Esports Chicago Schaumburg, LLC

☐ Affects Velocity Esports Newport Kentucky, LLC

☐ Affects Velocity Esports Orlando Downtown, LLC

☒ Affects All Debtors

Debtor(s).

Case No. 25-12627-mkn

Jointly Administered with
Case No. 25-12628-mkn
Case No. 25-12629-mkn
Case No. 25-12630-mkn
Case No. 25-12631-mkn

Chapter 11

**OBJECTION TO JOINT CHAPTER 11 PLAN OF REORGANIZATION #2**

Date: September 15, 2026
Time: 9:30 a.m.

Creditor Woodfield Mall LLC ("Woodfield") hereby submits its objection (the "Objection") to the *Joint Chapter 11 Plan of Reorganization #2* (the "Plan") [ECF No. 284] filed by Velocity Esports, Inc., Velocity Esports Las Vegas Town Square, LLC, Velocity Esports Chicago Schaumburg, LLC, Velocity Esports Newport Kentucky, LLC, and Velocity Esports Orlando Downtown, LLC (collectively, the "Debtors"). In support of the Objection, Woodfield respectfully represents as follows:

## THE OBJECTION

For the reasons set forth below, the Plan fails to satisfy the requirements of 11 U.S.C. §§1129(a) and (b) and cannot be confirmed. Among other things: (a) the Plan is not feasible because it depends on non-binding guarantor contributions and a single operating entity with insufficient liquidity to support the Debtors' ongoing business operations; (b) the Plan improperly treats Woodfield's Class 6 claim and does not satisfy the best interests of creditors test; (c) the Plan blatantly violates the absolute priority rule and otherwise does not meet cramdown requirements; (d) the Plan unfairly discriminates among similarly situated unsecured creditors; and (e) the Plan was not proposed in good faith. Accordingly, the Court should deny confirmation of the Plan.

## I. RELEVANT BACKGROUND

1. On May 7, 2025 (the "Petition Date"), the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code commencing their jointly administered Chapter 11 cases.

2. Woodfield's claim arises from a lease dated April 4, 2022, between Woodfield, as landlord, and Velocity Esports Chicago Schaumburg, LLC ("Velocity Chicago"), as tenant, for approximately 15,360 square feet of retail space at Woodfield Mall in Schaumburg, Illinois (the "Lease"). The Lease term commenced June 1, 2023, and was set to expire November 30, 2035.

3. The Lease was secured by personal guaranties (the "Guaranties") from Philip Kaplan and Leonard Wanger (together, the "Guarantors"), each guaranteeing obligations up to $1,500,000.

4. Prepetition, Velocity Chicago defaulted under the Lease. Neither Velocity Chicago nor the Guarantors cured the default prior to the Debtors' chapter 11 filings

5. The Lease is deemed rejected pursuant to 11 U.S.C. § 365(d)(4).

6. On September 4, 2025, Woodfield timely filed Proof of Claim No. 4 (the "Claim") in Velocity Chicago's Chapter 11 case. The Claim details that over $7 million is due and owing under the Lease for reserved rent and over $72,000 for unpaid rent as of the Petition Date. Pursuant to 11 U.S.C. § 502(b)(6), Woodfield's damages as to Velocity Chicago are capped at 15%[1] of the reserved rent under the Lease plus unpaid rent. Thus, the Claim asserts a general unsecured claim in the amount of $1,135,053.73, consisting of $1,062,180.06 under the Section 502(b)(6) lease rejection damages cap, plus $72,873.67 in unpaid prepetition rent. Woodfield's ballot estimates its claim for voting purposes in the full amount of $1,135,053.73.

7. On March 3, 2026, the Debtors filed a complaint against Woodfield commencing Adversary Proceeding No. 26-01031 (the "Adversary Proceeding"), seeking to enjoin Woodfield's guarantor enforcement efforts and to disallow or reduce the Claim. On June 15, 2026, the Court entered an order in the Adversary Proceeding denying the Debtors' motion for a temporary restraining order and preliminary injunction against Woodfield [Adv. ECF No. 42]. On August 17, 2026, Woodfield timely filed its answer to the complaint [Adv. ECF No. 53].

8. On May 28, 2026, the Debtors filed the Plan [ECF No. 284], and on July 8, 2026, the Debtors filed the Disclosure Statement [ECF No. 294].

9. On July 10, 2026, the Court entered an order that, among other things, conditionally approved the Disclosure Statement, approved solicitation procedures, set a voting deadline, and set a combined hearing on the final approval of the Disclosure Statement and confirmation of the Plan for September 15, 2026 [ECF No. 297].

10. Under the Plan, the Claim is classified in Class 6 and proposed to be paid in full in equal quarterly installments over 20 years, with simple interest at the 20-year Treasury rate. However, no payment stream commences until the applicable Class 6 Claim becomes "Allowed" after resolution of all debtor-controlled objection and reduction procedures. Plan § 3.8.2.

11. Class 8 (General Unsecured Claims) receives no distribution. Plan § 3.10.2. Class 9 (Equity Interests) ostensibly receives nothing, but the Newport Master Investment and Purchase

[1] Or one year's rent, whichever is greater. 11 U.S.C. § 502(b)(6).

Agreement (the "Newport MIPA") contemplates the transfer of membership interests in Velocity Esports Newport Kentucky, LLC ("Velocity Newport") to a "Purchaser" or "Insider Bid Party." Plan § 3.11.2.

12. Plan feasibility is materially dependent on $729,557.00 in Non-Debtor Guarantor Contributions from Mr. Kaplan and Mr. Wanger. However, these contributions are expressly not binding conditions to confirmation. Plan § 4.1.4. In fact, the Debtors' own projections reveal a deficit of approximately $287,770.13 in the initial 13-week period if guarantor support is not funded. ECF No. 294, p. 24.

## II. ARGUMENT

A plan of reorganization will only be confirmed if it satisfies the requirements identified in Sections 1129(a)(1)-(16), unless Section 1129(b)(1) applies. Section 1129(a) of the Bankruptcy Code provides that the Court shall confirm a plan only if the requirements of that section are met. Section 1129(a) sets forth, in sixteen (16) separate paragraphs, the requirements that must be complied with before a plan of reorganization can be confirmed. As set forth below, the Plan fails to satisfy many of these requirements, and therefore, cannot be confirmed.

### A. The Debtors Have Not Met Their Burden to Establish Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires as a condition of confirmation that the court find that: "confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan." "To establish feasibility, the debtor must present proof through reasonable projections, which are not speculative, conjectural or unrealistic, that there will be sufficient cash flow to fund the plan and maintain operations." *In re Quigley Co., Inc.*, 437 B.R. 102, 142 (Bankr. S.D.N.Y. 2010) (quoting *In re Leslie Fay Companies, Inc.*, 207 B.R. 764, 789 (Bankr. S.D.N.Y. 1997)). The Debtors bear the burden of proving that the Plan is feasible. *Pizza of Haw., Inc. v. Shakey's, Inc. (In re Pizza of Haw., Inc.)*, 761 F.2d 1374, 1382 (9th Cir. 1985).

In the Ninth Circuit, feasibility requires that the plan proponent demonstrate a "reasonable probability of success." *Acequia, Inc. v. Clinton (In re Acequia, Inc.)*, 787 F.2d 1352, 1364 (9th Cir. 1986). The purpose of this requirement "is to prevent confirmation of visionary schemes which

promise creditors and equity security holders more under a proposed plan than the debtor can possibly attain after confirmation." *In re Pizza of Haw., Inc.*, 761 F.2d at 1382. Although guaranteed success is not required, "a plan based on impractical or visionary expectations cannot be confirmed. . . . All that is required is that there be reasonable assurance of commercial viability." *In re WCI Cable, Inc.*, 282 B.R. 457, 486 (Bankr. D. Or. 2002) (quoting *In re The Prudential Energy Co.,* 58 B.R. 857, 862 (Bankr.S.D.N.Y.1986)). *See also Wells Fargo Bank, N.A. v. Loop 76, LLC (In re Loop 76, LLC)*, 465 B.R. 525, 544 (9th Cir. BAP 2012) ("The proposed plan must not be a 'visionary scheme which promises more than the debtor can deliver.'"); *In re Sagewood Manor Assoc. Ltd. P'ship*, 223 B.R. 756, 762–63 (Bankr. D. Nev. 1998) (same).

The Plan is fatally flawed because it is materially dependent on $729,557.00 in Non-Debtor Guarantors' Plan Contributions from the Guarantors, yet Plan § 1.1.46 expressly defines those contributions as "***voluntary*** Plan funding contributions only." (Emphasis added). The definition further provides that they "are not conditioned upon any release, discharge, injunction, stay, or limitation of creditor rights against any Non-Debtor Guarantor." Thus, the Plan provides no enforceable commitment that the funding will be available, and offers no alternative source of funding if it is not. Plan § 4.1.4 itself concedes the vulnerability of this mechanism in stating that "the Debtors' ability to implement the treatment of Class 6 and to consummate the transactions contemplated by the Plan may be materially impaired by collection activity, asset restraints, garnishments, or other enforcement efforts directed at Philip N. Kaplan or Leonard R. Wanger by holders of Class 6 Claims or by persons seeking to recover on account of the same underlying lease obligations." The same provision nevertheless says that confirmation is not conditioned upon receipt of any fixed minimum dollar amount of contributions, while acknowledging that the Guarantors' cooperation, liquidity, transaction support, and potential funding are not immaterial to feasibility or consummation. The Debtors' own projections reveal an almost immediate shortage of approximately $287,770.13 if guarantor support is not funded. ECF No. 294, p. 24. In other words, the Plan most certainly depends upon the guarantor support to have a chance of success post-confirmation, which support is neither guaranteed nor required under the Plan.

Moreover, the Debtors have offered no evidence that the Guarantors can actually afford to make $729,557.00 in contributions. Neither Guarantor has even submitted a declaration establishing the ability or willingness to do so. A plan that so materially depends on voluntary, non-binding contributions from third parties whose financial capacity is unproven cannot establish the "reasonable probability of success" required under Ninth Circuit law.

The Plan's feasibility further depends on closing of the Newport MIPA,[2] which remains subject to multiple conditions precedent under Plan § 9.2.5, including entry of any required Sale Order, resolution of NOTL Resolution Documents and any NOTL Resolution Order, equipment-obligation treatment, liquor-license or other regulatory arrangements, and any other transaction condition designated by the Debtors. Until those conditions are satisfied or waived, the Newport MIPA cannot close. The Plan provides no backstop funding mechanism or identified, enforceable reserve to fund Class 6 payments if the Newport MIPA fails to close. Although Plan § 9.2.4 refers generally to sufficient Cash and other assets being set aside for required distributions, the Plan identifies no amount, source, or binding commitment for a reserve that would cover the twenty-year Class 6 payment stream if the Newport transaction fails. A plan premised on a contingent transaction, without a funded alternative if it fails, is the very definition of a "visionary scheme" that § 1129(a)(11) was designed to prevent.

Moreover, Velocity Newport is not one of several viable operating venues; it is the Debtors' sole remaining operating venue expected to generate operating receipts during implementation. The Debtors have already failed at multiple venues (Las Vegas Town Square, Chicago Schaumburg, and Orlando Downtown) and now rely solely on Newport, Kentucky. The Disclosure Statement supplies no long-term revenue projections or historical operating data that would support assuming Velocity Newport can fund a twenty-year payment stream. A single-venue revenue model magnifies every operational, landlord, regulatory, and market risk: if Velocity Newport fails to close, underperforms, or ceases operations, there is no identified operating substitute or reserve to fund Class 6 payments. This is particularly fatal where the Plan contemplates a twenty-year payment period.

[2] Setting aside the absolute priority rule issue with this entire anticipated transaction, which discussion is separately set forth *infra*.

Accordingly, the Debtors have not met their burden under the feasibility analysis to prove a reasonable probability of success. The Plan's reliance on uncommitted guarantor funding, an un-closed (and otherwise problematic) Velocity Newport transaction, and a single venue with no funded fallback is not supported by realistic assumptions or evidence, and confirmation would create the very risk of liquidation or further financial reorganization that § 1129(a)(11) forbids.

**B. The Plan is Not in the Best Interests of Creditors**

"Section 1129(a)(7)(A)(ii) requires bankruptcy courts to determine what creditors would receive under a hypothetical chapter 7 liquidation, and then compare that amount to what the same creditors would receive under a chapter 11 reorganization." *Schoenmann v. Bank of the West (In re Tenderloin Health)*, 849 F.3d 1231, 1237 (9th Cir. 2017); *see also Todeschi v. Juarez (In re Juarez)*, 603 B.R. 610 (9th Cir. BAP 2019) (same).

The Plan fails the best interests test because the "property" promised to Class 6 creditors is speculative in amount, timing, and source. Plan § 3.8.2.3 provides that no payment stream shall be fixed, commence, or become due until the applicable Class 6 Claim becomes "Allowed" after all required reductions, offsets, credits, and non-Debtor recoveries. The Debtors and Reorganized Debtors retain the exclusive right to object to, estimate, reconcile, limit, compromise, settle, reduce, or otherwise contest Class 6 Claims, including through guarantor payments and garnishment proceeds. Plan §§ 3.8.2.2, 7.1, 7.1.1. Because the Debtors control the allowance process, the "Allowed" condition grants the Debtors unilateral ability to postpone the commencement of payments. It also allows the Debtors to reduce the amount ultimately paid by invoking claim objections, § 502(b)(6), estimation, mitigation, security-deposit credits, guarantor payments, garnishment proceeds, and other theories. The result is not a fixed payment right, but a debtor-controlled process that makes Class 6 recovery and its present value speculative.

The hypothetical Chapter 7 comparison actually reflects that liquidation is better than the reorganization proposed . In a Chapter 7 liquidation, Woodfield would retain unfettered rights to pursue the Guarantors for up to an aggregate $3,000,000—two $1,500,000 guaranties—without any Plan-imposed dollar-for-dollar offset, subject to applicable law and the terms of the Guaranties. Section 524(e) of the Bankruptcy Code preserves the liability of any other entity on, and property of

any other entity for, a discharged debt; a debtor's discharge does not eliminate or diminish the Guarantors' independent obligations. Yet Plan § 3.8.2.5 would reduce Woodfield's Class 6 distribution dollar-for-dollar by guarantor recoveries, while the Plan § 3.8.2.7 disclaims any release or injunction of those same guarantor liabilities. That offset mechanism effectively circumvents the protection preserved by § 524(e). A speculative twenty-year payment stream, subject to debtor-controlled allowance and reduction procedures, is worth materially less in present-value terms than immediate Chapter 7 liquidation proceeds coupled with unrestricted guarantor enforcement. The Plan therefore cannot provide Woodfield with property of a value at least equal to the recovery available in a hypothetical Chapter 7 liquidation, and fails the liquidation analysis.

Moreover, the Debtors' liquidation analysis may understate available value by failing to adequately account for potential avoidance actions under 11 U.S.C. §§ 544, 547, 548, and 550 that a Chapter 7 trustee could pursue. *Tenderloin Health*, 849 F.3d at 1237–1241 (explaining that courts may consider hypothetical avoidance actions within a hypothetical chapter 7 liquidation).

Accordingly, the Debtors have not met their burden to prove that Woodfield would receive under the Plan at least what it would receive in a hypothetical Chapter 7 liquidation, including the value of its preserved guarantor rights, and the Plan cannot be confirmed.

**C. The Plan is Not Fair and Equitable**

If any impaired class rejects the Plan, the Debtors may seek confirmation under § 1129(b)'s "cramdown" provisions. A plan is "fair and equitable" with respect to a dissenting class of unsecured claims only if: (i) each holder receives property of a value equal to the allowed amount of such claim; or (ii) "the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property." 11 U.S.C. § 1129(b)(2)(B). This is the absolute priority rule. *Zachary v. Cal. Bank & Trust*, 811 F.3d 1191, 1194 (9th Cir. 2016) (quoting *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 202 (1988)) ("The rule 'provides that a dissenting class of unsecured creditors must be provided for in full before any junior class can receive or retain any property under a reorganization plan.'").

Under the "new value exception," junior interest holders may receive a distribution if they offer value that is: (1) new; (2) substantial; (3) money or money's worth; (4) necessary for a

successful reorganization; and (5) reasonably equivalent to the value or interest received. *In re Bonner Mall P'ship*, 2 F.3d 899, 908 (9th Cir. 1993), *abrogated on other grounds by Bullard v. Blue Hills Bank*, 575 U.S. 496, 135 S.Ct. 1686, 191 L.Ed.2d 621 (2015); *Liberty Nat'l Enters. v. Ambanc La Mesa Ltd. P'ship (In re Ambanc La Mesa Ltd. P'ship)*, 115 F.3d 650, 654 (9th Cir. 1997). *Bank of Am. Nat. Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434 (1999) further requires meaningful competitive bidding or market exposure when equity holders retain interests under a claimed new value exception, so the market—not an insider bargain—can test whether the value contributed is reasonably equivalent to the interest retained.

The Plan requires cramdown because Classes 7, 8, and 9 are deemed to reject the Plan. Plan §§ 3.9.3, 3.10.5, 3.11.3. As such, the Debtors must satisfy the requirements of § 1129(b)(2)(B) with respect to each rejecting class of unsecured claims.

The Plan violates the absolute priority rule because the Newport MIPA contemplates the transfer of membership interests in Velocity Newport to insiders or an "Insider Bid Party." Plan § 3.11.2. The Plan's characterization of this transfer as outside the Plan does not change its substance: a membership interest in the sole operating venue is property retained or transferred for the benefit of equity holders or an insider bidder while unsecured creditors remain unpaid. Under *LaSalle*, when equity holders retain interests through the new value exception, the opportunity must be exposed to competitive bidding or a market process. 526 U.S. at 458. Here, the Newport MIPA transfer to an "Insider Bid Party" occurs without any identified competitive bidding process, auction, or other market exposure. The proposed insider transfer therefore violates *LaSalle* and deprives the Court of evidence needed to determine whether the consideration is reasonably equivalent to the interest transferred, while Woodfield and other unsecured creditors in Classes 6 and 8 are not paid in full.

Further, the non-binding guarantor contributions cannot supply a new-value exception. To qualify, value must be actually provided, not merely promised on a non-binding basis. The Plan itself labels the contributions voluntary Plan funding only, and § 4.1.4 makes confirmation independent of receipt of any fixed minimum amount. The contributions here are: (i) not "new" because they arise from prepetition guaranty obligations; (ii) not "substantial" because they are non-

binding and speculative; (iii) not "money or money's worth" because they are contingent promises rather than actual capital contributions; (iv) not "necessary for a successful reorganization" because the Plan disclaims them as conditions to confirmation; and (v) not "reasonably equivalent" to the equity interests retained. The Debtors cannot rely on the same voluntary and uncommitted funding both to establish feasibility and to justify insider retention of property.

Moreover, Class 6 does not receive the full present value of its claims. The Plan provides for payment over twenty years at simple interest calculated at the bare 20-year Treasury rate, without any risk premium to account for the substantial default risk inherent in the payment structure. Under *Till v. SCS Credit Corp.*, 541 U.S. 465, 478–81 (2004), the appropriate interest rate must include a risk adjustment above the risk-free rate. Here, the risk premium must account for: (i) the twenty-year payment horizon; (ii) single-venue revenue dependency; (iii) the non-binding nature of the Guarantors' contributions; and (iv) the Debtors' prepetition default history. Given the cumulative effect of these risks, an interest rate with a risk premium of at least three percentage points—and reasonably five percentage points—above the applicable Treasury rate would be appropriate. The Plan's use of the bare Treasury rate materially undervalues the deferred recovery and means that Class 6 creditors do not receive "property of a value" equal to the allowed amount of their claims, as required by § 1129(b)(2)(B)(i). *See In re Ambanc La Mesa*, 115 F.3d at 654.

Based on the foregoing, Woodfield respectfully submits that the Plan is not fair and equitable, and therefore cannot be confirmed.

**D. The Plan Unfairly Discriminates**

Section 1129(b)(1) requires that a cramdown plan "does not discriminate unfairly" with respect to each impaired, non-accepting class. The Plan separately classifies Woodfield's claim in Class 6 ("Legacy Landlord Lease Claims") apart from Class 8 ("General Unsecured Claims"). Under Plan §§ 3.8.1 and 3.10.1, both classes consist of general unsecured claims arising from prepetition obligations. Yet their treatment is starkly disparate: Class 6 receives payment over twenty years, subject to allowance and reduction procedures, while Class 8 receives nothing. The Plan identifies no reasonable basis for this disparity.

"Bankruptcy law does not mandate that all substantially similar claims be classified together, provided that there is a reasonable basis for not doing so." *In re Islet Scis., Inc.*, 640 B.R. 425, 465 (Bankr. D. Nev. 2022). Here, the Plan fails to identify a reasonable basis for the disparate treatment and the extreme result of a twenty-year conditional recovery for Class 6 while Class 8 receives nothing.

Section 1122(a) requires that claims within a class be "substantially similar" to each other, but does not authorize separate classification of substantially similar claims solely to manipulate voting or to permit different treatment that advances the Debtors' interests. *See In re Barakat*, 99 F.3d 1520, 1525 (9th Cir. 1996); *In re Tucson Self-Storage, Inc.*, 166 B.R. 892, 896–99 (9th Cir. BAP 1994). *In re Greystone III Joint Venture*, 995 F.2d 1274, 1279 (5th Cir. 1993), holds that a plan may not use classification to gerrymander acceptance or circumvent the Bankruptcy Code's substantive requirements. The separate classification of Class 6 appears designed to isolate the largest unsecured creditors rather than to reflect any legitimate difference in the legal nature or priority of the underlying claims.

Class 6 claims and Class 8 claims are substantially similar because both are general unsecured claims arising from prepetition obligations. Neither class has a legally superior priority, collateral position, or other status that justifies the disparate treatment. The only practical distinction is that Class 6 contains the Debtors' largest legacy landlord creditors—the creditors most likely to object—while Class 8 contains the remaining general unsecured creditors. Isolating the largest likely objectors in a class that can be delayed for twenty years, while smaller creditors receive nothing and have little practical incentive to object, is classic gerrymandering and violates § 1122(a).

The Plan's classification has no reasonable basis, is not necessary to carry out the Plan, is not proposed in good faith, and produces an extreme degree of discrimination between substantially similar unsecured claims. Accordingly, the separate classification and disparate treatment of Class 6 and Class 8 constitute unfair discrimination under § 1129(b)(1), and the Plan cannot be confirmed.

**E. The Plan Was Not Proposed in Good Faith**

Good faith under § 1129(a)(3) is assessed "under the totality of the circumstances" and "requires that a plan will achieve a result consistent with the objectives and purposes of the Code."

*In re Stolrow's, Inc.*, 84 B.R. 167, 172 (9th Cir. BAP 1988) (citing *In re Jorgensen*, 66 B.R. 104, 108–09 (9th Cir. BAP 1986)). Good faith also "requires a fundamental fairness in dealing with one's creditors." *Stolrow's*, 84 B.R. at 172. "In its most basic sense, 'good faith' means honesty in purpose, faithfulness to one's duty or obligation, observance of concepts of fair dealing, and the absence of intent to defraud or to seek unconscionable advantage." *In re Linda Vista Cinemas, L.L.C.*, 442 B.R. 724, 735 (Bankr. D. Ariz. 2010).

As the prior sections illustrate, this Plan was not proposed in good faith. It is structured to delay and reduce Class 6 recovery through interlocking mechanisms: (i) conditional payment that commences only upon "Allowance" of the claim; (ii) exclusive debtor control over the allowance process through reserved objection rights; and (iii) a twenty-year payment schedule that only begins running after all challenges are resolved. Plan §§ 3.8.2.1–3.8.2.3. Viewed together, these provisions suppress creditor recovery rather than reorganize the Debtors' business: they defer payment, permit the Debtors to reduce the claim through debtor-controlled proceedings, and preserve the benefit of any delay for the Debtors and their insiders. That structure is the antithesis of the fundamental fairness required by § 1129(a)(3).

The Debtors' insiders retain structural control and stand to benefit from the Newport MIPA, which contemplates the transfer of membership interests in Velocity Newport to a "Purchaser" or "Insider Bid Party," while Class 8 general unsecured creditors receive no distribution under Plan § 3.10.2 and Class 6 creditors face twenty years of conditional, speculative payments. Plan §§ 3.10.2, 3.11.2. Section 3.11.2 further declares that an Insider Bid Party transfer "shall not constitute a distribution or retention of property under the Plan on account of any prepetition Equity Interest." That is a legal conclusion concerning the nature and effect of the transfer; it is for the Court to decide under the Bankruptcy Code, not for the plan proponent to predetermine by drafting. Treating an insider's receipt of the Newport membership interests as outside the Plan cannot evade the absolute-priority and good-faith requirements, yet that is how this Plan is structured.

The Debtors' bad faith is further evidenced by Plan § 3.8.2.5. This Court already denied the Debtors' motion for a temporary restraining order and preliminary injunction against Woodfield in Adv. ECF No. 42, rejecting the Debtors' attempt to deter Woodfield's guarantor enforcement

through direct injunctive relief. The Plan now attempts to accomplish indirectly, through a dollar-for-dollar offset, what the Debtors could not obtain directly: a *de facto* stay on guarantor collection, without the procedural safeguards ordinarily required for relief under § 105(a) and *Celotex Corp. v. Edwards*, 514 U.S. 300 (1995), including separate notice and hearing. The provision penalizes Class 6 creditors for exercising independent rights against the Guarantors by reducing their Plan distribution by the amount recovered. The Plan simultaneously disclaims any release, discharge, or injunction of guarantor liability in Plan § 3.8.2.7, making the economic penalty internally contradictory and fundamentally unfair. A plan proponent cannot obtain through plan drafting a collection restraint that the Court previously declined to impose through an appropriate motion.

Based on the totality of the circumstances, it does not appear that the Debtors have proposed the Plan in good faith as required by § 1129(a)(3).

## III. RESERVATION OF RIGHTS

Woodfield expressly reserves its right to supplement this Objection and to make such other and further objections as it may deem necessary or appropriate.

## IV. CONSENT TO ENTRY OF FINAL ORDERS OR JUDGMENT

Pursuant to Local Rule 7012, Woodfield consents to entry of final orders or judgment by the Court if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgment consistent with Article III of the United States Constitution.

## V. CONCLUSION

For the foregoing reasons, Woodfield respectfully requests that this Court deny confirmation of the Plan. Woodfield prays for relief in accordance with the foregoing, and for such other and further relief that the Court may deem just and proper under the circumstances.

DATED: August 19, 2026

BG LAW LLP

By:______________________________
Jessica L. Bagdanov
Jessica S. Wellington
Attorneys for Defendant Woodfield Mall LLC